# In the Matter of:

*Ashley Moreaux and Chris Moreaux*

*vs.*

*Clear Blue Insurance Company, Tim Ables Trucking Company, LLC, Shannon Watson and Kevin Posey*

_____

## Huma Haider, M.D.

January 11, 2021

_____

EXHIBIT

C

**Huma Haider, M.D.**
**January 11, 2021**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION


ASHLEY MOREAUX AND
CHRIS MOREAUX                    NO. 2:18-CV-1255

       Plaintiffs

V.                               JUDGE CAIN


CLEAR BLUE INSURANCE
COMPANY, TIM ABLES
TRUCKING COMPANY, LLC,    MAGISTRATE JUDGE KAY
SHANNON WATSON AND
KEVIN POSEY


* * * * * * * * * * * * * * * * * * * * * * * *












Fully Remote Videoconference

Deposition of HUMA HAIDER, M.D., taken on

Monday, January 11, 2021, commencing at

10:00 a.m. CST.

Huma Haider, M.D.
January 11, 2021

Page 2

1                    INDEX

2                                        PAGE

3   Caption.......................................1

4   Appearances...................................3

5   Agreement of Counsel..........................4

6                  EXAMINATION

7

8   MS. VERLANDER.................................5

9

    Reporter's Certificate.....................174

10

11

                    *   *   *   *   *

12

               EXHIBIT INDEX

13                                        PAGE

14  Exhibit 1 - Curriculum Vitae originally
       sent to Defense Council              65
15
    Exhibit 2 - Updated Curriculum Vitae     84
16
    Exhibit 3 - Testimony List               84
17
    Exhibit 4 - Initial Comprehensive
18     Evaluation for Ashley Moreaux         96

19  Exhibit 5 - Diagram, "Neuromembrane
       Events in TBI"                       134
20
    Exhibit 6 - Future Medical Report       137
21
    Exhibit 7 - 8/13/20 telemedicine
22     visit report                         145

23  Exhibit 8 - 1/10/21 note by Dr. Haider
       regarding telephone call with
24     Ms. Moreaux                          148

25

**Huma Haider, M.D.**
**January 11, 2021**

```
 1                    APPEARANCES
 2
    REPRESENTING ASHLEY MOREAUX AND CHRIS MOREAUX:
 3
        VERON, BICE, PALERMO & WILSON, LLC
 4      J. Rock Palermo, III, Esq.
        Jere Jay Bice, Esq.
 5      721 Kirby Street
        P.O. Box 2125
 6      Lake Charles, Louisiana  70602-2125
        rock@veronbice.com
 7      jay@veronbice.com
 8  REPRESENTING HALLMARK SPECIALTY INSURANCE
    COMPANY:
 9
        DEUTSCH KERRIGAN, LLP
10      Robert E. Kerrigan, Jr., Esq.
        Denia S. Aiyegbusi, Esq.
11      755 Magazine Street
        New Orleans, Louisana  70130
12      rek@deutschkerrigan.com
        denia@deutschkerrigan.com
13
    REPRESENTING JAMES RIVER INSURANCE COMPANY:
14
        TAYLOR, WELLONS, POLITZ & DUHE
15      Paul J. Verlander, Esq.
        1515 Poydras Street
16      Suite 1900
        New Orleans, Louisiana  70112
17      pverlander@twpdlaw.com
18  REPRESENTING NATIONAL BRAIN INJURY INSTITUTE
    and HUMA HAIDER, M.D.:
19
        CHAMBERLAIN HRDLICKA
20      Michael Feibus, Esq.
        1200 Smith Street
21      Suite 1400
        Houston, Texas  77002-4310
22      Michael.Feibus@chamberlainlaw.com
23
    Reported By:
24
        Michelle Cossé
25      Certified Court Reporter
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 4

```
 1                    S T I P U L A T I O N S
 2
 3              It is stipulated by and among
 4   Counsel that the deposition of DR. HUMA HAIDER
 5   is being taken under the Louisiana Code of
 6   Civil Procedure for all purposes permitted
 7   under the law.
 8              The formalities of reading and
 9   signing are not waived.
10              The formalities of sealing,
11   certification and filing are hereby waived.
12   The party responsible for services of the
13   discovery material shall retain the original.
14              All objections, except those as to
15   the form of the questions and/or the
16   responsiveness of the answers, are reserved
17   until the time of the trial of this cause.
18
19                    *   *   *   *   *
20
21              Michelle Cossé, Certified Court
22   Reporter, in and for the State of Louisiana,
23   officiated in administering the oath to the
24   witness.
25
```

Huma Haider, M.D.
January 11, 2021

Page 5

```
 1           DEPOSITION OF HUMA HAIDER, M.D.

 2              THE COURT REPORTER:

 3                  Do all Counsel agree to allow

 4              me to swear the deponent in

 5              remotely?

 6           MS. AIYEGBUSI:

 7                  Yes.

 8           MR. FEIBUS:

 9                  Yes.

10           MR. BICE:

11                  Yes.

12           MR. VERLANDER:

13                  Yes.  That's fine.

14   (Whereupon, the court reporter administers the

15           oath upon the deponent.)

16           Huma Haider, M.D., National Brain

17   Injury Institute, 6065 Hillcroft Street, Suite

18   202, Houston, Texas, 77081, after having been

19   first duly sworn, testified on her oath as

20   follows:

21                  EXAMINATION

22      Q.      Good morning, Dr. Haider.  My name

23   is  Paul Verlander.  I represent James River,

24   which is one of the insurers that is named in

25   this suit relating to Ashley Moreaux, for whom
```

Huma Haider, M.D.
January 11, 2021

```
 1    you and NBII have provided certain services.

 2    And so that is what we're here to talk about

 3    today.

 4         A.        Thank you.

 5         Q.        Is that your understanding, also?

 6         A.        Yes.

 7         Q.        Sorry on the fact that I'm not

 8    visible to you by video. As I said before we

 9    started,  Zoom opines that it does not detect

10    a camera on my computer.

11         A.        That's okay.  No problem.

12         Q.        Let's talk, first of all, about

13    your background.

14                   First of all, you've given

15    depositions before; correct?

16         A.        Yes, I have.

17         Q.        And you're here with your personal

18    counsel today.  Is that NBII's counsel or is

19    that your, Dr. Haider's counsel, or both?

20         A.        It's NBII's counsel.

21         Q.        Okay.  And so you do -- a

22    significant part of your practice is patients

23    who are involved in litigation; that's true,

24    isn't it?

25         A.        I don't know when the patients come
```

Huma Haider, M.D.
January 11, 2021

1   for treatment whether they are involved in

2   litigation or not.  So the patients are coming

3   through many different sources, but when I am

4   deposed for a deposition, then at that time I

5   know that the patients are involved in a

6   litigation process.

7       Q.      Okay.  Well, we'll get to the

8   timing of when you become aware of that, I

9   guess, a little later.

10              Right now I'm asking:  Is a

11  significant portion of your practice

12  litigation-related patients?

13      A.      As I said earlier, the patients

14  that are being referred to us, they come from

15  many different sources.  And when I'm seeing

16  the patients, I do not see or know what the

17  patients -- what source the patients are

18  coming there for.

19      Q.      Okay.  But what you said earlier

20  also indicated that at some point during the

21  process of the services that you provide, you

22  do become aware of whether they're

23  litigation-related patients; true?

24      A.      Yes.  When I get subpoenas for a

25  deposition, or if I'm reviewing some medical

Huma Haider, M.D.
January 11, 2021

Page 8

```
 1   records, if there is any indication in the

 2   medical record that the patient is going

 3   through a litigation process, then at that

 4   time I may become aware of it.

 5        Q.      Okay.  And if you know, what

 6   percentage of your patients are

 7   litigation-related patients?

 8        A.      I will not be able to give you

 9   numbers of that.

10        Q.      More than half?

11        A.      As I said, I only become aware of

12   the patient's litigation status when I am

13   preparing for a deposition or when I get a

14   subpoena.

15        Q.      Yes, ma'am.  You've said that

16   several times, but I'm asking whenever you

17   become aware -- I don't care when you become

18   aware, right now, anyway.

19            I'm asking:  Do you know what

20   percentage of your patients are

21   litigation-related?  Whether you learn that at

22   the very outset, or you learn that during the

23   course of care, or you learn that when you get

24   a subpoena, what percentage of your patients

25   are litigation-related patients?
```

Huma Haider, M.D.
January 11, 2021

Page 9

```
 1     A.      I would not be able to give you a
 2  number for that.
 3     Q.      Is it more than half of your
 4  patients?
 5     A.      As I said, I would not be able to
 6  give you a number for that.
 7     Q.      So I understand when you say that
 8  you can't give me an exact number.  I'm
 9  asking:  You can't tell me whether it's 1
10  percent or 99 percent or anywhere in between?
11     A.      As I said, I am unable to give you
12  a percentage of it.  I don't know of it.
13     Q.      Okay.  And not even an estimate of
14  whether it's closer to 1 percent or closer to
15  90 percent; no idea?
16     A.      I would be speculating.
17     Q.      Okay.  How many depositions have
18  you given in the last year for patients that
19  are involved in litigation?
20     A.      Maybe 15 or 20.
21     Q.      Okay.  And in the case of
22  Ms. Moreaux, who contacted you first:
23  Ms. Moreaux or her attorney?
24     A.      Ms. Moreaux was on my schedule, so
25  that's how I made contact with her.
```

**Huma Haider, M.D.**
**January 11, 2021**

 1      Q.      Okay.  And who put her on your

 2   schedule?

 3      A.      I do not know.

 4      Q.      Do you have employees that handle

 5   that sort of thing?

 6      A.      So there is a back office who

 7   receive the referrals, and then they put the

 8   referrals on the calendar for the patients to

 9   be seen by the providers.

10      Q.      And so do those people, when they

11   make that schedule, record from whom the

12   contact came or from whom the referral came?

13      A.      Yes.  They will be getting the

14   referrals, whether via phone, whether through

15   referral forms submitted to the back office,

16   and then they will be contacting the patients,

17   scheduling the patients, and putting the

18   patients on the schedule.

19      Q.      Okay.  And in the case of

20   Ms. Moreaux, you don't know -- even though

21   there are forms, you don't know the route by

22   which she came to consult NBII?

23      A.      I have not seen those forms.

24      Q.      Okay.  That's a different question.

25              My question was:  Do you know the

Huma Haider, M.D.
January 11, 2021

```
 1   route by which Ms. Moreaux came to see NBII?

 2        A.      As I said, no, I don't know.  I did

 3   not see the forms.

 4        Q.      All right.  Is it the policy of

 5   NBII to have NBII's counsel attend every

 6   deposition that you give in litigation?

 7                MR. FEIBUS:

 8                    She's not going to answer that

 9                question.

10                MR. VERLANDER:

11                    On what basis, Counsel?

12                MR. FEIBUS:

13                    It has zero relevance.

14                MR. VERLANDER:

15                    I disagree.

16                    Do you have a privilege basis

17                to instruct her not to answer?

18                MR. FEIBUS:

19                    Whether or not she has counsel

20                in attendance absolutely has zero

21                relevance to her treatment of the

22                patient in this case or any

23                argument of bias.

24                    That's my instruction to the

25                witness.
```

Huma Haider, M.D.
January 11, 2021

```
 1              MR. VERLANDER:

 2                  Okay.  And you're an attorney

 3              where?  In Texas?

 4              MR. FEIBUS:

 5                  Yes, sir.

 6              MR. VERLANDER:

 7                  In what city?

 8              MR. FEIBUS:

 9                  Houston.

10              MR. VERLANDER:

11                  Okay.  Are you enrolled in the

12              Western District of Louisiana?

13              MR. FEIBUS:

14                  I am not.

15              MR. VERLANDER:

16                  Okay.

17  BY MR. VERLANDER:

18       Q.     Dr. Haider, where are you located

19  right now?

20       A.     Houston, Texas.

21       Q.     And is that where your primary

22  office is?

23       A.     Yes.

24       Q.     Okay.  Where does NBII have

25  physical offices?
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1      A.      Yes.  We have physical offices in
 2  Houston, Dallas, San Antonio, and Los Angeles.
 3      Q.      Okay.  And so on your website, when
 4  it talks about serving all 50 states, that's
 5  talking about telemedicine other than those
 6  locations that you just listed?
 7      A.      Yes.  It's telemedicine and
 8  patients travel from other states to come to
 9  the cities where we have physical offices.
10      Q.      And you're the founder of NBII;
11  correct?
12      A.      Yes.
13      Q.      Are you the only owner?
14      A.      Yes.
15      Q.      And what is the -- (inaudible) --
16  is it an LLC, a corporation?  What is it?
17      A.      I think you are breaking up a
18  little bit.
19      Q.      What is the nature of the NBII
20  entity?
21      A.      A clinical practice.
22      Q.      No.  No.  I meant the legal entity.
23              Is it an LLC?  Is it a corporation?
24  Do you know?
25      A.      I don't know the specific details
```

Huma Haider, M.D.
January 11, 2021

Page 14

```
 1    of it.
 2         Q.       Okay.  Do you know in what state
 3    it's formed?
 4         A.       It's formed in Texas.
 5         Q.       Okay.  And you have always been the
 6    sole owner of NBII?
 7         A.       I was not always the sole owner.  I
 8    founded it with Mr. Andrew Gomes, and then I
 9    purchased the company from him in 2019.
10         Q.       I'm sorry.  The man's name was
11    "Andrew" . . .
12         A.       "Gomes."
13         Q.       G-O-M-E-S?
14         A.       Yes.
15         Q.       And is Andrew a physician?
16         A.       Yes.
17         Q.       And I'm sorry, you said you bought
18    it -- bought him out in 2019?
19         A.       Yes.
20         Q.       And before that, y'all were
21    co-owners?
22         A.       Yes.
23         Q.       I think I saw in one of your videos
24    on your website that you formed NBII in 2018;
25    is that right?
```

Huma Haider, M.D.
January 11, 2021

```
 1      A.      Yes.

 2      Q.      And Dr. Gomes, what sort of doctor

 3 was he?

 4      A.      He's a radiologist.

 5      Q.      What led to Dr. Gomes's departure

 6 from the practice; do you know?

 7      A.      We decided to part ways.

 8      Q.      Okay.  Did that have anything to do

 9 with the allegations in the qui tam complaint

10 that was filed against you?

11      A.      No.

12              MR. FEIBUS:

13                  She's not going to answer that

14              question.

15                  Hold on, Paul.  She's not going

16              to answer any questions about the

17              qui tam litigation; okay?  Just so

18              we're clear up front.

19              MR. VERLANDER:

20                  And what's the basis of that

21              refusal to answer?

22              MR. FEIBUS:

23                  No relevance and it's harassing

24              to the witness.

25              MR. VERLANDER:
```

Huma Haider, M.D.
January 11, 2021

Page 16

```
 1                    No relevance?  How do you find
 2           that to be the case, sir, when it
 3           relates to the practice, vis-à-vis
 4           litigation in which the doctor is
 5           engaged?
 6           MR. FEIBUS:
 7                    That's my instruction, sir, and
 8           that's the basis for it.  If that's
 9           what you want to get, you need to
10           file a motion.  Go for it.  It is
11           absolutely no relevance to her
12           patient care in this matter or any
13           other matter that would otherwise
14           be admissible.
15           MR. VERLANDER:
16                    All right.  And your position
17           would be the same on any question
18           relating to the allegations
19           asserted in that complaint against
20           Dr. Haider and/or NBII; am I
21           correct about that?
22           MR. FEIBUS:
23                    You are.
24           MR. VERLANDER:
25                    All right.
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1                    Including whether or not
 2              Dr. Gomes left in -- having
 3              anything to do with the qui tam
 4              litigation; am I right about that?
 5              MR. FEIBUS:
 6                    It did not have anything to do
 7              with it.  But you are correct, that
 8              will be my instruction.
 9    BY MR. VERLANDER:
10       Q.      Dr. Haider, you are not a
11    neurologist; correct?
12       A.      Correct.
13       Q.      You're not a neurosurgeon; correct?
14       A.      Correct.
15       Q.      You're not a neuroradiologist;
16    correct?
17       A.      Correct.
18       Q.      All right.  I watched a video that
19    you have on your website, and in that video,
20    it's something like -- is it "Nail on the
21    Head"?  Is that the name of it?
22       A.      That is -- our senior vice
23    president of the company, he is responsible
24    for the website.  So I have seen the video,
25    but I don't know whether it's named that on
```

Huma Haider, M.D.
January 11, 2021

```
 1    the website.  I don't go on the website.

 2        Q.      Well, you appear in the video;

 3    right?

 4        A.      Uh-huh (positive response).

 5                Yes.

 6        Q.      And I'm sorry, you said you have

 7    seen the video; you acknowledge that?

 8        A.      Yes, I have.

 9        Q.      Okay.  Who's the senior vice

10    president you mentioned?

11        A.      Mr. Tim Dillard.

12        Q.      Ken Dillard?

13        A.      Tim Dillard.

14        Q.      Tim Dillard?

15        A.      Yes.

16        Q.      And he is still employed by the

17    company?

18        A.      Yes.

19        Q.      When was that video made?

20        A.      I would say probably last year

21    sometime.

22        Q.      So 2020?  2020?

23        A.      Probably 2020 or end of 2019,

24    sometime around that.

25        Q.      Okay.  In that video, you indicate
```

Huma Haider, M.D.
January 11, 2021

1    that you are studying, at least at the time of

2    the filming of the video, for a master's in

3    psychology, I think; is that right?

4         A.     Yes.

5         Q.     All right.  And where were you

6    pursuing that training?

7         A.     I have completed it.  I was

8    pursuing it at North Central University.

9         Q.     I'm sorry.  North Central . . .

10        A.     -- University.  Yes.

11        Q.     Where is that located?

12        A.     It's based in Arizona.

13        Q.     And so this was, what, online

14   learning?

15        A.     Yes.

16        Q.     And you said you've completed it.

17   So you got a master's in psychology from North

18   Central University in Arizona via an online

19   program completed when?

20        A.     I completed in February of 2019,

21   almost a year ago.

22        Q.     I'm sorry.  So nearly two years ago

23   you completed it?

24        A.     No.  2020, February of 2020.

25        Q.     Okay.  Now I'm clear.

**Huma Haider, M.D.**
**January 11, 2021**

```
 1                  And how long was that program?

 2        A.        Two years.

 3        Q.        Did you have to do any in-person

 4   learning, or was it entirely online?

 5        A.        It was entirely online.

 6        Q.        And have you obtained any licensure

 7   or certification in psychology post completion

 8   of that master's?

 9        A.        I have not.

10        Q.        Have you pursued certification or

11   licensure?

12        A.        I have not, at this moment.

13        Q.        I'm not sure what to make of "at

14   this moment."  Does that mean you never have,

15   or you're intending to?  Help me understand

16   what "at this moment" means.

17        A.        At this time, it means that I could

18   proceed with it, depending upon my schedule,

19   if I have time to proceed with it.  Yes, you

20   know, I plan on doing many other educational

21   activities, and this is, you know, on the

22   books.  And if I have time, then I might

23   proceed with that.

24        Q.        Okay.  So what I was driving at,

25   though, is you have -- up to this point, as we
```

Huma Haider, M.D.
January 11, 2021

1    sit here today, you have not sought out or

2    attempted or tested for any certification or

3    licensure in the field of psychology; am I

4    right about that?

5         A.       I have master's in general

6    psychology, and I completed that.

7                  I don't know what you are asking

8    me.  Can you be more specific?

9         Q.       Okay.  Well, you understand the

10   difference between getting an educational

11   degree and then obtaining certification in the

12   field or licensure in the field.  You

13   understand those are two different things;

14   right?

15        A.       Yes, I do understand that.

16        Q.       Okay.  And I understand that you

17   have obtained the degree from North Central

18   University in Arizona via an online program in

19   psychology.  What I'm asking is:  Beyond that

20   degree, have you sought any certification or

21   licensure in the field of psychology?

22        A.       I have answered you that question.

23        Q.       Well, yes.  But what I'm trying to

24   nail down is, you said something like "at this

25   moment."  I just want to make sure that up to

Huma Haider, M.D.
January 11, 2021

```
 1   this point, as we sit here today, that you
 2   have not attempted to obtain any certification
 3   or licensure in the field of psychology.  Am I
 4   correct about that?
 5        A.      I have answered that question,
 6   also.
 7        Q.      Well, is that a "yes" or a "no"?
 8        A.      I'll have the court reporter read
 9   it back to you.
10        Q.      Ma'am, you said -- what I'm trying
11   to clarify is that you said "I have not at" --
12   "I am not, at this moment, seeking
13   certification."
14               All I want to make clear is that as
15   we sit here today, at no point in the past
16   have you sought certification or licensure in
17   the field of psychology.  You have not
18   answered that specific question.  If that's a
19   "yes," "no, I have not sought any such
20   certification or licensure up to this moment
21   in time," then that's fine.  We'll move on.
22               Is that --
23        A.      I have answered this question.
24        Q.      I don't think you have, ma'am.
25               MR. FEIBUS:
```

Huma Haider, M.D.
January 11, 2021

```
 1                    Dr. Haider, just try to answer
 2            it again if you can; okay?
 3            THE DEPONENT:
 4                 Okay.
 5                 So at this time --
 6   BY MR. VERLANDER:
 7       Q.      Do you want me to restate it?
 8       A.      Go ahead.
 9       Q.      Okay.  All I'm trying to nail down,
10   ma'am, is after you've completed your degree
11   in psychology, your master's degree, from that
12   point up through the present time, have you at
13   any point sought certification or licensure in
14   the field of psychology?
15       A.      I have not.
16       Q.      Thank you.
17                 So I also watched in your video
18   that you're -- you come from, I guess -- is it
19   India or Pakistan?  I wasn't clear.
20       A.      It's Pakistan.
21       Q.      Okay.  The Khyber Pass, I think it
22   said; right?
23       A.      Yes.
24       Q.      All right.  And I saw on your
25   résumé that you pursued training in Pakistan.
```

**Huma Haider, M.D.**
**January 11, 2021**

1    You got a bachelor of science over the course

2    of one year from two institutions:  Khyber

3    Medical College and Jinnah College for Women.

4               Do I have that right?

5        A.      Can you share the résumé that

6    you're looking at from?  Can you share it on

7    the screen?

8        Q.      You don't have your résumé there,

9    your CV?

10       A.      I do have it, but I want to see

11   which one you are referring to.

12       Q.      Well, it's the one that has been

13   provided to me.  It doesn't have a date on it.

14       A.      So I want to see where you are

15   reading it from.

16       Q.      Okay.  I will see if I can call it

17   up when we get a break here, but what I'm

18   reading from is page 3, "Undergraduate

19   Education," on your CV that we, the defense

20   lawyers, have been given in this case.

21               Do you have it up on your screen

22   there?

23       A.      I'm pulling it up.

24       Q.      Okay.  Let me know when you're

25   ready.

**Huma Haider, M.D.**
**January 11, 2021**

```
 1      A.      (Reviewing.)

 2              Yes, I have it opened.

 3      Q.      Okay.  So what I was asking you is,

 4  the CV says "Bachelor of Science, September

 5  1998 to September 1999," and it lists two

 6  institutions:  Jinnah, J-I-N-N-A-H, College

 7  for Women and Khyber Medical College; is that

 8  accurate?

 9      A.      So the bachelor of science is

10  between September 1999 to September of 2000,

11  and it is at Jinnah College for Women,

12  University of Peshawar, Pakistan.

13      Q.      Okay.  So --

14      A.      It's a typo error there.

15      Q.      Okay.  So when it says September

16  '98 to September '99, that's a typo.  It

17  should be September '99 to September of 2000?

18      A.      It should be September of 1998 to

19  September of 2000.

20      Q.      I see.  Okay.

21              And did you say it's only the

22  Jinnah College for Women -- or it's also the

23  Khyber Medical College; is that accurate?

24      A.      Sorry.  What are you saying?

25      Q.      Did you attend both institutions
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 26

```
 1    for your bachelor of science, or was it just

 2    the Jinnah College for Women?

 3         A.       No.  So it's the bachelor of

 4    science is from -- it's two years.  It's from

 5    '97 to '99; that's two years.  And then

 6    January 2000 to December of 2004 is the

 7    medical school education.

 8              So the bachelor of science was only

 9    at Jinnah College for Women.  It's not both

10    institutions.

11         Q.       Okay.  So -- well, just then, you

12    said '97 to '99.  I thought it was '98 to

13    2000.  So which is it?

14         A.       So it's '97 to '99.  And then 2000

15    is the medical school.

16         Q.       Okay.  So -- and that's -- is that

17    a standard course of study in Pakistan for a

18    bachelor of science degree is two years?

19         A.       Yes.

20         Q.       And then January 2000 to December

21    2004, bachelor of medicine and bachelor of

22    surgery from Khyber Medical College; are those

23    dates and the institution correct?

24         A.       Yes, that is correct.

25         Q.       All right.  And the conferral of
```

Huma Haider, M.D.
January 11, 2021

1    that degree from Khyber Medical College, did

2    that qualify you to practice medicine in

3    Pakistan?

4         A.       It does.

5         Q.       All right.  And is Pakistan similar

6    to the U.S. in that you need to go through a

7    program of internship and residency after

8    completion of your college training?

9         A.       Yes.

10        Q.       Okay.  And so you went to Chicago

11   to do your internship and residency; correct?

12        A.       Correct.

13        Q.       In internal medicine?

14        A.       Correct.

15        Q.       And then that was from -- is that

16   correct -- it says July 2005 to June 2008?

17        A.       Yes.

18        Q.       And then you went for an

19   anesthesiology residency immediately following

20   completion of your internal medicine residency

21   for, it looks like, another three years, from

22   July 2008 to June 2011, also in Chicago;

23   correct?

24        A.       Correct.

25        Q.       All right.  So up to that point in

Huma Haider, M.D.
January 11, 2021

 1   your training, had you done any training that

 2   was specific to traumatic brain injury or

 3   neurocritical care?

 4        A.      Yes.  Both internal medicine and

 5   anesthesiology has electives and -- on a daily

 6   basis that you are diagnosing, managing, and

 7   treating patients who have -- could be having

 8   traumatic brain injury or neurological

 9   conditions.

10        Q.      Okay.  And did you say "electives"?

11   Did you take electives that were specific to

12   neurocritical care or traumatic brain injury?

13        A.      Yes.  There are mandatory electives

14   in critical care for internal medicine and

15   anesthesiology, both.  And those critical care

16   electives involve patients who have had

17   traumatic brain injury in the critical care

18   settings.

19              And also on a routine, everyday

20   basis in internal medicine, the residents or

21   the doctors are involved in various

22   neurological conditions, diagnosing and

23   treatment of that, and traumatic brain injury

24   is also one of that.

25        Q.      Okay.  So when you mention

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    "critical care," "mandatory electives," and

 2    you indicated that did include some brain

 3    injury cases, critical care also encompasses

 4    many other things; correct?

 5        A.      Correct.

 6        Q.      All right.  And so what you're

 7    saying is that in the ordinary course of your

 8    internal medicine and anesthesiology training

 9    that you encounter brain injury cases;

10    correct?

11        A.      Yes.  There is a part of the

12    training, both internal medicine and

13    anesthesia.

14              In anesthesia, Cook County is Level

15    1 Trauma Center, and on a routine daily basis,

16    other than critical care, we did very complex

17    cases involving polytrauma, and traumatic

18    brain injury was part of that polytrauma

19    training on a daily basis.

20        Q.      Okay.  And then you go -- from the

21    anesthesiology residency, it looks like you

22    went -- well, no, not quite straight into

23    neurocritical care.  There was a gap of, it

24    looks like, about four months before you

25    started the fellowship.  Did you practice in
```

Huma Haider, M.D.
January 11, 2021

Page 30

1    between?

2        A.      So I was moving from Illinois to

3    Texas, getting my Texas license and then

4    starting my fellowship at Baylor College of

5    Medicine.

6        Q.      Okay.  So you were, I guess, life

7    transitioning from the anesthesiology

8    residency down to Texas for the neurocritical

9    care fellowship, and so you were not actively

10   practicing during that four-month period or

11   so; is that right?

12       A.      Correct.

13       Q.      Okay.  And then it says on your

14   résumé, or your CV, that you were in the

15   neurocritical care fellowship from November of

16   2011 to October of 2012; are those dates

17   accurate?

18       A.      Yes, they are accurate.

19       Q.      And it was, in fact, at Baylor?

20       A.      Yes.

21       Q.      I looked at Baylor's neurocritical

22   care fellowship program, and it indicates that

23   it is -- at least, generally -- a two-year

24   program; is that right?

25       A.      Yes.

Huma Haider, M.D.
January 11, 2021

1     Q.      But you were only there for one

2   year?

3     A.      Yes.  Because of my internal

4   medicine residency training and anesthesia

5   residency training, I had fulfilled the second

6   year requirements of the training for the

7   neurocritical care fellowship program.

8     Q.      Okay.  And then when you completed

9   that fellowship in October of 2012, did you

10   immediately or within the months following

11   become board certified in neurocritical care

12   through the United Council for Neurologic

13   Subspecialties, or was there some other

14   requirement besides completing the fellowship?

15     A.      That is the only requirement, for

16   them to complete the fellowship training and

17   then take an exam and passing of that exam,

18   and then you become certified in neurocritical

19   care.

20     Q.      Okay.  And so when did you become

21   certified in neurocritical care?  It says that

22   you are certified on your first page of your

23   CV, but it doesn't say when you first got

24   certified.

25     A.      Yeah.  So the exam -- I believe

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    they offer the exam once a year, if I remember

 2    it correctly.  So I completed my fellowship in

 3    November -- sorry -- October of 2012, and I

 4    became certified in 2013.

 5         Q.     So in other words, about as

 6    promptly as you could have done so, upon

 7    completion of the fellowship?

 8         A.     Yes.  The next available exam,

 9    whenever it was, I took that exam and became

10    certified.

11         Q.     So you passed it on the first try,

12    I take it.

13         A.     Yes, I did.  I passed all of my

14    exams on the first try.

15         Q.     Okay.  And then the next training

16    that's mentioned is interventional headache

17    management training course, October 2017, at

18    Northwestern Feinberg School of Medicine in

19    Chicago.  How long was that program?

20         A.     It was a weekend program.

21         Q.     So one weekend?

22         A.     Yes.

23         Q.     And you say that you're board

24    eligible -- this is on the first page of your

25    CV -- "board eligible in headache management
```

**Huma Haider, M.D.**
**January 11, 2021**

1   through the United Council of Neurological

2   Subspecialties."  What does that mean?

3       A.      I'm board certified.  Where are you

4   reading it, that I am board eligible?

5       Q.      Okay.  Again, this is from the CV

6   that we have been provided, either directly

7   from NBII or from counsel; I'm not sure which.

8               But it says on the fourth bullet

9   point down under your certifications on page 1

10  of your CV, it says "board eligible in

11  headache management."  But you're board

12  certified?

13      A.      Yes.  I'm board certified in

14  headache management through United Council for

15  Neurologic Subspecialties, and I'm also board

16  certified in headache medicine through

17  American Board of Headache Management (sic).

18      Q.      And when did you get the board

19  certification from the United Council of

20  Neurologic Subspecialties in headache

21  management?

22      A.      That was in 2020.  I think it was

23  towards the later half of 2020.

24      Q.      So within the last six months?

25      A.      Yes.

Huma Haider, M.D.
January 11, 2021

```
 1       Q.      And then, I'm sorry, the other

 2   headache certification you mentioned was the

 3   American Board of Headache Management?

 4       A.      Headache Medicine, yes.

 5       Q.      Okay.  And when did you get that

 6   certification?

 7       A.      That was also towards later part of

 8   last year.

 9       Q.      And the requirements to get these

10   headache management certifications, do you

11   have to take an exam?

12       A.      Yes.

13       Q.      And was it two exams; one for the

14   United Council and one for the American Board?

15       A.      Yes.  They were two separate exams.

16               For American Board of Headache

17   Medicine, there is also a written part of the

18   exam, there is an oral part of the exam, and

19   there is a practical part of the exam.

20               And then for the UCNS, there was a

21   written exam, I think, which lasted for like

22   three or four hours.  I don't remember exactly

23   how many hours it was long.

24       Q.      Okay.  The CV I have also lists you

25   as board eligible in internal medicine; is
```

Huma Haider, M.D.
January 11, 2021

```
 1    that correct, "board eligible," or is that
 2    one -- are you board certified in internal
 3    medicine?
 4        A.      Board certified in internal
 5    medicine.
 6        Q.      And when did you become certified
 7    in internal medicine?
 8        A.      The first time I became certified
 9    was back in -- when did I finish my residency?
10    I think it was 2011, so I -- no.  Sorry.
11              I became certified in 2008 or '09.
12    I completed my residency in 2008, and I think
13    the next available exam was in 2009.  And I
14    took that exam, became board certified, and
15    then I recertified in 2020.  My exam was
16    delayed because of the COVID, but I became
17    certified in -- again recertified in internal
18    medicine in 2020.
19        Q.      When did the first certification,
20    the board certification in internal medicine,
21    lapse?
22        A.      It was December of 2019.  So I was
23    scheduled to take the exam, I think, in March
24    or April, but then it was postponed because of
25    COVID.  And I took the exam in the -- I think
```

Huma Haider, M.D.
January 11, 2021

Page 36

```
 1    in the fall session of the internal medicine

 2    exams and then became certified.

 3         Q.      Okay.  And then it says you're

 4    board certified in anesthesiology.  When did

 5    you become board certified in anesthesiology?

 6         A.      I completed my residency in 2011,

 7    and I became certified -- the next available

 8    exam was in 2012, so I became certified in

 9    2012.

10         Q.      And so that certification has

11    remained in effect up to the present day

12    without lapsing?

13         A.      Correct.

14         Q.      Is there some point at which you

15    have to be recertified in anesthesiology, or

16    does that just keep going as long as you keep

17    up with your continuing education?

18         A.      Yeah.  As long as you keep up with

19    your continuing education, you don't have to

20    take recertification exams.

21         Q.      So help me understand, then, what's

22    different about the internal medicine

23    certification.  Why did that lapse, then?  Or

24    is it different than the anesthesiology

25    certification?
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1      A.      So different boards are coming up

 2   with different schedule right now.  In the

 3   past, there was recertification every ten

 4   years.  But the rules keep on changing, and

 5   most of the boards now have different options,

 6   whether you take the boards every ten years,

 7   or whether you take some tests, or have

 8   continuing medical education every -- yearly

 9   basis, every two-year basis.  So different

10   boards have different requirements these days.

11              Internal medicine only had the

12   option of recertifying every ten years, but

13   now they have option to recertify every four

14   years or, I believe, two years.

15              So they have different schedules.

16   And it depends on the physician, which route

17   do they want to take and how do they want to

18   maintain their certifications.

19      Q.      Okay.  But normally, you wouldn't

20   allow your certification in internal medicine

21   to lapse, would you?  I mean, you said that

22   the scheduled test was two or three or four

23   months after the lapse of the original

24   certification.

25      A.      So certification is voluntarily;
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 38

```
 1   it's not a mandatory to practice medicine.
 2   And even if I took the exam in -- you know,
 3   scheduled to take in April, I would still be
 4   practicing medicine, and it would not have any
 5   effect on me practicing as a medical doctor of
 6   medicine.
 7       Q.     Okay.  And I accept that as true,
 8   but my question was -- well, I guess, let me
 9   rephrase the question.
10              Did you intentionally let the
11   internal medicine certification lapse, or how
12   did that come to pass that your exam was
13   scheduled months after the lapse of the
14   internal medicine certification?
15       A.     No.  It's not about intentionally
16   allow it to lapse or not.  As I said, it does
17   not have any bearing on my ability to practice
18   as a medical doctor, so it's not intentional
19   or unintentional.  I am still qualified to
20   practice internal medicine, practice
21   anesthesia, practice neurocritical care,
22   because I have completed the required
23   trainings and have the training and experience
24   to do that.
25              So, and as I mentioned earlier,
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    these board certifications are voluntarily and
 2    they're not mandatory.
 3              So, having said that, I recertified
 4    at the earliest that I could.
 5       Q.      Well, certainly -- who issues the
 6    board certification in internal medicine; what
 7    organization?
 8       A.      American Board of Internal
 9    Medicine.
10       Q.      That makes sense.
11              It certainly was an option to
12    recertify prior to the expiration of your
13    existing certification, wasn't it?
14       A.      Say that again.  Can you ask the
15    question again?
16       Q.      It certainly was an option with
17    that organization for you to have met the
18    requirements to recertify prior to the
19    expiration of your original certification in
20    internal medicine; correct?
21       A.      Yes.  I could have recertified at
22    the later half of 2019, but I certified when I
23    was scheduled to certify, within six months
24    of -- and, actually, I think the board gives a
25    grace period of about six months to a year.  I
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 40

```
 1    don't remember it exactly.  So I was within

 2    the grace period of recertification.

 3        Q.      Okay.  And you --

 4              THE DEPONENT:

 5                  Excuse me.  My office lights

 6                  just turned off.  Let me turn them

 7                  on.  They are motion sensors, so if

 8                  I don't move, they turn off.

 9              MR. VERLANDER:

10                  Okay.  We'll pause for a

11                  moment.

12          (Whereupon, a recess was taken.)

13    BY MR. VERLANDER:

14        Q.      Your CV also says that you're a

15    certified physician life care planner; when

16    did you obtain that certification?

17        A.      I believe that certification was in

18    January or February of 2019.

19        Q.      And what did you have to do to earn

20    that designation?

21        A.      So, I had to take -- I had to

22    actually enroll in a program.  And it was a

23    very intense training program.  Two of their

24    courses were on-site, in-person, and the

25    remaining were online.  There were different
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 41

```
 1    areas and aspects of life care planning that I
 2    had to first review the course material and
 3    then complete assignments relating to that
 4    course material, and then after completing,
 5    submitting those assignments, and then taking
 6    tests for each of those assignments.  And
 7    after completing -- it took about -- it
 8    normally takes about three to six months to do
 9    all of that.
10              After completing that, you get a
11    certificate of course completion.  Before
12    doing that, you have to write some sample life
13    care plans, also, and get graded on those.
14    And then after completing that, you have to
15    take a formal exam through the gold standard
16    organization.  And if you pass that exam, then
17    you get your license and you are a certified
18    life care planner.
19         Q.     And, I'm sorry, the course work you
20    just described before the life care planning
21    was done where?  You may have said it, but I
22    missed it.
23         A.     So, yeah.  So there is an
24    organization.  It is called FIG.  And that
25    organization actually, you know, trains you
```

Huma Haider, M.D.
January 11, 2021

 1   and teaches you to become a life care

 2   planner -- certified life care planner -- by

 3   giving you course work.  And it's just like

 4   enrolling into any other course.  And then

 5   after you complete all the courses -- I

 6   believe there are, like, 12 or 15 different

 7   sections of that course that you have to go

 8   through and read the materials and do the

 9   assignments -- and then at the end of those,

10   write some sample life care plans and get a

11   certificate of completion.  And once you have

12   a certificate of completion of that course,

13   then you enroll into the test.  And once you

14   enroll, you take the online test.  I think

15   it's about a three- or four-hour-long test.

16   And you pass it, then you get your license,

17   and you can write life care plans.

18       Q.     And, then, also on your

19   certifications, it says you are a

20   "Credentialed ImPACT Consultant."

21       A.     Yes.

22       Q.     What is that?

23       A.     So in order to become a certified

24   ImPACT Consultant -- again, you have to go

25   through completion of course material that,

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    again, there's different modules of that

 2    course.  You have to watch those videos, then

 3    there is assignments that you have to complete

 4    those assignments, and there is -- each

 5    section has its own course that you have to

 6    take, a brief test that you have to take, and

 7    I believe -- it was quite a while ago.

 8              And after you complete all the

 9    course work, then you take a exam.  And if you

10    pass the exam, then you become certified

11    ImPACT Consultant.

12    Q.        Okay.  But explain to me, if you

13    can, what an ImPACT Consultant is or does?

14    A.        So ImPACT is a brief neurocognitive

15    assessment platform.  It's a computerized

16    platform that assesses a patient's long-term

17    memory, short-term memory, and attention span,

18    processing speeds, and reaction times.  So

19    that's what it tests the patient on, by giving

20    them different tests.  It lasts anywhere from

21    30 minutes to 45 minutes.  And after the

22    patient completes those tests, then there is

23    different scores that are generated.  And then

24    the interpretation of those scores and what it

25    means, that is what the duty of a certified
```

Huma Haider, M.D.
January 11, 2021

1    ImPACT Consultant is.

2        Q.      And the training that you described

3    to become a Credentialed ImPACT Consultant

4    lasts how long?

5        A.      It depends on the pace that you are

6    doing the training at.  It is -- it can take

7    up to three months.  It's self-paced course,

8    so it can take up to three months, it can take

9    up to six months for practitioners to complete

10   it.

11       Q.      And the training is provided by the

12   same company that developed the software

13   platform?

14       A.      Yes.

15       Q.      When did you obtain that ImPACT

16   Consultant designation?

17       A.      I believe that was back in 2017 or

18   '16, one of those years.

19       Q.      And do you have to do anything to

20   maintain that; or once you have that

21   credential, you have it for life?

22       A.      No.  You have to maintain it.  I

23   have to review articles.  I have to attend

24   webinars.  I have to keep updated and continue

25   to maintain my certification on a yearly

Huma Haider, M.D.
January 11, 2021

Page 45

```
 1    basis.
 2        Q.      And that's with the same company
 3    that makes the ImPACT software platform?
 4        A.      That is correct.
 5        Q.      The "ACLS certified" designation
 6    you have on your CV, what is that?
 7        A.      It's called "Advanced Cardiac Life
 8    Support."
 9        Q.      Okay.  And when did you obtain that
10    certification?
11        A.      I believe we have to renew it every
12    year or every two years, so I think it was --
13    I renewed it last year.
14        Q.      You also list on your
15    certifications, the fifth bullet point down on
16    my copy of your CV, it says "traumatic brain
17    injury specialist," but it doesn't reference
18    any organization.  Is that a designation you
19    have from some organization?
20        A.      So, no, it is not a designation
21    from an organization.  It is by virtue of my
22    practice and my experience and my training
23    that I have sort of become -- specialized in
24    seeing patients with traumatic brain injury.
25        Q.      Okay.  But that's not a
```

Huma Haider, M.D.
January 11, 2021

Page 46

```
 1    certification; that's your characterization of

 2    the nature of your experience?

 3         A.       Correct.

 4         Q.       Let's talk about your work

 5    experience a little bit.

 6                  And let me know if you need to take

 7    a short break.  We're coming up on an hour,

 8    but do you want to press on?

 9         A.       I'm okay.

10         Q.       Okay.  Well, give me the high sign

11    if you would like to take a quick break.

12         A.       Okay.

13         Q.       So on your "Professional

14    Experience" list, it first lists you as an

15    assistant professor of anesthesiology at

16    Memorial Hermann Hospital-Texas Medical

17    Center, from August of 2013 to December of

18    2015.  First, is all of that accurate?

19         A.       Yes.  I worked at Memorial Hermann

20    Hospital-Texas Medical Center as assistant

21    professor of anesthesiology.

22         Q.       Okay.  And so was that your first

23    medical job post-residency and fellowship?

24         A.       Yes.

25         Q.       All right.  So from October 2012
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 47

```
 1   until August of 2013, what, were you studying

 2   for boards?  Why the time gap, is what I'm

 3   driving at.

 4        A.      Ask your question again.

 5        Q.      Yeah.  I'm just trying to account

 6   for the time gap between finishing your

 7   neurocritical care fellowship in October 2012

 8   and your starting work at Memorial Hermann in

 9   August of 2013.

10                Is that just because you were

11   studying for your medical boards and taking

12   the tests, or was there another reason for the

13   gap in time?

14        A.      Oh, no.  I started in Memorial

15   Hermann in January, and so I completed my

16   fellowship in October of 2012.  So November,

17   December, there was two months in between

18   there, getting the credentials and getting all

19   the paperwork done for the hospital.

20        Q.      Okay.

21        A.      And then I was studying for the

22   exam, also.

23        Q.      Okay.  So you say you started in

24   January; that's January of 2013?

25        A.      Yes.
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1      Q.      And did you start as an assistant

 2   professor of anesthesiology?

 3      A.      Yes.  I started as an

 4   anesthesiologist, and by August, I was working

 5   in their neurocritical care as a

 6   neurointensivist, also.

 7      Q.      So I want to be clear.

 8              From January of 2013 to August of

 9   2013, you were working at Memorial Hermann as

10   an assistant professor of anesthesiology?

11      A.      Yes.

12      Q.      Okay.  And, actually, you continued

13   in that role through December of 2015 as an

14   assistant professor of anesthesiology, but you

15   also took on another role?

16      A.      Yes.  So I was working more in the

17   neuro-ICU and then less in the operating room,

18   but I was -- I would say my credentials were

19   still there.  So if I wanted to work in the

20   operating room, I could.  But I was doing more

21   of the neurocritical care work.

22      Q.      Okay.  So for the first eight

23   months of 2013, you were practicing actively

24   as an anesthesiologist?

25      A.      Yeah, you could say that.  I was
```

Huma Haider, M.D.
January 11, 2021

Page 49

```
 1   doing -- you know, by August, I started doing
 2   both and then transitioning to
 3   neurointensivist.
 4             And then, as I said, I had
 5   credentials, and, here and there, I would fill
 6   in the requirements in the operating room.
 7   But most of the times, I was working as
 8   neurointensivist.
 9       Q.      Okay.  And you say -- I'm not
10   really clear on the -- why this is listed this
11   way on your CV, but at least on the one I
12   have, on the bottom of page 1, it says, under
13   your professional experience, "Memorial
14   Hermann Hospital Southwest."
15             Oh, it's a different location,
16   maybe.  "Attending neurointensivist, August
17   2013 through October 2018."
18             And then at the top of page 2, it's
19   "Memorial Hermann Hospital-Texas Medical
20   Center, attending neurointensivist, August
21   2013 through December 2015."
22             So the difference is there are
23   different locations of Memorial Hermann
24   Hospital?
25       A.      Correct.  So Memorial Hermann --
```

Huma Haider, M.D.
January 11, 2021

Page 50

```
 1    the way Memorial Hermann works is they have
 2    multiple locations in Texas, or in Houston
 3    area, and you go to work in more than one
 4    location.  And while I was working in Texas
 5    Medical Center, then I also started working in
 6    the Southwest location, also.
 7        Q.      Okay.  And that's Southwest -- both
 8    of those are in Houston, Southwest and the
 9    Texas Medical Center?
10        A.      Yes, that is correct.
11        Q.      What is a neurointensivist?
12        A.      A neurointensivist is a physician
13    that is trained to diagnose and treat patients
14    who have critical brain-related conditions.
15    And those critical brain-related conditions or
16    brain pathologies are several of those.  These
17    are -- include brain hemorrhages, brain
18    strokes, brain swellings, brain tumors,
19    vascular malformations, aneurysms, sepsis,
20    musculoskeletal disorders, infarctions, and
21    autoimmune conditions, age-related conditions,
22    and also encompasses general critical care in
23    it as well.
24        Q.      So in that work, whether at Texas
25    Medical Center or at Southwest, the two
```

Huma Haider, M.D.
January 11, 2021

 1    locations of Memorial Hermann, is it correct

 2    that your -- you were dealing with acute brain

 3    injury patients?  Is that a correct

 4    characterization?

 5         A.      "Acute" in the sense that --

 6    patients who required hospitalization related

 7    to their brain conditions.  And so in Memorial

 8    Hermann Southwest, along with brain-related

 9    conditions, it was also general critical care

10    as well.

11         Q.      I'm sorry.  That was at Southwest

12    that it was general critical care as well?

13         A.      Yes.  So it's -- I was doing both.

14    So I was an attending neurointensivist, but

15    they did not have a dedicated neuro-ICU at

16    that time, so the patients who required

17    advanced critical care for their brain

18    conditions, they were admitted to that ICU,

19    and along with that, they were general

20    critical care patients, also.

21         Q.      Okay.  I understand.

22               And just -- I think I understand

23    your explanation, but as for instance, if,

24    say, I have a stroke and then I would be

25    admitted -- if I were in Houston, Texas, I

**Huma Haider, M.D.**
**January 11, 2021**

```
 1   might be admitted to Memorial Hermann

 2   Hospital.  I would go to this critical care

 3   unit for my initial care and treatment; am I

 4   right about that?

 5        A.        Yes, that is correct.

 6        Q.        Okay.  But then for, if I might

 7   need rehab and longer-term recovery care, that

 8   would be done somewhere else other than the

 9   critical care unit; is that right?

10        A.        Yeah.  So the way it works is a

11   patient would come to neuro-ICU or the ICU for

12   their acute support, and then they are --

13   don't require one-on-one care, one-on-one

14   support, then they will be downgraded to a

15   tele-unit or telemedicine unit.  And then

16   there will be more involved care, but not as

17   involved as in the ICU setting.  So then the

18   patient will go into the telefloor.

19                 Now, after staying there for a few

20   days, then they are further downgraded into

21   general medical floor because they're not

22   requiring continuous telemonitoring.  So their

23   condition, if it continues to improve, they

24   continue to be downgraded to different units.

25   So when they go to general medical floor, then
```

Huma Haider, M.D.
January 11, 2021

1    there the nursing staff has, let's say, four

2    patients per nurse.  So they are not getting

3    as -- you know, one-on-one care because their

4    condition is improving.

5              So from there, the decision will be

6    made whether they need to go home or whether

7    they need to go to any, you know, rehab

8    facility or any advanced skilled nursing

9    facility and so forth.  So it depends on

10   hospital policies -- or different hospitals

11   have different practice policies.

12             In Texas Medical Center, when we

13   were doing neuro-ICU, then the same team would

14   transfer the patient, whether to a telefloor

15   or neuro, general medical floor.  And we would

16   follow the patient from the ICU to the general

17   medical floor until their further disposition

18   is decided, whether they are going home or

19   whether they are being transferred to a rehab

20   facility or a nursing facility; versus at

21   Memorial Hermann Southwest, there will be

22   different team that will take over once the

23   patient is transferred out of the critical

24   care unit.

25        Q.     Okay.  So during the -- your

Huma Haider, M.D.
January 11, 2021

```
 1   service at Southwest Memorial Hermann, you

 2   were part of the critical care unit, which

 3   would be the first stop for a critical care

 4   patient, be it neuro or otherwise?

 5       A.      Correct.

 6       Q.      But if -- when that patient

 7   progressed to other floors or wards or

 8   programs, you would not follow the patient at

 9   Southwest?

10       A.      Correct.

11       Q.      But at Texas Medical Center,

12   you're -- the critical care team would follow

13   the patient to the next steps in treatment?

14       A.      Correct.

15       Q.      All right.  At this Southwest work,

16   from August 2013 to October 2018, you

17   indicated that it was general critical care,

18   as well as -- which included a subset of

19   neurocritical care.  Do you have any way of

20   characterizing what proportion of the critical

21   care was neuro involved during your time at

22   Southwest?

23       A.      It was both, mixed.

24       Q.      Okay.  And were there -- was it

25   like a practice team that would staff the
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1   critical care unit at Southwest; would that be

 2   a fair way to put it?

 3       A.      Yes.  It was a team of providers.

 4   There was a 24/7 coverage of the critical care

 5   units everywhere, so there was a team of

 6   providers who would provide this 24/7

 7   coverage.

 8       Q.      Okay.  And were there neurologists

 9   on that team?

10       A.      Yes.  There were neurologists who

11   have had training in critical care.

12       Q.      Okay.  And what about

13   neuroradiologists; were they part of the team

14   at Southwest?

15       A.      So it's a multidisciplinary team,

16   where the neuroradiologist, if we order

17   neuroradiological procedure for the patients,

18   then, yes, they will get involved.  But they

19   were not involved in day-to-day diagnosis,

20   treatment, and management of the patients.

21       Q.      Your next job that's listed on your

22   professional experience, which actually

23   overlaps the time at the two Memorial

24   Hermanns, was March of 2013 through August of

25   2015, at MODSculpt -- M-O-D-S-C-U-L-P-T --
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    Medical Spa.  You were the medical director.

 2                What did that spa do?

 3        A.      So, it was a wellness facility.

 4    They took care of multiple different aspects

 5    of wellness, including weight loss, including

 6    hormonal replacements, including aesthetic

 7    procedures, including -- and I think those

 8    were the main -- I think nutrition guidance,

 9    also, and hormone replacement.  So those were

10    the main areas of that facility.

11        Q.      I'm sorry.  Earlier, you said

12    something "procedures" and I missed what the

13    word was.

14        A.      I said they were doing wellness

15    procedures for the patients.

16        Q.      Okay.  It says "Sculpt" in the

17    name.  Did it include -- what, was it like

18    liposuction?  Was that happening at this spa?

19        A.      Yes.  So aesthetic procedures.

20        Q.      "Aesthetic procedures."  That's

21    what you were saying.

22        A.      Yes.

23                MR. VERLANDER:

24                    Off the record, Michelle.

25          (Whereupon, a recess was taken.)
```

Huma Haider, M.D.
January 11, 2021

1    BY MR. VERLANDER:

2        Q.       So was that business -- was that a

3    business of which you were an owner, the

4    MODSculpt Medical Spa?

5        A.       I was part owner.

6        Q.       Okay.  And were there other

7    physicians working in that spa or just you?

8        A.       I was a supervising physician

9    there.  There were nurse practitioners and

10   there were other aestheticians who were

11   working there.

12       Q.       Okay.  So you were the only M.D.?

13       A.       I believe in the beginning.  But

14   later on, I think there was an ENT specialist

15   who was doing some aesthetic procedures.  She

16   was also a part of the practice.

17       Q.       And you said "ENT"?

18       A.       Yes.  Ear, nose, and throat.

19       Q.       Yes.  So aesthetic procedures by an

20   ENT, what does that mean; like, nose jobs?

21   What does that mean?

22       A.       They do -- so it was not a surgical

23   facility, so they will not do bigger

24   procedures, surgical procedures.

25                So ear, nose, throat cosmetic

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    doctors, they can do office-based procedures,

 2    so she was doing that.

 3         Q.      So, again, what does that mean;

 4    like Botox?

 5         A.      Yes.  That, and some other

 6    aesthetic procedures such as collagen fillers

 7    and I believe other minor office-based

 8    procedures that she would do.

 9         Q.      Okay.  And what caused you to leave

10    MODSculpt?

11         A.      It was a decision that I made to

12    pursue -- it was time-related.  I would say

13    more of a time concern for me because I was

14    more -- saw myself and wanting to give more

15    time to my critical care and anesthesia

16    practice and traumatic brain injury side of

17    it.  So there were conflicts of time where I

18    felt like I was not able to give enough time

19    to both of the areas, so I decided to pursue

20    what I felt that I liked more.

21         Q.      Okay.  And then Advanced

22    Diagnostics Hospitals and Clinic, you were

23    working as an anesthesiologist from October of

24    2015 to March of 2018.

25                 So you were practicing as an
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    anesthesiologist at that institution?

 2         A.      Yes, I was.

 3         Q.      And that was at the same time as

 4    you were working in the critical care unit at

 5    Southwest; correct?

 6         A.      Correct.

 7         Q.      How was your time divided there, if

 8    you can characterize that?

 9         A.      Yeah.  It was -- it's hard to

10    characterize and say how much, you know, time

11    I was doing at Texas Brain Center or Advanced

12    Diagnostic or Southwest.  It was, I would say,

13    probably 60/40 or 70/30 percent.

14         Q.      And in which direction?

15         A.      So more at Advanced Diagnostics.  I

16    would say 50 percent or 60 percent, Advanced

17    Diagnostics, and 40 percent or 30 percent at

18    Memorial Hermann Southwest.

19         Q.      Okay.  So then January of '16, you

20    also began working at Texas Brain Center as

21    the medical director, from January '16 to

22    March of 2018, which also overlaps your work

23    in the critical care unit at Southwest;

24    correct?

25         A.      Correct.
```

Huma Haider, M.D.
January 11, 2021

```
 1      Q.      All right.  So if I'm looking at

 2   these dates correctly, in January of '16

 3   through March of 2018, you were working at all

 4   three places:  Southwest, Advanced

 5   Diagnostics, and Texas Brain Center.  Is that

 6   right?

 7      A.      Yes, that is correct.

 8      Q.      Were you an owner of Texas Brain

 9   Center?

10      A.      No, I was not.

11      Q.      And you were medical director

12   there; correct?

13      A.      Correct.

14      Q.      Were there other MDs working at

15   Texas Brain Center?

16              THE DEPONENT:

17                  Sorry.  My lights keep turning

18              off.

19              MR. VERLANDER:

20                  Okay.  We'll pause.

21              THE DEPONENT:

22                  They're back on.

23   BY MR. VERLANDER:

24      Q.      Were there other MDs working at

25   Texas Brain Center when you were there?
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 61

```
 1        A.        I would consult with other doctors
 2   as part of Texas Brain Center, yes.
 3        Q.        Well, okay.  Were you an employee
 4   of Texas Brain Center?
 5        A.        Yes.
 6        Q.        Were there other MDs who were
 7   employees of Texas Brain Center --
 8        A.        That, I don't know.
 9        Q.        -- at the time you were there?
10        A.        I don't know.  I would consult with
11   other doctors who worked there, but I do not
12   know their status of whether they were
13   employees or not.
14        Q.        Were these other doctors full-time?
15        A.        Again, I don't know their specific
16   arrangements, but I knew they were there
17   working.  And if I needed to consult with
18   them, I would consult with them.
19        Q.        And what sort of doctors were
20   these; neurologists, neuroradiologists?
21        A.        There were neuroradiologists.
22   There were orthopedic surgeons.  There were
23   primary care physicians.  There were hand
24   surgeon.  There were orthopedic spine --
25   multiple different specialities.
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1        Q.       Okay.  So Texas Brain Center

 2    treated things other than brain injuries?

 3        A.        So I would see the patients with

 4    brain injuries, but if those brain injury

 5    patients required further treatment and care,

 6    then I would send them to the appropriate

 7    provider.

 8        Q.        Which were also operating within

 9    Texas Brain Center?

10        A.        I would not say that they were

11    operating within Texas Brain Center, but they

12    were operating under the Advanced Diagnostics

13    Hospital.  And I don't know -- I was not the

14    owner of Texas Brain Center, so they may be

15    operating under it or they may not be.  I

16    don't know.

17        Q.        I see.

18                  So did Texas Brain Center work in

19    conjunction with Advanced Diagnostics

20    Hospitals?

21        A.        Yes.

22        Q.        And was the gentleman that you were

23    partners with previously in NBII an owner of

24    Texas Brain Center?

25        A.        No, he was not.
```

Huma Haider, M.D.
January 11, 2021

1      Q.      All right.  And then in March of
2   2018, we've already talked about you started
3   NBII as a co-owner and then later became full
4   owner in 2019, when you bought out Dr. Gomes.
5      A.      Correct.
6      Q.      And did I say that right?  Is that
7   how he says his name?
8      A.      Yes.
9      Q.      Is Dr. Gomes still practicing in
10   Houston; do you know?
11      A.      I don't know for -- I haven't
12   spoken with him, so I don't know.
13      Q.      And from -- well, you continued at
14   Southwest for -- what, about six months after
15   you started NBII, you were also still working
16   at Memorial Hermann Southwest?
17      A.      That is correct.
18      Q.      All right.  And then from October
19   2018 to the present, you've been exclusively
20   working at National Brain Injury Institute?
21      A.      Correct.
22      Q.      And is your practice exclusively in
23   the evaluation and management of traumatic
24   brain injury since you went full-time at NBII?
25      A.      Yes.

**Huma Haider, M.D.**
**January 11, 2021**

Page 64

```
 1      Q.      From March of 2018 until October of
 2  2018 -- same question as I asked earlier about
 3  the overlapped way.
 4              Can you characterize the proportion
 5  of time you spent at Memorial Hermann versus
 6  NBII?
 7      A.      I would say it was probably about
 8  50/50.
 9      Q.      Okay.
10              MR. VERLANDER:
11                  I tell you what.  We've been
12                  going almost an hour and a half.
13                  Can we have about a five-minute
14                  break, if that's okay with you?
15              THE DEPONENT:
16                  Yes.  Sure.
17              MR. VERLANDER:
18                  And can you remind me -- your
19                  counsel indicated at the outset --
20                  what your hard stop time is today?
21              THE WITNESS:
22                  It's 2:00 PM.
23              MR. VERLANDER:
24                  2:00 PM, okay.  So let's just
25                  take a short break and we'll press
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1              on until you have to stop, and

 2              maybe we'll be done, but, if not,

 3              figure out Part 2.

 4                   All right.  So for now, let's

 5              say until 11:30.  It's 11:25 now.

 6         THE DEPONENT:

 7                   Thank you.

 8         MR. VERLANDER:

 9                   All right.

10    (Whereupon, a recess was taken from 11:25 to

11              11:32 a.m.)

12         MR. VERLANDER:

13                   Dr. Haider, I guess we've been

14              talking about -- and, Jay, I'll ask

15              you to weigh in on this if you have

16              an opinion.

17                   We've been talking about your

18              CV, with which we've been provided,

19              which I will attach as Exhibit 1 to

20              your deposition, and I'll provide

21              that to the court reporter.

22         (Exhibit No. 1 is marked for

23               identification and is attached

24               hereto.)

25         THE DEPONENT:
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1                    That's not the most recent CV
 2              that you have.  I think it's
 3              missing my board certifications,
 4              and it has typo errors in it, so it
 5              seems to be a quite old CV.
 6  BY MR. VERLANDER:
 7     Q.     Yes, ma'am.  Well, that's exactly
 8  where I was going.  I wanted to see if you
 9  could --
10              MR. VERLANDER:
11                    And, Counsel, I defer to you on
12              how you want to accomplish this,
13              but, Dr. Haider, if you could
14              email, really, all of us or to
15              Michael or to Rock and Jay -- how
16              ever y'all want to do it -- a copy
17              of your current CV so that we can
18              have the most up-to-date
19              information?
20              THE WITNESS:
21                    All right.  I'm going to write
22              it down, that I have to provide the
23              most updated CV.
24              MR. VERLANDER:
25                    Mr. Feibus, how would you like
```

Huma Haider, M.D.
January 11, 2021

```
 1          us to do that?
 2          MR. FEIBUS:
 3               (No response.)
 4          MR. VERLANDER:
 5               He must have migrated.
 6               How about you, Jay?
 7          MR. BICE:
 8               Paul?
 9          MR. VERLANDER:
10               Yes, sir.
11          MR. BICE:
12               If I understand the question,
13          Dr. Haider is going to get us an
14          updated copy of her CV, and we'll
15          agree to get that to you, upon
16          receipt.
17          MR. VERLANDER:
18               Yeah.  That's great.  I was
19          trying to ask Mr. Feibus, but he
20          must be away at the moment.
21          THE DEPONENT:
22               Can I get your email?  Who's
23          email that -- who am I going to be
24          providing it to?
25          MR. VERLANDER:
```

Huma Haider, M.D.
January 11, 2021

```
 1              Jay?

 2         MR. BICE:

 3              Jay@veronbice.com.

 4              And, Paul, I will forward it to

 5         you upon receipt.

 6         MR. VERLANDER:

 7              Okay.  Great.

 8              And Denia please, too, so she

 9         can digest it while I'm asking

10         questions on other things.  But I'm

11         sure we've covered most of it, but

12         I just want to make sure, since

13         clearly there is a more updated

14         version than what we have.

15         MR. BICE:

16              Okay.  Will do.

17         MR. VERLANDER:

18              All right.  Thank you, Jay.

19         MR. BICE:

20              Thank you.

21    BY MR. VERLANDER:

22      Q.     Dr. Haider, while we're talking

23    about paperwork, we, the defense counsel in

24    this case, cannot identify a past testimony

25    list for you.  And that's -- I can't swear
```

Huma Haider, M.D.
January 11, 2021

Page 69

```
 1   that that's never been provided because there

 2   was prior counsel in this case, and perhaps it

 3   has been.  But do you have a list of your

 4   prior testimony?

 5        A.      Yes, I do.  And that should have

 6   been provided.  That is one of the standard

 7   documents that, you know, is always provided

 8   to whoever is asking for the deposition.  So

 9   my apologizes if you did not get it, but I do

10   have a list of my prior deposition testimony.

11        Q.      Okay.  So may we add that to the --

12        A.      Yes.

13        Q.      -- matter to be emailed to

14   Mr. Bice, please?

15        A.      Right.

16        Q.      Thank you.

17                And what we'll do, at some point,

18   we'll take another short break to allow you to

19   go ahead and email that so you're not trying

20   to answer questions and email at the same

21   time.

22                You indicated that you estimate

23   that you've given 15 depositions in the last

24   year or so; do I remember that right?

25        A.      Yes.  Probably 15 to 20 -- or I
```

**Huma Haider, M.D.**
**January 11, 2021**

 1   have to look at the list, but I think it's

 2   around 15 to 20 or maybe 25.

 3       Q.      Okay.  Have you testified in court

 4   as an employee of NBII?

 5       A.      What do you mean by "employee of

 6   NBII"?

 7       Q.      Well, you've been an employee of

 8   NBII since March of 2018 to present; right?

 9       A.      Yes.  So I have testified in court.

10   I don't remember if I testified last year or

11   not.  2020, I think it was -- everything was

12   done via Zoom.  So I don't think I went to the

13   court.  Maybe, if I went to the court for

14   testimony in January or February, I don't

15   remember it.

16       Q.      Okay.

17       A.      But I have testified in the court

18   before.

19       Q.      Okay.  In light of that, the way

20   you answered there, let me make sure I'm being

21   clear to you.

22              I'm not limiting it to physically

23   appearing in a courtroom.  So it would

24   include, like if it were by Zoom or some other

25   remote or video technology that you gave trial

**Huma Haider, M.D.**
**January 11, 2021**

Page 71

```
 1   testimony in -- in any cases during your

 2   tenure at NBII.

 3        A.      I have given testimony at trials in

 4   the court.  I'm just trying to remember if I

 5   did it last year.  I don't think I did it via

 6   Zoom, so if it was, then it was prior to

 7   March.

 8        Q.      Do you know how many times you have

 9   testified in as a trial testimony?

10        A.      Probably three or four times.

11        Q.      And were you offered as an expert

12   on those occasions?

13        A.      I don't remember.

14        Q.      Okay.  I guess that answers the

15   second question.

16                If you don't remember whether you

17   were tendered, you don't remember what area

18   you would have been tendered in any of these

19   trial testimony cases; am I right?

20        A.      Ask the question again, please.

21        Q.      Yeah.  It may be poorly worded.

22                I assume this is subsumed in your

23   prior answer --

24                MR. FEIBUS:

25                     Paul, just to clarify, there
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1              might be some confusion between the

 2              two of you guys as to whether or

 3              not she was testifying as a

 4              treating physician versus a

 5              retained expert, and that might not

 6              have been what you're asking versus

 7              what she's answering.  Just trying

 8              to help clear that up.

 9              MR. VERLANDER:

10                 Okay.  Thank you, Michael.

11    BY MR. VERLANDER:

12       Q.     So, Dr. Haider, did you hear what

13    your counsel said there?

14       A.     Yes.  My understanding is that I am

15    testifying today as a treating physician.

16       Q.     I'm sorry.  You're testifying today

17    as a treating physician?

18       A.     Yes.

19       Q.     Okay.  And so you don't understand

20    yourself to be a retained expert for the

21    plaintiff in this case, Ashley Moreaux?

22       A.     Yes.  That is my understanding.

23       Q.     Okay.  So testimony at trial since

24    you started NBII, whether as treating

25    physician or as a retained expert, do you
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1   recall how many times since you started at

 2   NBII in March of 2018?

 3       A.       I don't remember how many times I

 4   testified as an expert or a treating

 5   physician.

 6       Q.       Okay.  And help me understand

 7   what's the distinction in your mind between,

 8   for example, here you're saying you're

 9   testifying as as treating physician.  What's

10   the -- what's the distinction when you're

11   testifying as a retained expert?

12       A.       So every case that I have

13   testified, either in court or at a deposition,

14   I have treated those patients.  They are

15   actually under my care.  So for me, I'm their

16   treating physician, and that's how I am

17   testifying.

18                But in your legal terminology, I

19   think sometimes you like to say it's, you

20   know, an expert or treating physician.  So far

21   that I have testified for everyone, they are

22   my patients.

23       Q.       Okay.  I understand.  And we'll get

24   into in a minute the occasion or occasions on

25   which you've seen Ms. Moreaux and what the
```

Huma Haider, M.D.
January 11, 2021

```
 1   nature of your care for her is, but I

 2   understand what you're saying there.

 3              Do you recall whether you have ever

 4   been tendered as an expert in any case in

 5   state or federal court where you have been

 6   limited or rejected by the court in the

 7   tendered field of expertise?

 8      A.      Not to my knowledge.

 9      Q.      And I'm sorry.  I think you

10   answered this earlier, but I want to make sure

11   I'm clear on it.

12              Your best recollection right now --

13   and I guess we'll go to the testimony list

14   when we get it -- but is that during your

15   tenure at NBII, you have testified at trial,

16   you think, three or four times, or do I have

17   that wrong?

18      A.      Yeah.  I think that is close, maybe

19   could be -- number could be one or two more,

20   but that's not a significant difference.

21      Q.      And do you know whether you have

22   ever been tendered in court as an expert in

23   traumatic brain injury?

24      A.      I have to look at the -- I have to

25   go back and look how the --
```

Huma Haider, M.D.
January 11, 2021

```
 1              THE DEPONENT:
 2                  There's a lot of background
 3              noise.
 4              MR. VERLANDER:
 5                  Yeah.  I hear it, too.
 6                  They're muted now, though.
 7              THE DEPONENT:
 8                  Okay.
 9                  So expert as a traumatic brain
10              specialist, probably, yes, that's
11              how I have been seeing my patients
12              and treating them for.  But I have
13              to see their designation.  I don't
14              see that paper or document, how
15              they file it with the court.
16      BY MR. VERLANDER:
17          Q.      Okay.  You mentioned you are the
18      CEO of NBII; correct?
19          A.      Correct.
20          Q.      And you're also still the medical
21      director?
22          A.      Yes.
23          Q.      And then you mentioned -- I don't
24      remember the name of the guy that's the vice
25      president.  "Tim Dillard," was it?
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 76

```
 1        A.        Correct.

 2        Q.        How many other full-time employees

 3    does NBII have?

 4        A.        Probably, like, 14 or 15 or 16.

 5        Q.        And they're -- those 14 to 16 are

 6    spread among the four offices you mentioned

 7    earlier?

 8        A.        Yes.

 9        Q.        All right.  And for the Houston

10    office, is there an individual who handles the

11    new patient intake process or is it multiple

12    people?

13        A.        There are multiple people.

14        Q.        All right.  But you said there are

15    written forms that are filled out when a new

16    patient contact occurs and that patient is

17    going to be seen by you.

18        A.        So what I said is that there are --

19    if a referral form is sent to us, there is no

20    form that we are creating when we get that

21    referral.  So whether we get the referral via

22    phone, whether we get the referral with some

23    kind of form filled out and sent to us, that's

24    what I meant.

25        Q.        Okay.  But the form, is that
```

Huma Haider, M.D.
January 11, 2021

```
 1    something that's available through your

 2    website, the intake form?

 3         A.       Yes.  So they could use that intake

 4    form that is on our website, or a lot of times

 5    we get patients from other providers,

 6    physicians, and chiropractors, where the

 7    referral will be written on a prescription

 8    paper, or the referral will be in the form of

 9    their referral form.  So there is multiple

10    different forms that we could receive.

11         Q.       Do you track in your business the

12    source of referral for your patients?

13         A.       No, we don't.

14         Q.       So you don't know whether they're

15    coming to you more from other medical

16    providers or attorneys?

17         A.       No, we don't.

18         Q.       I understand you don't track it.

19              The second question was whether you

20    know or don't know whether they come more from

21    other medical providers or from an attorney?

22         A.       No.  We don't track.

23         Q.       I understand you don't track.  I'm

24    also asking:  Do you, Dr. Haider, know whether

25    more of your referrals come from attorneys or
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    more come from other medical providers?

 2         A.      No, I don't know.

 3         Q.      Okay.  You have someone in your

 4    Houston office who handles billing?

 5         A.      Again, there is multiple people

 6    who, in the back office, would do billing,

 7    also.

 8         Q.      Okay.  How many people are we

 9    talking about in Houston, these multiple

10    people?

11         A.      There would be about five or six

12    different individuals.

13         Q.      Five or six different individuals

14    who handle billing?

15         A.      Yes.

16         Q.      Are those the same five or six who

17    would handle new patient intakes?

18         A.      So the admin at the back office,

19    the admin work is done by all the back office

20    employees.

21         Q.      Okay.  Do you have an office

22    manager?

23         A.      We have an operations manager.

24         Q.      Who is that?

25         A.      His name is Juan Hernandez.
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 79

1      Q.      I'm sorry.  Juan Hernandez?

2      A.      Yes.

3      Q.      And that's -- I'm sorry.  That's a

4    male or a female?

5      A.      Male.

6      Q.      Okay.  I'm sorry.  I thought you

7    said "her."

8              And I noted that you have a listing

9    on the Houston Injury Solutions Network; were

10   you aware of that?

11     A.      I know of it.

12     Q.      Do you know of the Houston Injury

13   Solutions Network?

14     A.      I know that I'm listed on their

15   network, on their website.

16     Q.      Okay.  And what's your

17   understanding of what that network is, or

18   does?

19     A.      My understanding is that it's a

20   network of different providers, and those

21   providers belong to different specialties and

22   subspecialties.  And that is a referral

23   network, so any patient that needs to be

24   referred to a specialist or subspecialist uses

25   that network.

**Huma Haider, M.D.**
**January 11, 2021**

```
 1      Q.        Okay.  And is it your understanding
 2   that this Houston Injury Solutions Network is
 3   primarily related to personal injury
 4   litigation, or do you know?
 5      A.        No, I don't know.
 6      Q.        Are you or is the NBII on any other
 7   similar injury networks?
 8      A.        Not that I'm aware of.
 9      Q.        Have you ever given seminars in
10   continuing legal education in the area of
11   traumatic brain injury?
12      A.        Yes, I have.
13      Q.        And for which organizations have
14   you done that?
15      A.        I've done those -- I do those for
16   chiropractors.  I do those for -- like, I get
17   invitations to talk on different seminars.
18               So I have done it for Brain SoCal.
19   I have done it for Cal Chiro Association,
20   which is an association of chiropractors.  I
21   have -- I think I have done a seminar for
22   Houston Injury Network, also.
23               I have done -- actually, there is
24   one coming up for American Board of Headache
25   Medicine, later part of January.  I'm doing
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 81

```
 1    two webinars for them.  So I do quite a few

 2    seminars, all across.

 3        Q.      The one that you did for Houston

 4    Injury Network, what was the subject?

 5        A.      I don't remember.  It was -- I

 6    think it was a long time ago.

 7        Q.      Was the audience attorneys or other

 8    medical providers?

 9        A.      I don't know.  My understanding

10    is -- it is a chiropractic association, and so

11    the audience could be pain management

12    physicians, chiropractors, lawyers, or any

13    other providers.

14        Q.      Are there other MDs who are

15    full-time employees of NBII?

16        A.      Full-time, no.  But we do have MDs

17    who are working in the capacity of independent

18    contractors.

19        Q.      Okay.  What about

20    neuropsychologists; do you have any

21    neuropsychologists who are employees, or are

22    the ones that you use all independent

23    contractors?

24        A.      We have one forensic psychologist

25    who is a part-time employee of NBII.
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1        Q.       And who is that?

 2        A.       His name is Dr. Daniel Osborn.

 3        Q.       "Osborn"?

 4        A.       Yes.

 5        Q.       Was Dr. Osborn involved in Ashley

 6   Moreaux's assessment or care?

 7        A.       I believe not.

 8        Q.       According to the records I've seen

 9   and the deposition we took, there was a

10   neuropsychologist by the name of Dr. Lauren

11   Gavron, I believe, who was involved in

12   Ashley's care; is that correct?

13        A.       Yes, that is correct.

14        Q.       She was an independent contractor?

15        A.       She was independent contractor,

16   yes.

17        Q.       All right.  Were there other --

18   what about Dr. Filler; is he a part-time

19   employee or is he an independent contractor?

20        A.       He's an independent contractor.

21        Q.       Were there other doctors, whether

22   employees or independent contractors, other

23   than you and Dr. Filler who were involved in

24   Ashley's care?

25        A.       I believe it was myself,
```

Huma Haider, M.D.
January 11, 2021

```
 1   Dr. Filler, and Dr. Gavron who were involved

 2   in Ashley Moreaux's care.  I don't think there

 3   is any other doctor involved in her care.

 4        Q.      Okay.  And you mention the five or

 5   six people that were involved in billing and

 6   patient intake forms and then the manager of

 7   operations.  Are there other employees of NBII

 8   who are involved in -- directly in patient

 9   care or patient assessment?

10        A.      We have medical assistants who are

11   involved in direct patient care and

12   assessment, and we have nurse practitioners

13   who are also involved in direct patient care

14   and assessment and treatment, yeah.

15              Other than that -- yeah, those will

16   be additional.

17        Q.      Okay.  Are the nurse practitioners

18   full-time employees?

19        A.      We have one full-time nurse

20   practitioner, and then we have others who are

21   independent contractors, depending upon the

22   requirements.

23        Q.      Okay.  And in the case of Ashley

24   Moreaux, was there a nurse practitioner

25   involved in her assessment or care?
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1      A.      So her initial assessment was done

 2  by myself.  And I think the follow-up, the

 3  nurse practitioner was involved, but I have to

 4  double check.

 5      Q.      And then is that something you have

 6  at your fingertips there or do you have to

 7  search for that?

 8      A.      (Reviewing.)

 9              I have to check the notes, because

10  if the nurse practitioner is involved, then

11  their signature will be on the note

12  (reviewing).

13              MR. VERLANDER:

14                  I tell you what, while we're

15                  pausing, Michelle, when we get the

16                  updated CV for Dr. Haider, we'll

17                  attach that as Exhibit 2 and then

18                  the testimony list that she's also

19                  going to provide to Jay as

20                  Exhibit 3.

21                  (Exhibits No. 2 and No. 3 are

22                   marked for identification and are

23                   attached hereto.)

24              MR. VERLANDER:

25                  And, Michael, you were, I
```

Huma Haider, M.D.
January 11, 2021

Page 85

```
 1              think, away for a moment when I was
 2              raising this, and what we arranged
 3              is for Dr. Haider to send those
 4              documents I just referenced to Jay
 5              Bice, who will then circulate them.
 6              So I was trying to ask you that
 7              earlier, but that's the game plan,
 8              unless you object.
 9         MR. FEIBUS:
10              And it's just a copy of her
11              updated résumé?
12         MR. VERLANDER:
13              CV, and then also her testimony
14              list which we appear not to have
15              gotten.  And she indicated that
16              would normally be provided, so she
17              is going to send that to Jay as
18              well.
19         MR. FEIBUS:
20              Sure.
21         MR. VERLANDER:
22              Okay.
23         THE DEPONENT:
24              So, yes, the follow-up that we
25              did was -- the nurse practitioner
```

Huma Haider, M.D.
January 11, 2021

```
 1                 was involved in that follow-up.
 2    BY MR. VERLANDER:
 3         Q.      And who was that?
 4         A.      Jacqueline Childs.
 5         Q.      "Childs"?
 6         A.      Yes.  Jacqueline Childs.
 7         Q.      Okay.  And is she a full-time
 8    employee or an independent contractor or a
 9    part-time employee?
10         A.      She's a part-time employee.
11         Q.      And she still, at present, is a
12    part-time employee?
13         A.      She's on maternity leave right now.
14         Q.      Is there anyone in your practice or
15    in NBII's organization who would have better
16    recall or information about the breakdown of
17    your practice litigation versus nonlitigation
18    patients than you do?  You've indicated a few
19    times that you don't know and don't recall and
20    can't even estimate.  Is there anyone else in
21    your organization who could give us better
22    information about those questions?
23         A.      No.  There would be nobody else in
24    the organization.
25         Q.      So nobody in your organization
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    knows what proportion of your patients are

 2    litigation versus nonlitigation?

 3        A.      We don't track that.

 4        Q.      Do you ever get guarantees or

 5    direct payments from attorneys for patients?

 6        A.      Can you explain what you mean by

 7    that?

 8        Q.      Yeah.  An attorney providing a

 9    commitment to make sure that your bills get

10    paid for a patient that's that attorney's

11    client; does that ever happen?

12        A.      What do you mean by "commitment"?

13        Q.      A promise that that attorney will

14    make sure that your bills get paid when you

15    see that patient, his or her client.

16                No?

17        A.      Now, if I understand the question

18    correct, we don't get any such commitment that

19    the bills are going to get paid.

20        Q.      Okay.  And what about in the --

21    coming up on three years of existence of NBII,

22    have your bills ever been paid directly by an

23    attorney for a -- your patient, his or her

24    client?

25        A.      Yes, we have been paid.
```

Huma Haider, M.D.
January 11, 2021

Page 88

```
 1                  And I don't understand your

 2      previous question correctly.  Is it -- like,

 3      are you talking about any kind of a written

 4      agreement that we have?  Or could you explain?

 5      Because we don't -- we don't -- to my

 6      knowledge, I don't have such commitment for

 7      sure that our bills are going to get paid.

 8          Q.      Okay.  And I wasn't -- ordinarily,

 9      it would be something in writing, but I wasn't

10      trying to limit the question to that.

11                  Yeah.  It's like if I'm a

12      plaintiff's lawyer and I have a client that I

13      want you to see as a patient, I might provide

14      you with a written statement that I'll make

15      sure that your bills are paid so that you

16      don't have to worry about whether your bills

17      are going to be paid.

18                  You don't recall ever doing such an

19      arrangement with a plaintiff's lawyer?

20          A.      No.  If the -- you know, the

21      patient is ultimately responsible for paying

22      their bills.  So, no, I don't think we have --

23          Q.      There went the lights again.

24          A.      Yes, I know.  I have to get up

25      again.
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1              Okay.  So I don't think we -- I
 2   don't think we have any such commitment
 3   arrangement there, we have -- we know or
 4   somebody tells us that, you know, our bills
 5   are going to get paid for sure.  No, I don't,
 6   not to my knowledge.
 7      Q.      Okay.  And you indicated, though,
 8   you have had bills paid for a patient by an
 9   attorney who represents that patient; that has
10   occurred?
11      A.      Yes.  We have had our bills paid.
12   As I said, ultimately the patient is
13   responsible for paying our bills, so whether
14   the patient is paying the bills themselves or
15   whatever is their means of paying the bills
16   are.  So we hold the patients accountable for
17   making the payments.
18      Q.      Okay.  But you do you recall at
19   least some instances where the means by which
20   the patient paid your bills was through his or
21   her attorney?
22      A.      Yes.
23      Q.      And do you keep a record of that?
24   Like, say, if Ashley Moreaux's bills were paid
25   by Veron Bice firm; do you have a record of
```

Huma Haider, M.D.
January 11, 2021

 1   that in your business records?

 2        A.       No.  We don't have tracking for

 3   that.

 4        Q.       You don't track where the money

 5   comes from to pay your bill?

 6        A.       No.  We don't track that.

 7        Q.       Okay.  Have you ever made an

 8   agreement with an attorney to defer the

 9   patient's bills until the case is settled or

10   otherwise resolved?

11        A.       So we -- I have not personally made

12   such arrangements, but it's, again, the

13   patient is ultimately responsible.  When a

14   patient comes to us, they sign a consent form,

15   they sign a lien form.  And in instances if

16   the patient is represented, then I guess there

17   is some kind of a written communication, a

18   written letter from the attorney on behalf of

19   the patient that the patient is going to pay

20   the bills after whatever is the outcome of

21   the -- their process or their litigation is.

22        Q.       Okay.  And do you keep that -- such

23   letters in your files?

24        A.       If we have received such letter,

25   then it should be in the patient's folder.

Huma Haider, M.D.
January 11, 2021

```
 1      Q.      And did you say you have the
 2  patient sign a lien letter?  Did I understand
 3  that correctly?
 4      A.      Yes.  It's the payment form;
 5  basically, who is responsible for paying our
 6  bills.  So it's the patient who is going to be
 7  signing that standard form that we have for
 8  all the patients that they are responsible for
 9  paying our bills.
10      Q.      Okay.  I understand that, but I
11  also thought you said earlier there was a lien
12  letter, L-I-E-N.  Did I misunderstand you?
13      A.      No.  That is what it is called.
14  It's part of the consent form.
15      Q.      Okay.  Then do you just keep that
16  lien letter in your file, or do you send it to
17  someone else?
18      A.      No.  It stays in the patient's
19  folder.
20      Q.      Okay.  You don't send it to the
21  lawyers involved in the case?
22      A.      No, we don't.
23      Q.      Earlier, I was asking do you agree
24  to defer collection of your professional fees,
25  or NBII's professional fees, until the
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    conclusion of a case by settlement or

 2    judgment, I guess, with a patient who is

 3    involved in personal injury litigation.

 4         A.        So it is the patient is --

 5              THE DEPONENT:

 6                   I think there is an echo in the

 7              background.

 8              MR. VERLANDER:

 9                   Jay, can you mute, please?

10              THE DEPONENT:

11                   So it is the patient's

12              responsibility, and I do not know

13              what is -- the course of payment

14              is, but my understanding is that

15              yes, the patient is ultimately

16              responsible for payment of the

17              medical bills.

18    BY MR. VERLANDER:

19         Q.        Yeah.  Well, you've said that, that

20    the patient's ultimately responsible, probably

21    half a dozen or more times.

22                   What I was asking, though, is:  Do

23    you ever agree to defer collecting your fees,

24    your -- NBII's bills, until the conclusion of

25    the patient's case?  Does that ever happen?
```

Huma Haider, M.D.
January 11, 2021

```
 1      A.      No.  We don't defer the collection
 2  of the fees.
 3      Q.      Okay.
 4              All right.  Let's talk about -- oh,
 5  sorry.  When I was asking you questions
 6  earlier about your qualifications and all
 7  that, I forgot to ask you:  You are licensed
 8  in the state of Texas; correct?
 9      A.      Yes, I am.
10      Q.      And you've been licensed in the
11  state of Texas as a medical doctor since when?
12      A.      Since I moved here, which is 2011.
13      Q.      And you've been continuously
14  licensed in the state of Texas from 2011 to
15  the present?
16      A.      Correct.
17      Q.      Do you hold licenses in any other
18  states?
19      A.      I do.
20      Q.      Which states?
21      A.      I'm licensed in California.  I'm
22  licensed in Arizona.  I'm licensed in New
23  York.  I'm licensed in Colorado.  I'm licensed
24  in Florida.  Those are the ones I can remember
25  off the top of my head.
```

Huma Haider, M.D.
January 11, 2021

Page 94

```
 1       Q.        Okay.  Have you ever been the

 2   subject of any complaint from any medical

 3   boards in any of the states in which you are

 4   licensed?

 5       A.        In Texas, one time.

 6       Q.        Okay.  Tell me about that.

 7       A.        I think it was related to -- I had

 8   posted my CV -- not myself.  The office staff

 9   had posted my CV on the website, and it had my

10   board eligibility listed on the website.  I

11   think that was two or three years back, when I

12   was board eligible in headache medicine.  And

13   so I did not know, nor my office knew, that

14   advertising board eligibility on the website

15   is not allowed by Texas Medical Board.

16               So somebody went ahead and wrote to

17   Texas Medical Board about it.  And so the

18   Texas Medical Board asked me about the details

19   of it, and I explained it to them, and they

20   dismissed the complaint against me.

21               And since then, I have become board

22   certified in those areas where I was board

23   eligible.

24       Q.        Okay.  And other than that

25   complaint in Texas, any other complaints of
```

Huma Haider, M.D.
January 11, 2021

```
 1    which you were the subject in any of the

 2    states in which you are licensed?

 3         A.       No, not that I am aware of.

 4         Q.       Have you ever had any of your

 5    licenses suspended or revoked for any reason?

 6         A.       No, they have not.

 7         Q.       Have you ever been the subject of

 8    any medical ethics complaints in any of the

 9    states in which you are licensed to practice?

10         A.       No, I have not.

11         Q.       Okay.  Let's talk about Ashley

12    Moreaux some more.

13              I have a document called the

14    "Initial Comprehensive Evaluation" for Ashley

15    Moreaux, dated April 4th, 2020.

16              Is that report reflective of your

17    findings from your initial visit and

18    assessment with Ashley Moreaux?

19         A.       Yes.

20         Q.       Okay.  And how that appointment was

21    set up and scheduled for, then, you don't

22    know?  That's other people in your office, and

23    you don't know how that came to pass; am I

24    right?

25         A.       Correct.
```

Huma Haider, M.D.
January 11, 2021

Page 96

```
 1      Q.      All right.  But you said you're the
 2  one personally who did the initial
 3  comprehensive evaluation?
 4      A.      Yes.
 5      Q.      So when you -- and do you have this
 6  document in front of you?  It's 19 pages.
 7      A.      Yes, it is.
 8      Q.      Okay.
 9              MR. VERLANDER:
10                  And we'll mark this as -- I
11              think we're on Exhibit 4.
12              (Exhibit No. 4 is marked for
13                  identification and is attached
14                  hereto.)
15  BY MR. VERLANDER:
16      Q.      Okay.  And, again, this says at the
17  bottom, "Initial Comprehensive Evaluation for
18  Moreaux, Ashley, 1 of 19," and it goes through
19  19 of 19.
20              So, ma'am, when you first saw
21  Ms. Moreaux, this occurred in the Houston
22  office of NBII?
23      A.      It was via telemedicine.
24      Q.      Okay.  So do you know where she was
25  when you were talking with her?
```

Huma Haider, M.D.
January 11, 2021

```
 1        A.       Yes.  She had been at NBII's

 2   office, and she had a neuropsychological

 3   battery done.  And then after that, I did my

 4   evaluation via telemedicine.

 5        Q.       Okay.  So the neuropsych assessment

 6   for NBII occurred for Ashley Moreaux in

 7   Houston?

 8        A.       Yes.  Correct.

 9        Q.       And I'm sorry.  As I'm asking you

10   the question right now, I don't have the

11   neuropsych in front of me.  How far in advance

12   of April 4 was that done?

13                 If you don't -- I can find it later

14   if you don't know.

15        A.       So the date of service on that is

16   April 3rd and April 4th, so that was split

17   into two days.  And on the -- April 4th, I did

18   my evaluation.

19        Q.       Okay.  But the way it happened was

20   she came to Houston, did the neuropsych

21   assessments during April 3rd continuing over

22   to April 4, and then she drove back home, and

23   you interviewed her via telemedicine?

24        A.       Yes.  My assessment of her was via

25   telemedicine.
```

Huma Haider, M.D.
January 11, 2021

```
 1      Q.      Yes.  But what I'm trying to

 2   understand is why that was.  If she was over

 3   there in Houston doing the neuropsych tests,

 4   why didn't you just see her in-person in

 5   Houston?

 6      A.      There are two reasons.

 7              Number one, the assessment took two

 8   days, so she had to leave and drive back.  But

 9   I did meet with her while she was having the

10   neuropsychological assessment, in person.  But

11   I didn't do my evaluation here on-site because

12   it was COVID concerns, also.  And then she

13   also had to drive back to her home before it

14   was too late.

15      Q.      Okay.  So you met her in person?

16      A.      Yes.  I did briefly met her in

17   person.  But my comprehensive evaluation can

18   take several hours, so I did not want her to

19   stay here for three hours.  So I met her

20   briefly, but I did my evaluation via

21   telemedicine with her.

22      Q.      Okay.  And the -- and do you

23   remember how she got to Houston?  Did she

24   drive herself?  Did someone bring her?  Was

25   there someone with her?
```

Huma Haider, M.D.
January 11, 2021

Page 99

```
 1      A.      When I did my evaluation with her,

 2   she was with her boyfriend.

 3      Q.      Okay.  But that was after she had

 4   left your office.  Do you know, did he bring

 5   her to the neuropsych eval in your office?

 6      A.      I have to read through the

 7   neuropsych eval to see who accompanied her.

 8      Q.      But in your independent recall, you

 9   don't recall meeting anyone else when you met

10   her in your office?

11      A.      No, I don't recall seeing anyone.

12              So when we're doing neuropsych

13   evals, nobody else is allowed to be in the

14   room with the patient, so I would not expect

15   to see anyone there at that time.  So if there

16   was someone accompanying her, they would be in

17   the waiting area, waiting room.

18              But again, if she -- I don't know

19   if in the neuropsych this information will be

20   written, if she was driven by someone to our

21   office.

22      Q.      I understand.  I'm just asking what

23   you recall.

24      A.      Right.  So, no, I did not see

25   anyone in that room, and I would not expect to
```

**Huma Haider, M.D.**
**January 11, 2021**

1    see anyone in that room with her.

2        Q.      Okay.  Well, and that suggests to

3    me that when you met her on that April 3rd/4th

4    visit, you talked with her in the neuropsych

5    exam room.

6        A.      Yes.  During the break time.

7        Q.      Okay.  And so was that limited to

8    you were just stepping in to say, "Hi, I'm

9    Dr. Haider"?

10       A.      Yes.  I was -- yes.  I met with her

11   and introduced myself; she introduced herself

12   to me.  And I talked to her for about five

13   minutes because I wanted to get a general idea

14   of her physical appearance, and I wanted to

15   see -- neurologically, I wanted to see if her

16   movement or functioning of her eyes were okay;

17   if her hearing was okay; if she was able to

18   speak appropriately in that brief time period

19   I was with her; if there was any other

20   physical abnormalities that would jump out at

21   that time.  And I asked her to walk along for

22   me.

23                  So those were the -- that was the

24   quick assessment that I did because I knew

25   that via telemedicine I would not be able to

Huma Haider, M.D.
January 11, 2021

```
 1    have that close contact and assessment of

 2    those functions.

 3         Q.      Okay.  So in that five minutes

 4    during a break in the neuropsych evaluation,

 5    you did do some sort of initial patient

 6    assessment of Ms. Moreaux?

 7         A.      Yes.

 8         Q.      Did you write down your findings

 9    from that initial assessment anywhere?

10         A.      Those are -- in my telemedicine

11    note is what my note is.

12         Q.      So that's Exhibit 4, the initial

13    comprehensive evaluation, the 19-page

14    document?

15         A.      Correct.

16         Q.      Okay.  What about at the time that

17    you were actually doing this five-minute,

18    in-person assessment; did you make any notes

19    during that assessment?

20         A.      No.  I did not ask any clinical

21    questions from the patient at that time.

22         Q.      So, no, you didn't make any notes?

23         A.      No, I did not.

24         Q.      All right.  Was the neuropsych

25    examiner present during your five-minute
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 102

```
 1    examination of Ms. Moreaux?

 2         A.        No.

 3         Q.        Did you make any medically

 4    significant observations about Ms. Moreaux's

 5    condition or limitations in that five-minute

 6    assessment?

 7         A.        Yes.  She was limping; that's what

 8    I saw when she got up to go out for lunch.

 9    And other than that, she had -- other than

10    that, everything else, then, I did assessment

11    via telemedicine.

12         Q.        Okay.  And the limp, did you

13    attribute that to her actual, like, orthopedic

14    leg injury or did you attribute that to

15    neurological findings?

16         A.        So it will be both.  She feels

17    dizzy.  Dizziness, that's an ongoing problem

18    for her.  And she also had left ankle

19    fracture.  So the limp is associated with the

20    ankle fracture that she had, but the dizziness

21    is associated with the traumatic brain injury

22    that she suffered.

23         Q.        Okay.  But a limp is not caused by

24    dizziness.  That's a separate issue, isn't it?

25         A.        Right.  I said the limping is
```

**Huma Haider, M.D.**
**January 11, 2021**

  1    attributable to the ankle fracture that she

  2    had.

  3        Q.      Okay.  And did you observe an

  4    instance of the dizziness hitting her during

  5    this in-person visit with Ashley?

  6        A.      No, I did not.

  7        Q.      Okay.  And the actual initial

  8    assessment that you did, that was, what,

  9    sometime later in the afternoon on April 4th?

 10        A.      I would say yes, it was more

 11    towards in the evening, after she reached

 12    home.  That's when I did a telemedicine

 13    evaluation with her.

 14        Q.      Okay.  And what does that mean?

 15    Were you on Zoom with her?  Were you on the

 16    telephone?  How did you do the telemedicine?

 17        A.      Yes.  We have Doxy.me software that

 18    we use -- or the platform for telemedicine

 19    that we use.  And I have an account.  And a

 20    link is sent to any patient; in this case,

 21    Ashley Moreaux.  And she will click on the

 22    link, and it will be then a video interview

 23    and conferencing with the patient.

 24        Q.      Do you record that, or you just

 25    take notes while it's taking place?

**Huma Haider, M.D.**
**January 11, 2021**

Page 104

```
 1      A.      No.  I don't believe that there

 2  is -- we have -- we can record that.  So while

 3  I'm talking to the patient, I'm taking down --

 4  writing down my notes.

 5      Q.      All right.  And is this Doxy.me

 6  service something that you still use, to this

 7  day?

 8      A.      Yes, we do.

 9      Q.      Do you remember who did the

10  neuropsych assessments that were done in

11  Houston at NBII's office on April 3rd and

12  April 4th, 2020?

13      A.      Yes.  It would be written on the

14  response booklet for the patient, record forms

15  and response booklets.

16      Q.      Okay.  But as we sit here right

17  now, you don't remember who it was that did

18  it?

19      A.      I would have to look at the name of

20  the person or technician who did that

21  assessment.  We have a few of them who do it,

22  so it could be different for different

23  patients.

24      Q.      Okay.  Well, we'll look at that a

25  little later.
```

**Huma Haider, M.D.**
**January 11, 2021**

1          Do you know whether the person who

2    started the neuropsych assessments on Ashley

3    on April 3rd was the same person who completed

4    them on April 4th?

5        A.      I believe so.

6        Q.      And these -- the people who did, in

7    April of 2020, assessments, neuropsych

8    assessments on patients for NBII, were they

9    independent contractors or part-time employees

10   or a mixture?

11       A.      Yeah.  All of our technicians who

12   do the initial testing battery, they are

13   full-time employees.

14       Q.      Okay.  And are all of the full-time

15   employees who do the assessments certified in

16   administering neuropsychological assessments?

17       A.      Every institution has their own

18   policy, and our institution's policy is the

19   clinicians or technicians have to have a

20   college degree, and they have to go through

21   the training process at NBII, under the

22   supervision of a licensed psychologist and

23   myself.  And so once they complete that

24   training, then they are qualified to perform

25   those assessments, under supervision of a

**Huma Haider, M.D.**
**January 11, 2021**

1    licensed psychologist and myself.

2        Q.      Okay.  And who for NBII was the

3    licensed psychologist?

4        A.      It was Dr. Gavron, and it's

5    Dr. Daniel Osborn.

6        Q.      Doctor -- what's the first name?

7        A.      Gavron.  Lauren Gavron.

8        Q.      No.  I'm sorry.  Of Dr. Osborn.

9                What's Dr. Osborn's first name?

10       A.      Daniel Osborn.

11       Q.      Daniel Osborn.

12               Okay.  So is there any

13   certification or licensure that one can obtain

14   in administering neuropsychological assessment

15   batteries?

16       A.      Yes.  There is a psychomotrician

17   certification an individual can obtain to

18   administer the neuropsychological assessment

19   batteries.

20       Q.      But the employees that you have

21   administering the tests as of April 2020 did

22   not have that designation; correct?

23       A.      So, in order for you to become a

24   psychomotrician, you have to go through a

25   training -- not training.  You have to perform

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    this test, I believe it's 300 or some hours

 2    and a number of testing that they have to

 3    perform, and then they can take the test.

 4              So a few of our clinicians are in

 5    the process where they are getting the

 6    acquired hours and the number of assessments

 7    that they need to take that test and exam.

 8    And, regardless, it is not a requirement for

 9    them to be able to administer this testing.

10       Q.      Okay.  Again, not my question.

11              My question was:  As of April 2020,

12    were any of them psychomotricians?  And your

13    answer is "no"?

14       A.      No.

15       Q.      Okay.  And you said it's not a

16    requirement that the person administering the

17    test batteries be a psychomotrician; a

18    requirement determined by whom?

19       A.      First of all, it's not a

20    requirement by our institution, and it is also

21    not a requirement by many other institutions.

22    And I'm not aware of any requirement by any

23    other governing agency that makes it a

24    requirement for the testing to be administered

25    by a psychomotrician.
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 108

```
 1      Q.      Okay.  So when you said "not a
 2   requirement of our institution," you mean
 3   NBII?
 4      A.      Correct.  The requirement of NBII
 5   is that the person administering the testing
 6   has to have a college degree, and they have to
 7   be trained, and they have to be supervised.
 8      Q.      How many neuropsychological test
 9   administration employees did you have in April
10   of 2020 in the Houston office?
11      A.      I don't know exact at that time,
12   but at any time, we have about three or four
13   full-time employees who are trained to
14   administer neuropsychological assessment
15   testing.
16      Q.      Okay.  You mentioned Dr. Gavron as
17   being one of the people that would supervise
18   the training that you mentioned for your
19   clinicians and neuropsychological testing;
20   correct?
21      A.      Correct.
22      Q.      Did she perform that role in person
23   on-site in Houston, or did she do that somehow
24   remotely?
25      A.      Remotely.
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 109

```
 1      Q.      I see.  And how does that work?
 2      A.      So, just like that we are having a
 3   Zoom conference and having this deposition,
 4   then she would have a meeting with all the
 5   clinicians in a similar manner.  Everyone
 6   would log in.  Everyone she would be able to
 7   see.  She will be able to talk to everyone,
 8   and she will be able to go over the training
 9   materials.  She's going to be able to show
10   them the training materials.  Everything is in
11   our cloud, G Suite, so all the clinicians all
12   have access to all the training materials.
13               And it's a very comprehensive
14   training process.  Before anyone can
15   administer that, they have to go through a
16   competency checklist and a process.  So there
17   are training videos; there are training
18   manuals.
19               So sometimes it can take up to,
20   just in reading and going through that
21   material, two or three weeks before they can
22   actually start to shadow someone who is
23   administering that.  And after shadowing them
24   several test batteries, then they administer
25   in supervision.  And then when they are ready,
```

Huma Haider, M.D.
January 11, 2021

Page 110

```
 1    then they are able to independently administer

 2    that.

 3              So it's a very, very rigorous

 4    training process.  And remotely, as we all

 5    know that these days everything is done

 6    remotely, and it is as superior as doing

 7    things in person.

 8       Q.     Okay.  So the training materials

 9    that you mentioned, the training material and

10    the manuals that you put your clinicians

11    through before they are able to independently

12    give the assessments, you said those are

13    stored in the cloud for NBII somewhere; is

14    that right?

15       A.     Yes.  So it is in our cloud system

16    that we use.  So there is step-by-step

17    training documents; there is step-by-step

18    script of administration; there is

19    step-by-step videos of it; and there's actual

20    manuals of the neuropsychological assessment

21    battery there also scanned and uploaded in our

22    cloud system.  So all the materials are

23    accessible and available to everyone at all

24    times.

25       Q.     Okay.  And when -- you said that
```

**Huma Haider, M.D.**
**January 11, 2021**

1    the employee being trained will shadow another

2    clinician who is already working in your

3    practice; correct?

4         A.        Correct.

5         Q.        In the training process, is

6    Dr. Gavron or Dr. Osborn watching that process

7    take place by Zoom or that's just the trainee

8    watching the existing clinician?

9         A.        Dr. Osborn is on-site here in our

10   Houston office, so he does see in person the

11   actual training, and he's training them

12   himself, also.  So it is his discretion that

13   when he thinks that the clinician is ready to

14   be independent or -- and it is, you know, as

15   any other disciplines, it's an ongoing

16   training and teaching, also.  It doesn't stop

17   when you complete training.

18              So there is an initial bulk of the

19   training that the clinicians get, but at the

20   same time, just like I -- as a medical doctor,

21   I have to continuously keep up with what my

22   licenses are, so they continue to get ongoing

23   training and improvement.

24              And, in fact, we have -- every

25   quarter, we do in-service training, where the

Huma Haider, M.D.
January 11, 2021

```
 1   clinicians are going to sit down with

 2   Dr. Osborn, and they are going to discuss the

 3   challenges; they are going to discuss the

 4   areas that anyone needs for the training.  So

 5   it's ongoing training.

 6       Q.      I forgot.  Is Dr. Osborn an

 7   independent contractor or a full-time

 8   employee?

 9       A.      He's a part-time employee with us.

10   He's here on Monday, Wednesdays, and Fridays.

11       Q.      And when did he start working with

12   NBII?

13       A.      I think he started working with

14   NBII in the later part of last year.

15       Q.      So after the time when Ashley was

16   seen by NBII?

17       A.      Yes.  Ashley was seen in April, and

18   he started with us, I think, later half of the

19   year.

20       Q.      Okay.  And so the clinicians who

21   would have administered neuropsychological

22   testing batteries to Ashley would have been

23   trained by Dr. Gavron?

24       A.      Yes.

25       Q.      And Dr. Gavron is no longer with --
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    or working with NBII; is that right?
 2         A.        So she is an independent
 3    contractor.  And she has said to us that as an
 4    independent contractor basis, she would be
 5    available.  So at this time, we have not work
 6    with her, but definitely -- she's based in
 7    Florida, and I have Florida license, also.
 8    And if we need to work with her in future, we
 9    will be able to work with her.
10         Q.        Okay.  At the time that Ashley
11    Moreaux was seen by NBII, was Dr. Gavron based
12    in Florida at that time?
13         A.        Yes.
14         Q.        All right.  And so the -- as I
15    recall her testimony, the procedure for Ashley
16    was, the results of the neuropsych testing
17    that was done in Houston at NBII on April 3rd
18    and 4th were provided to Dr. Gavron, who,
19    based upon those results, rendered her
20    opinions; is that your understanding of how it
21    went?
22         A.        So let me explain the process a
23    little bit.  So the testing -- so we've been
24    over the training process, right.
25                   So Dr. Gavron selected the tests
```

Huma Haider, M.D.
January 11, 2021

Page 114

 1    that would be provided to the majority of our

 2    patients.  She also worked on creating the

 3    template for the neuropsychological assessment

 4    test battery, and then she was also involved

 5    in the training of the clinicians.

 6               Now, so -- and as I said, after --

 7    the clinician has to go through a very

 8    rigorous testing process and a competency

 9    checklist.  After they are approved by our

10    standards, then they are providing or

11    administering the tests.

12               Now, after the tests are -- the

13    tests are paper/pencil testing, for the most

14    part.  So there, the clinician is writing down

15    the responses of the patient and the scores in

16    the record booklet and the response booklet.

17               So after -- the total test time

18    could be six hours, eight hours, ten hours.

19    As you saw in Ashley's case, it was divided

20    over in two days.

21               So after the testing is completed,

22    then all the raw data is entered -- there is

23    two ways that it could be -- the raw data

24    could be converted into scores:  either you

25    could do it manually, which takes longer time,

Huma Haider, M.D.
January 11, 2021

1    and then this would involve some human error

2    in it; or you could use a computer software

3    program, where you could enter the raw data

4    into the computer software program, where, you

5    know, it would convert the raw data into

6    Z-scores, then into standard scores, then into

7    actual -- then actual total scores.  And then

8    that raw data and the report is then uploaded

9    into the cloud system that we have, which is G

10   Suite.

11              Now, once the raw data is

12   uploaded -- and there is a template of

13   neuropsychological assessment, which this

14   information is then put into that template and

15   then given to Dr. Gavron or a psychologist,

16   whoever we are working with.  And that

17   psychologist or neuropsychologist then reviews

18   the report, reviews the raw data, and then

19   render their opinion, along with any other

20   information that we have available for the

21   patient that would be provided to them.

22        Q.      Okay.  Is the neuropsychological

23   testing done at NBII videotaped?

24        A.      No, it's not.

25        Q.      So in the case of Ashley Moreaux

Huma Haider, M.D.
January 11, 2021

Page 116

```
 1    with Dr. Gavron, was Dr. Gavron provided any

 2    information other than the raw data and the

 3    compiled test results you just described?

 4        A.      So Dr. Gavron was provided the

 5    medical records for the patient, the raw data

 6    results, the report of the raw data, and then

 7    the background information of the patient --

 8    the past medical history, past surgical

 9    history, and the initial comprehensive

10    evaluation that was performed for the patient.

11        Q.      Okay.  So when you say "medical

12    records," Dr. Gavron was provided with all of

13    the medical records that NBII had on Ashley

14    Moreaux?

15        A.      So the way our system works is that

16    Dr. Gavron has access to our clinical -- all

17    the clinical files for the patients.  So she

18    has access.  It's a shared -- how do I explain

19    it?

20        Q.      Well, I think I understand.

21        A.      You understand, okay.

22              So it's the patient folders are

23    shared with the clinician.  So I have the same

24    access as she has.

25              So Ashley Moreaux's folder, it has
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    all of her medical records.  It has all of the

 2    reports that, you know, are written at NBII.

 3    So she will have access to all the information

 4    that I have access to.  So it's not like that

 5    we are separately sending some things to her

 6    via email.  No.  It's like she has been given

 7    the access, she's been provided the access,

 8    and then so she goes in the patient's folder,

 9    or in her folder, the reports are there that

10    she needs to work on, and she will have all

11    the raw data, the actual report, and access to

12    the patient's medical records.

13         Q.    Did she directly interview Ashley

14    Moreaux as part of NBII's assessment and/or

15    care, that is, whether by telemedicine or in

16    person?

17         A.    So that's part of the training

18    process that the psychologist provides to our

19    patients -- sorry -- to our clinicians.  And

20    if when they are reviewing the reports they

21    feel like they need to -- they don't have

22    enough information, then they will reach out

23    to the patients themselves, either via

24    telemedicine or via telephone, to obtain more

25    information that they need to.
```

**Huma Haider, M.D.**
**January 11, 2021**

1      Q.      Okay.  And in the case of Ashley

2   Moreaux and Dr. Gavron, do you know whether

3   that occurred?

4      A.      I believe she spoke with the

5   patient over the phone to obtain any further

6   information that she needed.

7      Q.      Okay.  And is that coming from your

8   own memory or from review of records, or do

9   you know?

10     A.      No, I don't remember.

11     Q.      Okay.  So going back to Exhibit 4,

12   the Initial Comprehensive Evaluation, the

13   History of Present Illness narrative there,

14   does that come from your interview via Zoom

15   with Ashley?

16     A.      Yes.  Via telemedicine, I would

17   say.

18     Q.      Okay.  And I'm sorry.  You said it

19   was -- what was it -- "Go See Doc"?  Is that

20   the platform?

21     A.      It's called "Doxy.me."

22     Q.      Doxy.me?

23     A.      D-O-X-Y-M-E, yeah.

24     Q.      Okay.  And what you've recorded in

25   the History of Present Illness, how is the

**Huma Haider, M.D.**
**January 11, 2021**

```
 1    information that you gleaned from talking with
 2    the patient transferred into this typed,
 3    formal report, the Initial Comprehensive
 4    Evaluation; that is, do you take handwritten
 5    notes and then later generate the report?  Do
 6    you just remember, or do you type it as you
 7    go?
 8         A.      Absolutely not.  To remember
 9    something that -- you know, it's an hour-long,
10    two-hour-long conversation.  I'm going to miss
11    a lot of important information if I just try
12    to remember and then go back and then try to
13    write everything down.
14              No.  So I am writing down this
15    information either via voice-typing or I'm
16    pen-typing this information down when I'm
17    talking to the patients.  I don't take any
18    handwritten notes.  We don't do that at NBII.
19    We are a cloud-based practice.  So if anytime
20    you come in my office, you are not going to
21    see any paper on my table.  So everything that
22    is there is, you know, written down in the
23    patient's record.
24         Q.      Okay.  So if I followed all that
25    right, while you're interviewing the patient,
```

**Huma Haider, M.D.**
**January 11, 2021**

1    you're typing into the evaluation what she

2    tells you?

3         A.        Absolutely, yes.

4         Q.        And are you actually doing the

5    typing, or are you dictating?  How do you

6    accomplish that?

7         A.        It could be a combination of both.

8    I could be voice-typing or I could be

9    hand-typing.

10        Q.        Oh, I see.  But either way, there's

11   not some other person involved in the physical

12   process of generating the report; it's all

13   you, Dr. Haider?

14        A.        Yeah.  I don't see a nurse

15   practitioner doing this with me. So if there

16   is a nurse practitioner involved, then, yes,

17   the nurse practitioner will be writing down

18   the information alongside with me if I'm

19   writing down the information in the note.  But

20   we are all working in the note at the same

21   time, so there would be nobody keeping

22   separate notes.

23        Q.        Okay.  So, for example, on the

24   first line of the History of Present Illness:

25   Patient 29 years old does not remember

Huma Haider, M.D.
January 11, 2021

Page 121

1    anything from 3/2018 collision."

2              That's you're writing down what

3    Ashley herself is directly telling you,

4    Dr. Haider?

5       A.    So let me just -- I'm asking the

6    patient, I think, "Can you tell me what you

7    remember about your injury?"

8              And if a patient would remember,

9    they would say, "Okay.  On this date or this

10   time, you know, so-and-so happened to me" --

11   or in her case, when I started asking her, she

12   told me she does not remember anything from

13   that injury.

14             Then I further -- you know, you can

15   read in my note.  Then I further started

16   probably asking her, "Okay.  What is your

17   first memory?"

18             Then she told me what was her first

19   memory.

20             So it is as she has described to me

21   during that interview.

22      Q.    Okay.  And, yeah, I understand it,

23   and I can read the content.  I have a few

24   questions about the content.

25             But what I was driving at there is,

**Huma Haider, M.D.**
**January 11, 2021**

Page 122

```
 1   is what's written there is your note from what

 2   Ashley herself told you in the interview?

 3        A.        Correct.

 4        Q.        All right.  And the second

 5   sentence:  She says the memory she has is that

 6   she was in a bookstore purchasing some books,

 7   "if that memory is correct," in quotes.

 8                  Did you follow up on that?  Was

 9   that a memory of just prior to the collision,

10   or do you know?

11        A.        Yes.  Prior to the collision, if

12   that memory is correct.

13                  So the quotation is her exact

14   words, that "if that was a correct memory."

15        Q.        Did you ask her where the bookstore

16   was?

17        A.        No, I did not ask her.

18        Q.        Okay.  And you say she has no

19   memory of her birthday or Thanksgiving that

20   year.  This occurred March 1 of 2018, so are

21   we talking about 2017 she doesn't remember her

22   birthday or Thanksgiving?

23        A.        Yes, of that year, of this

24   birthday, her birthday from -- on 2018, that

25   she does not have any memory of her birthday
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 123

```
 1    or Thanksgiving in 2018.
 2        Q.      Okay.  So -- all right.  So that's
 3    what I was driving at, though.
 4              It's memory of her birthday or
 5    Thanksgiving in 2018, that is, after the
 6    accident; not 2017, before the accident;
 7    correct?
 8        A.      Yes.  So she does have lapses in
 9    her memory.  And what she's getting here is
10    that it is memory of her birthday and
11    Thanksgiving of that year, which is 2018.
12        Q.      Okay.  And you say the details of
13    the collision were given to her by her family,
14    which, I guess, she then recounts what they
15    told her?
16        A.      Yes.  So she has lapses in memory
17    from a few months prior to what happened,
18    then, you know, several months after that.
19    And, you know, that can happen.  That is
20    anterograde and retrograde amnesia for the
21    patient.
22              So, in her words, you know, she
23    does not remember.  But what her memories are
24    now is because of her family, that either they
25    have told her about the injury that she
```

Huma Haider, M.D.
January 11, 2021

Page 124

```
 1   sustained or they showed her pictures of her
 2   hospital stay or different days or different
 3   events that occurred.
 4            So as I said, you know, in 2018,
 5   prior to that, she also had memory lapses;
 6   like a year before or two years before, she
 7   does not remember all the details, prior to
 8   and after that.
 9       Q.     "After that" being the collision?
10       A.     Yes.  2018.  So there is -- she has
11   memory lapses prior to 2018, also, and after
12   2018.
13       Q.     Okay.  Did she indicate to you one
14   way or the other whether this memory of being
15   in a bookstore purchasing some books, was that
16   just shortly -- within minutes before or
17   within an hour before her collision, or did
18   she not clarify that one way or the other?
19       A.     No, she did not.  She could not
20   remember whether it was immediately before or
21   several days before or several weeks before.
22   All she remembered was -- the only thing that
23   she remembers is she was purchasing some
24   books.
25       Q.     Okay.  And did she indicate to you
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 125

```
 1    whether she had made any stops after she got

 2    off work?  It says, "she got off work at

 3    3 a.m.  After getting off work, she was

 4    driving to her parents."

 5            Did she indicate one way or the

 6    other whether she made any stops in between?

 7    A.      No.

 8    Q.      All right.  You say first that her

 9    first memory after the collision is her sister

10    bringing her baby to the hospital.  And then

11    the next sentence says "she is not sure what

12    is her first memory after the collision."

13            So I was unclear on what that

14    meant.

15    A.      Right.  So she explained to me

16    after that she thinks that is her first memory

17    because her -- you know, she sees the pictures

18    that the family has taken, but she does not

19    know that if this is her actual memory or if

20    she is remembering this after seeing the

21    pictures that the family has taken when her

22    sister brought the newborn baby to visit her

23    in the hospital.

24    Q.      Got it.  Okay.

25            And then below, she says, "I really
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 126

```
 1   don't remember the hospital stay" -- "anything

 2   of the hospital stay"?

 3       A.      Yes.

 4       Q.      And then you say "the information

 5   from the collision came" -- "about the

 6   collision is obtained from the medical

 7   records.  That's from her hospitalization?

 8       A.      Yes.

 9       Q.      And so everything that comes after

10   that statement in your History of Present

11   Illness is drawn from the hospital medical

12   record?

13       A.      Correct.

14       Q.      And did you personally review the

15   hospital medical records, or is that something

16   that someone -- an independent contractor or

17   employee does?

18       A.      No.  I have done this myself.  And

19   these are, like, a lot of medical records.

20       Q       Okay.  And you are saying you've

21   read through all of these -- Ashley Moreaux's

22   medical records?

23       A.      I have.  And as I said, these are,

24   like, thousands of pages of medical records.

25   I may not remember all of it, but I may have
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 127

```
 1    to go back in reference to them.

 2        Q.       That's perfectly understandable.

 3    But what I want to be clear on is that --

 4    yeah, I agree.  I've added it up.  It's

 5    something like on the order of 20,000 pages of

 6    medical records.

 7        A.       Yes.

 8        Q.       You personally have read through

 9    the entirety of Ashley's medical records?

10        A.       Yes, I have.

11        Q.       Okay.  And those medical records,

12    are those stored in the cloud you mentioned

13    earlier for -- under Ashley's file?

14        A.       Yes.  It would be in Ashley's

15    folder.

16        Q.       And when you say "folder," you mean

17    digitally, right; not a physical folder?

18        A.       Correct.

19        Q.       When you say that the patient had a

20    GCS of 12 -- that's the Glasgow Coma Scale;

21    correct?

22        A.       Correct.

23        Q.       All right.

24                 Is that something you drew from the

25    ER record?
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 128

```
 1        A.       Yes.

 2        Q.       All right.  And so what her actual

 3   Glasgow Coma Scale condition was at the time,

 4   all you have is what's written in the ER

 5   report; right?  You don't have any other

 6   independent basis to assess that?

 7        A.       Yes.  That was reported in the ER

 8   records.

 9        Q.       Yes.  But what I'm driving at is,

10   you don't have any independent corroboration

11   or verification of that score.  You're just

12   relying on what the ER doc wrote down;

13   correct?

14               MR. PALERMO:

15                   Objection.

16               THE DEPONENT:

17                   Can you explain more what you

18               mean by this question?

19               MR. VERLANDER:

20                   Well, I can try again.

21               MR. PALERMO:

22                   We just lost audio, so . . .

23      (Whereupon, a discussion was held off the

24                   record.)

25   BY MR. VERLANDER:
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 129

```
 1      Q.      So, Dr. Haider, let's try again.

 2              I asked a question which you were

 3   not clear on what I was asking, and I think

 4   Rock objected to the form as well.

 5              What I was driving at, or trying to

 6   drive at, was:  This GCS of 12 you already

 7   indicated was pulled from the ER record for

 8   Ashley when she was admitted to the hospital

 9   right after the collision; correct?

10      A.      Yes.

11      Q.      All right.  And my question was:

12              Do you have any way of

13   independently corroborating or verifying that

14   that is an accurate score for her at the time,

15   or you just have to rely on what's written in

16   the record like the rest of us do?

17      A.      So are you saying that I should

18   score --

19      Q.      Well, no.  No, ma'am.  I'm not

20   saying --

21      A.      Because I can do those.  I have

22   very well done those GCS -- I do it all the

23   time -- to see what is the, you know, eye

24   opening, verbal response, motor response of

25   the GCS is.  So verifying, that is one way --
```

**Huma Haider, M.D.**
**January 11, 2021**

 1   a good thing to verify is to do it myself.

 2              So, again, I may not understand

 3   your question correctly.  What do you mean by

 4   "verifying" it?  Should I go to the nurse and

 5   ask her how did she do it, is she trained in

 6   doing that, or --

 7      Q.      Well, no, ma'am.  I wasn't -- there

 8   wasn't really any particular implication about

 9   the question that you should have done

10   something different than what you actually

11   did.  All I was trying to establish is that

12   that score that is recorded in your history is

13   not the result of any independent assessment

14   of Ashley's GCS score at the time by you; that

15   is a recordation of what was recorded in her

16   medical record?

17      A.      That is correct.  That was how it

18   was listed in the medical record.

19      Q.      When you say, at the bottom with

20   the bullet points, "LOC: Yes," that's "loss of

21   consciousness"; correct?

22      A.      Correct.

23      Q.      And is that "yes" based on what

24   Ashley told you or based on the medical

25   record?

Huma Haider, M.D.
January 11, 2021

Page 131

```
 1      A.      It's both.

 2      Q.      Well, but she doesn't remember

 3  anything about what happened after the

 4  collision; right?

 5      A.      Correct.  So she does not remember

 6  anything; right.  So that is an indication

 7  that she had confusion, disorientation.  She

 8  has loss of consciousness, post-traumatic

 9  amnesia, and low GCS, so that is indicative of

10  loss of awareness.  And the medical records

11  also indicate that she did have loss of

12  consciousness, loss of awareness, confusion,

13  and disorientation.

14      Q.      But it's possible to have

15  post-traumatic amnesia without having lost

16  consciousness at the point of trauma or

17  immediately thereafter, isn't it?

18      A.      It is a possibility, yes.  The

19  patient can have post-traumatic amnesia,

20  and -- but again, the loss of consciousness,

21  there's a few things there.

22              Okay.  So when the paramedics were

23  called, there is a time period in between that

24  she could have loss of consciousness, and the

25  indicator for that is, you know, she does not
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1   remember.  Her last memory is, you know, she

 2   was at a bookstore.  So, clearly, there is a

 3   missing time period where she does not

 4   remember it.  So that is a loss of

 5   consciousness there, also.

 6              Then the paramedics arrive.  There

 7   is a five-minute -- at least five-minute gap

 8   in there.  They came in and they find her

 9   confused and disoriented.  Now, that is loss

10   of awareness; that is loss of consciousness.

11   So, and then she has post-traumatic amnesia,

12   then she had the GCS is low.  So all of that

13   points towards altered mentation and

14   alteration of brain function.

15      Q.      Did you say that confusion and

16   disorientation are loss of consciousness?

17      A.      Uh-huh (positive response).

18              Yes.  They are on the spectrum of

19   loss of consciousness called "loss of

20   awareness."

21      Q.      Okay.

22              All right.  And then on page 2,

23   what you list there under the numbered

24   items -- they continue over to page 3 -- are

25   these headings part of your standard
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 133

```
 1    questions?  Like if I had been in a collision

 2    and came to see you with a neuro condition,

 3    would you ask me "Do you have post-traumatic

 4    headaches?" Like, is that an every-patient

 5    question?

 6        A.      Yes.  So as I said, I mostly see

 7    patients who have a traumatic brain injury.

 8    So what is important for me, for my diagnosis

 9    and treatment and plan, is, as you saw, the

10    questions such as loss of consciousness,

11    confusion, disorientation, dizziness, nausea,

12    vomiting.

13             So these questions, to you they may

14    appear as questions, but to me, they are

15    giving some more information about what is

16    going on inside the brain.

17             And I could give you an example

18    here (indicating), which I have a little --

19    you know, I always keep it on my table, which

20    is a primary injury and secondary injury, and

21    all these metabolic derangements that start to

22    happen inside the brain if there is traumatic

23    blow to the head or to the brain.

24             So when I'm asking all these

25    questions to the patient, I'm getting
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 134

```
 1   information on what is going on inside the

 2   brain at that time.

 3              So, yes, as a result of the primary

 4   and secondary injury, the patients start to

 5   have certain symptoms.  And when you look at

 6   the report for Ashley, those are symptoms that

 7   are experienced by most of the patients who

 8   suffered a traumatic brain injury.

 9              So, yes -- to answer your

10   question -- these are the questions that I do

11   ask my patients on a routine basis.  But then

12   again, every patient is different.  There

13   could be some different questions for some of

14   the other patients.

15   Q.     Okay.  Can I ask you -- since you

16   referenced that little diagram that you held

17   up just a minute ago, I would also ask you to

18   send a copy of that, if that's possible, to

19   Mr. Bice.

20              MR. VERLANDER:

21                   And we'll attach that as

22                   Exhibit 5, if I'm remembering

23                   correctly.

24              (Exhibit No. 5 is marked for

25                   identification and is attached
```

Huma Haider, M.D.
January 11, 2021

```
 1                  hereto.)

 2              THE DEPONENT:

 3                  I will see if I have an

 4              electronic copy of this diagram.

 5              What I have right now is something

 6              that is a printed and laminated

 7              version of it.

 8   BY MR. VERLANDER:

 9      Q.      Yes.  Well, I get that that's all

10   you have.  Then perhaps someone in your office

11   could scan it and forward it.  But if you have

12   it electronically, that's fine, too.

13              Is that document, that diagram that

14   you held up, something that you yourself

15   created?

16      A.      No, I have not created it.

17   Actually, this is the book that -- sorry.  I

18   dropped something (indicating).

19              So this is the book where I got

20   this diagram from.  So if you want to write

21   down the name of this book, you can find the

22   diagram in this book.  This is called Brain

23   Injury Medicine, and this is the Second

24   Edition of it.

25      Q.      Brain Injury Medicine, Second
```

Huma Haider, M.D.
January 11, 2021

Page 136

```
 1    Edition?

 2        A.      That's correct.

 3        Q.      Okay.  But still, if you can send

 4    us a copy of what you just showed us, that

 5    would be very helpful.

 6        A.      Okay.

 7                MR. VERLANDER:

 8                    Okay.  So, I tell you what.  It

 9                is 1:06 or so.  Let's -- and I know

10                you have to stop at 2:00.  Let's

11                take another five-minute break so

12                we can all stretch our legs or

13                whatever.  And I'm also going to

14                talk to co-defense counsel, because

15                it's apparent to me I'm going to

16                continue to the stop point, and I

17                want to see if she wants to have a

18                turn on this, I guess -- round, I

19                guess.  So let's start back in

20                eight minutes.  That will leave us

21                45 minutes to go.

22                THE DEPONENT:

23                    Okay.

24                MR. BICE:

25                    Sounds good.
```

Huma Haider, M.D.
January 11, 2021

Page 137

```
 1   (Whereupon, a recess was taken from 1:07 p.m.

 2                to 1:18 p.m.)

 3                MR. VERLANDER:

 4                     Dr. Haider, we're back on,

 5                after a short break.

 6                     It's evident that we're not

 7                going to complete our discussion

 8                today.  We've -- to accommodate

 9                your other obligations, we're going

10                to stop at 2:00 today.  But since

11                it's evident that we're not going

12                to complete it today, I want to go

13                ahead and attach as Exhibit 5 --

14                or, no.  I'm sorry.  Exhibit 5 was

15                the diagram.

16                     Exhibit 6 will be the Future

17                Medical Report, also dated April 4,

18                2020, which is 11 pages.

19                (Exhibit No. 6 is marked for

20                 identification and is attached

21                 hereto.)

22   BY MR. VERLANDER:

23        Q.    And that's also a document prepared

24   by you; correct?

25        A.    Correct.
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 138

```
 1      Q.      Okay.  You mentioned earlier that
 2  the neuropsych battery of testing, both the
 3  raw data and the, I guess, summation or
 4  compilation of that data, are kept in Ashley's
 5  file in the -- in your NBII cloud; do I
 6  remember that right?
 7      A.      Correct.
 8      Q.      Okay.  Again, I can't swear that
 9  prior counsel for the defense did not have
10  that, but I don't recall seeing in the records
11  that we have from NBII that information.
12              That is documentation y'all still
13  retain in your records?
14      A.      Absolutely.  So it's the raw data,
15  right.  So the raw data, we can only release
16  it to another provider, whether it's a
17  neuropsychologist, a psychologist, or a
18  medical doctor.  So the release of the raw
19  data happens between provider to provider.
20              So we don't -- we give you the
21  report that is generated based on the raw
22  data, but the actual raw data is given to a
23  licensed provider.  So that's the reason that
24  you did not receive that raw data.
25              If you have a provider that would
```

Huma Haider, M.D.
January 11, 2021

Page 139

```
 1   communicate with us, send us an email, give us
 2   their email address and their mailing address
 3   and they're name, then we would be happy to
 4   send them the raw data.
 5        Q.      Okay.  Understood.
 6                And we'll actually take that up
 7   through Ms. Moreaux's counsel as well as
 8   y'all.  We'll work with Michael and Jay to get
 9   that.
10                But you indicated that in that raw
11   data would be the information about who did
12   the actual assessment battery for Ms. Moreaux.
13        A.      Absolutely.  So I can show you a
14   sample form of it.  I have it here.
15                So it's not belonging to any
16   patient.  It's a blank form (indicating).
17                So let's say this is the -- this is
18   the memory module, right.  So here you could
19   see that the name of the patient will be here,
20   date of birth, age, sex, ethnicity,
21   handedness, education.  And then there is the
22   date of examination and the examiner.  And the
23   examiner portion will be written down who
24   administered this assessment for the patient.
25                And then the person who's
```

Huma Haider, M.D.
January 11, 2021

Page 140

 1    administering that information, then they will

 2    be hand-filling all the information out in

 3    there for the patient.

 4                So this is all blank, but all this

 5    information will be present in Miss Moreaux's

 6    memory module record form.

 7        Q.      Okay.

 8        A.      Same with the language form

 9    (indicating), right.  This is the blank form.

10    But Ms. Moreaux has a file like this in our

11    folder, which will be provided to your expert.

12                Same how it goes for the spatial

13    form.  So there is several of these for

14    Ms. Moreaux in her folder.

15        Q.      Okay.  But as we sit here right

16    now, you don't have in front of you the record

17    indicating who it was who did the assessments

18    on Ms. Moreaux?

19        A.      No.  I don't have those records in

20    front of me right now.

21        Q.      Okay.  Well, perhaps that's

22    something we can resolve between Part 1 and

23    Part 2 of this deposition.

24        A.      Yes.  And we can provide all this

25    information to your expert and they can have a

Huma Haider, M.D.
January 11, 2021

Page 141

```
 1   look at all the raw data.
 2      Q.      Yes.  Thank you for that
 3   explanation and cooperation.
 4              Okay.  So going back to the --
 5   well, before I get back in the Initial
 6   Comprehensive Evaluation, the Future Medical
 7   Report document that we labeled as Exhibit 6,
 8   it's dated -- it just says "date of service,"
 9   and maybe it says somewhere else where you --
10   when you generated the report.  But if it
11   does, I didn't see it.  Was that done on the
12   same April 4th date?
13      A.      I have to check the dates
14   (reviewing).
15      Q.      I wasn't sure if "date of service"
16   on the Future Medical Report, Exhibit 6, means
17   the date that you generated the Future Medical
18   Report or the date that you spoke with
19   Ms. Moreaux.
20      A.      So it is the same date, which is
21   April the 4th; that's when I interviewed Miss
22   Ashley Moreaux.
23      Q.      Okay.  So both Exhibit 4, the
24   Initial Comprehensive Evaluation, and Exhibit
25   6, the Future Medical Report, were generated
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 142

```
 1   by you, personally, on April 4th, 2020?

 2        A.      Correct.

 3        Q.      Okay.  I thought, in your earlier

 4   testimony, you alluded to a follow-up visit or

 5   assessment by someone, or maybe multiple

 6   people, at NBII with Ashley Moreaux; did I

 7   understand that correctly?

 8        A.      Yes.  She does have a follow-up,

 9   yes, with us.  And that follow-up visit was

10   done on August 13th of last year.

11        Q.      Of 2020?

12        A.      Correct.

13        Q.      Okay.  And have you provided

14   records of that follow-up visit?

15        A.      Yes, we have.

16        Q.      Okay.  To her counsel?

17        A.      Yes.

18        Q.      Okay.  Do you know if you provided

19   records of that follow-up visit in response to

20   subpoena from Hallmark?

21        A.      Yes.  We have an -- and I'm

22   surprised that you don't have any of that.

23   You don't have my most updated CV; you don't

24   have a list of my testimony and trial and

25   deposition experience; you don't have the
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 143

```
 1    records that were provided by my office in

 2    response to the subpoena.  Because, you know,

 3    that is provided all the time.

 4              So, yes, we do have a follow-up

 5    visit with her, and there is a report of that,

 6    and that was on August 13th, 2020.  And it's

 7    not like on purpose we did not provide it to

 8    you.  We always do that.  So I'm just a little

 9    confused why you don't have all of these notes

10    and reports.

11       Q.    Well, yeah, obviously, I'm raising

12    it because I need to have the paper in front

13    of me to ask you about the things I need to

14    ask you about, but I'm sure that's

15    something we can track down and resolve again

16    between what's now going to be Part 1 and Part

17    2 of your deposition.

18              Okay.  On that August 13, 2020

19    visit, that took place in Houston?

20       A.    That took place via telemedicine.

21       Q.    Okay.  And who was involved in the

22    telemedicine visit?

23       A.    My nurse practitioner and myself.

24       Q.    And which nurse practitioner?

25       A.    It was Jacqueline Childs.
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 144

```
 1      Q.        And what did Jacqueline do with
 2   Ashley on August 13 of 2020?
 3      A.        So it was a follow-up note to
 4   follow up on all the symptoms that she has
 5   reported to us on the initial comprehensive
 6   evaluation, to ask her if she has developed
 7   any new symptoms, any worsening of the
 8   symptoms, any improvement of the symptoms; the
 9   medications that she's taking, need to
10   increase or decrease the medication or add
11   some more medication; add some more tests.
12              So it's all of the above.
13      Q.        Okay.  And all of that is reflected
14   in the report for that visit?
15      A.        Correct.
16      Q.        All right.
17              MR. VERLANDER:
18                  I tell you what.  I will label
19                  as Exhibit 7 the August 13, 2020
20                  visit, telemedicine visit report,
21                  if you will provide that to counsel
22                  and they'll get it to the court
23                  reporter and so on.  And that way
24                  we can review it prior to the
25                  next -- the completion of your
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 145

```
 1              deposition.
 2              (Exhibit No. 7 is marked for
 3               identification and is attached
 4               hereto.)
 5              THE DEPONENT:
 6                  Okay.
 7     BY MR. VERLANDER:
 8         Q.      Thank you.
 9              And what was your role in the
10     August 13, 2020 visit?
11         A.      Well, my role is the supervising
12     physician for Jacqueline Childs.  I meet with
13     her on her evaluation of the patient, and I
14     review the report, and I agree with the
15     recommendations or I add more recommendations.
16     So it's a collaborative teamwork between me
17     and Jacqueline Childs.
18         Q.      Okay.  Thank you.
19              But you, personally, did not speak
20     with Ashley on August 13, 2020 on this
21     telemedicine follow-up?
22         A.      No.  I did spoke with her.
23              So it's common in all the medical
24     practices where the nurse practitioners will,
25     you know, assess and evaluate and speak with
```

Huma Haider, M.D.
January 11, 2021

Page 146

```
 1   the patient and the medical provider joins in

 2   in the middle of it and gets the report from

 3   the nurse practitioner.  And if, you know, I

 4   have any question, then I would ask Ashley

 5   myself.

 6             And then me and the nurse

 7   practitioner go over the treatment and plan

 8   together and ask Ashley if she has any

 9   question regarding the treatment and plan, and

10   then the visit ends after that.

11             But Jacqueline Childs would -- or

12   the nurse practitioner starts it, the visit,

13   and I become part of it during that visit.

14   Q.      Okay.  So I get this, so I'm clear,

15   this was on that same platform you mentioned

16   earlier?  I won't say it again because I will

17   say it wrong.

18   A.      Yes.  So what I see here is -- yes.

19   It was via telemedicine visit that that was

20   performed, and that was via Doxy.me.

21   Q.      Okay.  And were you -- I'm not

22   clear on the -- I heard your narrative about

23   it, but I wasn't clear.

24             Were you actually present for the

25   entirety of the telemedicine visit or just for
```

**Huma Haider, M.D.**
**January 11, 2021**

 1   part of it?

 2        A.     Just for a part of it.

 3        Q.     Okay.  And so, what, Jacqueline

 4   starts it, comes up with her initial plan of

 5   action, then you come in and participate in a

 6   discussion with her and with Ashley about

 7   "have we covered everything, do we understand

 8   what we're doing?"  That's about how it goes?

 9        A.     Yes.

10        Q.     Okay.  Do you know if Jacqueline

11   did any actual supplemental assessment of

12   Ashley beyond interviewing her?

13        A.     What do you mean, "supplemental

14   assessment"?

15        Q.     Well, yeah, I guess that's a little

16   vague.

17               She didn't do anymore

18   neuropsychological testing, did she?

19        A.     No.  So during the follow-up visit,

20   the neuropsychological testing -- further

21   neuropsychological testing was not done.

22        Q.     Okay.  And then she is doing it in

23   some sort of online video interview with

24   Ashley, asking her questions about her

25   symptoms, progress, setbacks; correct?

Huma Haider, M.D.
January 11, 2021

Page 148

```
 1        A.      Yes.

 2        Q.      Correct?

 3        A.      Correct.

 4        Q.      Okay.  Is there any other sort of

 5   assessment beyond that interview process that

 6   took place on August 13, 2020?

 7        A.      I spoke with Ashley yesterday.  So

 8   there is a brief report of that in the

 9   Practice Fusion.

10        Q.      So that was on Sunday the 10th?

11        A.      Yes.

12        Q.      And was that by video or by

13   telephone?

14        A.      By telephone.

15        Q.      Okay.  And there, you made a

16   written note about that conversation?

17        A.      Yes, I did.

18   BY MR. VERLANDER:

19        Q.      All right.  So I guess I'll label

20   that as Exhibit 8, if you will provide that to

21   your counsel and counsel will get that to us

22   and to the court reporter; is that agreeable?

23        A.      Yes.

24                (Exhibit No. 8 is marked for

25                 identification and is attached
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 149

```
 1              hereto.)

 2   BY MR. VERLANDER:

 3       Q.      Thank you.

 4               How long did you talk to Ashley

 5   yesterday?

 6       A.      I spoke with her about 35 minutes.

 7       Q.      And what was the reason for that?

 8   Was that part of your preparation for this

 9   deposition?

10       A.      Yes.  That was part of preparation

11   and to follow up.  The last time I saw was in

12   August, so I wanted to follow up on how she

13   was doing from that time until now.

14       Q.      When was that telephone conference

15   with Ashley arranged?

16       A.      Oh, it was not arranged.  I have

17   her phone number listed in our system, and I

18   do call patients.  I don't have to arrange my

19   phone calls with the patients.  So I have her

20   number in the system, and I called her, and I

21   wanted to see how she was doing.

22       Q.      Oh, okay.  So just without any

23   advance warning, you just picked up the phone

24   and dialed her number?

25       A.      Yes.
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 150

```
 1      Q.      Okay.  What else did you do to get

 2   yourself ready for the deposition today?

 3      A.      I reviewed all the medical records;

 4   I reviewed all reports.  And I reviewed --

 5   yeah, most of her medical records.

 6      Q.      The August 21 -- I'm sorry --

 7   August 2020 visit, August 13, 2020, was that

 8   visit scheduled when Ashley saw you in April,

 9   or was that arranged at some subsequent time?

10      A.      No.  That was scheduled in April.

11              So the way it works is that when we

12   see the patients, we always have a follow-up

13   appointment for the patient, whether it's

14   three months, six months, one month.  So we

15   do, most of the time, schedule the appointment

16   at that visit.

17              But sometimes patients will say

18   that, you know, "Hey, I need to go look at my

19   calendar.  I will call you back and I will set

20   up an appointment."

21              But majority of the times, we are

22   setting up all of the appointments at that

23   visit.  So the August appointment was set up

24   in April.

25              Now, there is another follow-up
```

Huma Haider, M.D.
January 11, 2021

Page 151

1   appointment that is coming up.  I believe it's

2   in March.  And that was set up during her

3   August appointment.

4        Q.      Okay.  So the August appointment,

5   that's a little more than four months after

6   the April 4 appointment; correct?

7        A.      Correct.

8        Q.      So would that be a normal span of

9   time when you see a patient initially, you

10  would say "Let's schedule something four

11  months out to see how you're doing"?

12       A.      Yes.  That depends on patient's

13  symptoms and conditions, right.  So if someone

14  needs to be seen more frequently, we are

15  seeing them more frequently.  I have seen

16  patients in two weeks' time.  I have seen

17  patients in one month time.  I have seen

18  patients in three months' time.  I have seen

19  patients in six months' time.  So, you know,

20  her being seen within four months is fairly

21  routine for us.  And if I said, "I want to see

22  you in three months," then maybe because of

23  our schedule she couldn't get in in three

24  months but she got in in four months.

25       Q.      Okay.  And then you mentioned there

**Huma Haider, M.D.**
**January 11, 2021**

Page 152

```
 1    is a March 2021 follow-up that was scheduled

 2    back in August of 2020.

 3        A.        Correct.

 4        Q.        All right.  So that's, by my math,

 5    eight months after the August 2020 visit.  Is

 6    that a standard gap of time for second

 7    follow-up?

 8        A.        Again, every patient is different,

 9    right.  It's not like, okay, first we see them

10    in three months, back in six months.  It

11    depends on what the patient's needs and

12    requirements are.

13                  So if, you know, it is eight

14    months, then most likely she couldn't get in

15    in a six-month time period because of, again,

16    the schedule, so she's getting in within eight

17    months.

18        Q.        Okay.  And does the scheduling have

19    anything to do with litigation dates?

20        A.        No, absolutely not.

21        Q.        Okay.  Do you know when this case

22    is set for trial?

23        A.        I don't know.

24        Q.        Have you been asked to testify live

25    at trial?
```

Huma Haider, M.D.
January 11, 2021

Page 153

```
 1      A.      Not to my knowledge.

 2      Q.      Okay.  Do you have any idea how

 3  long the August 13, 2020 telemedicine visit

 4  with Jacqueline and then partly you lasted?

 5      A.      On an average, our visits --

 6  follow-up visits could last between an hour --

 7  anywhere between 45 minutes to one hour, 15

 8  minutes.  So it would be fair to say that it

 9  lasted between that time.

10      Q.      Okay.  I should have asked you this

11  probably earlier in the process, but how do

12  you bill for the services that NBII provides?

13  Is it based on time or based on we're

14  providing "X" testing, "Y" telemedicine

15  visits, and those are billed at a certain

16  rate; or is it based on the time that you

17  spent?

18      A.      It's a combination of all.  So

19  telemedicine or via phone, bills are different

20  than if we are seeing the patient in person.

21  So it's a different billing schedule.

22      Q.      Okay.  And the telemedicine, is

23  that based on the time that it takes or is it

24  done on some other rate system?

25      A.      It is based on time.
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 154

```
 1                  Telemedicine, we are spending less
 2      time with the patient compared to if we will
 3      be seeing the patient in person.
 4           Q.       Okay.  And then what about --
 5           A.       That may not always be true, but
 6      sometimes in telemedicine, we end up spending
 7      more time with the patient, depending upon
 8      what the patient's symptoms are and what their
 9      care and needs are.
10           Q.       Okay.  And what about the
11      neuropsychological testing; is that a flat
12      rate or is that based on how long it takes?
13           A.       That's a combination.  It's not
14      only time.  It's time.  It's expertise.  It's
15      intellectual property.  It's our time.  It's
16      our training.  It's our years that we have
17      spent in this, creating this program, and our
18      overhead, our staffing.
19                  So all of that comes together when
20      bills are generated.
21           Q.       Okay.  I get all that, that there's
22      a lot that goes into the value that you bring
23      to the table for your patients, all the things
24      you listed.  Does that then yield an hourly
25      rate or a charge of "X" amount of dollars?
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 155

```
 1      A.      As I said, it's, you know, based on

 2   everything that I just mentioned.  So it

 3   involved the services that we provide, the

 4   testing that we do, the training and

 5   experience, intellectual property, the

 6   research, the overhead.  So it's a combination

 7   of all.

 8      Q.      Okay.  I get everything that goes

 9   into it, and I agree you did just say that,

10   but at the end of the day, does that then

11   yield "We're going to charge you $10,000," or

12   "We're going to charge you $300 an hour"?

13              How do you figure what you bill the

14   patient?

15      A.      I think -- you know, I explained to

16   you that it's different.  Like when I'm doing

17   depositions, we are charging hourly for that.

18   But when we are providing some services for

19   the patient, you know, it's charged

20   differently.  It's charged based on everything

21   that I listed above.

22              When I'm preparing for a

23   deposition, then I'm charging per hour for

24   that, also.  So it's billed differently.

25      Q.      Okay.  So let's start there.
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 156

```
 1              How much do you charge per hour for
 2   preparing for a deposition?
 3       A.     I think that is on the payment and
 4   fee schedule.  I don't remember what is listed
 5   there.
 6       Q.     And where is this payment and fee
 7   schedule?
 8       A.     I think that will be with the back
 9   office, what my deposition and preparation fee
10   is.
11       Q.     Okay.  Do you charge a different
12   rate for preparing than you do for actually
13   testifying?
14       A.     I believe it's the same.
15              Again, I don't -- I don't remember
16   what is listed there.
17       Q.     Okay.  And what about at trial
18   testimony; do you charge differently for trial
19   than depositions?
20       A.     I believe it's the same, also, but
21   I think it's for more hours because, you know,
22   the entire day is spent -- if I go, there is
23   travel involved.  The whole day is then spent
24   in the court.  So I think the rate is the
25   same, but I think it's more hours, that we
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 157

```
 1    bill for more hours.

 2       Q.      Okay.  And so that's clear enough,

 3    and I guess we can determine from your payment

 4    and fee schedule you mentioned what the rates

 5    are for the testimony and preparation for

 6    testimony.

 7            But if I come in there as a patient

 8    today and say, "I was in a car wreck and had a

 9    head injury and I want you to assess me," or

10    I'm referred by someone for that purpose, and

11    I want to know how much is it going to cost to

12    do this battery of neuropsychological testing

13    you're proposing to do, you can't tell me it's

14    going to cost "X," or you can tell me?

15       A.      I will give you an example.  I

16    got -- like, I think two or three days ago, I

17    got a call from another doctor.  He was a pain

18    management specialist.  And he, in his email,

19    got an invitation for my presentation for

20    American Board of Headache Medicine that I'm

21    presenting, I think, next week or so.  So he

22    got my information from there.

23            He called my office, set up an

24    appointment to speak with me, and he wanted to

25    talk to me about his son, who suffered a
```

Huma Haider, M.D.
January 11, 2021

Page 158

```
 1   concussion.  He was playing basketball and he

 2   fell and hit his head on the concrete, and

 3   since then, he's been having symptoms.

 4            So he did a consultation with me

 5   over the phone, a brief consultation, and he

 6   wanted his son to be seen by me.  And he asked

 7   me the same question as you asked.  And I

 8   directed him to my back office, that you can

 9   call my office and they will be able to give

10   you the information that you are asking.

11      Q.      And that would come from the

12   payment and fee schedule you mentioned?

13      A.      Yes.  That would come from how do

14   we bill for the patients, what is -- what are

15   they going to be paying for their services.

16      Q.      Okay.  And that's a printed

17   document?

18      A.      Yes, that should be.  It is -- it

19   is a list of services and associated fees with

20   that.

21      Q.      Okay.

22              MR. VERLANDER:

23                  Michelle, did I list the

24                  1/10/21 --

25   BY MR. VERLANDER:
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 159

```
 1      Q.      Well, let me ask you, Dr. Haider.

 2              The telephone interview, you

 3   generated a written note about the interview

 4   yesterday?

 5      A.      Yes.

 6      Q.      Okay.

 7              MR. VERLANDER:

 8                  Have I listed that, Michelle?

 9              MS. AIYEGBUSI:

10                  You did, Paul, as No. 8.

11                  It's Denia.

12              MR. VERLANDER:

13                  Okay.  That's No. 8.

14                  Thank you.

15                  So we will make No. 9 the

16              payment and fee schedule that we've

17              been alluding to -- same thing --

18              when we obtain that through

19              Dr. Haider providing that.

20              MR. FEIBUS:

21                  Well, let's hold on, Paul.

22              We're not going to produce our rate

23              sheet in this matter.  That's her

24              proprietary -- I mean, you've

25              already got her bills.  You've
```

Huma Haider, M.D.
January 11, 2021

Page 160

```
1              already got what she's agreed to

2              charge for services which she

3              provided in this instance.  At a

4              bare minimum, we're not going to

5              produce anything, going further,

6              without a confidentiality order, if

7              we produce something at all.

8         MR. VERLANDER:

9              We can talk about

10             confidentiality, but what I'm

11             interested in is to compare what's

12             on the sheet to what's on the

13             Ashley Moreaux bill.

14        MR. FEIBUS:

15             Look, you've got the bills for

16             the services provided.  It is what

17             it is.

18        MR. VERLANDER:

19             Yeah.  But I'm entitled to see

20             if that's what is the -- in the

21             normal course of business what is

22             charged.

23             And if you need

24             confidentiality, we can work that

25             out.  I don't want to show it to
```

Huma Haider, M.D.
January 11, 2021

Page 161

```
 1              anybody.  I just want to know what
 2              it is.
 3              MR. FEIBUS:
 4                   Well, look, she's not agreeing
 5              to -- at the moment, to produce it.
 6              You're saying to mark it as an
 7              exhibit.  You and I can have the
 8              conversation.
 9              MR. VERLANDER:
10                   Fair.
11              MR. FEIBUS:
12                   I'm simply just telling you
13              that's not a guarantee.  That's not
14              a given.  That's a conversation for
15              another date.
16              MR. VERLANDER:
17                   Fair enough.  We have other
18              issues to take up, anyway, so we
19              will put that on the list.
20                   And you're right.  I guess I
21              won't list it as an exhibit right
22              now because there is pushback or
23              reservation on whether it's going
24              to be voluntarily produced.
25         BY MR. VERLANDER:
```

Huma Haider, M.D.
January 11, 2021

Page 162

```
 1      Q.      Okay.  Let's go back, in our

 2   remaining time today, Dr. Haider, to Exhibit

 3   4, which is your Initial Comprehensive

 4   Evaluation.

 5              In the questions that you ask, you

 6   mention, towards the end of No. 7, under

 7   "Speech":  "Her boyfriend also reports that

 8   she does 'aaaahhh,' repeats herself until she

 9   can complete her thoughts."

10              Was the boyfriend part of the

11   telemedicine interview?

12      A.      Yes.  Yes, he was.

13      Q.      Okay.  And so was he there the

14   whole time?

15      A.      Yes.  He was sitting with her.

16      Q.      And is that your normal operating

17   procedure when you conduct that initial

18   telemedicine interview with the patient?

19      A.      Yes.  That is normal for both.  If

20   I'm seeing a patient in person or via

21   telemedicine, we prefer to have a family

22   member or significant other or a very close

23   friend that -- who could also shed light into

24   the patient's deficits and symptoms.

25      Q.      And to conduct that interview, I
```

Huma Haider, M.D.
January 11, 2021

Page 163

```
 1    get that you would want information from loved

 2    ones, family members, friends, but it's your

 3    normal procedure to do that simultaneously

 4    with interviewing patient herself?

 5         A.      Yes.  If the patient agrees to have

 6    the other person present during the interview,

 7    then, yes, we do at the same time.

 8         Q.      Did you record any information

 9    about the boyfriend or the relationship, like,

10    first of all, who is the boyfriend at this

11    time?

12         A.      How is it -- are you asking me that

13    I did not put in the name of the boyfriend?

14         Q.      I'm asking if you know, either in

15    your head or from your records, who the

16    boyfriend was that you were interviewing as

17    part of your assessment of Ashley Moreaux.

18         A.      Yes, I do remember the boyfriend.

19         Q.      Okay.  Who was it?

20         A.      He was her boyfriend at that time.

21         Q.      Okay.  So you don't know who it

22    was?

23         A.      I don't know the name of the

24    boyfriend.

25         Q.      Okay.  And that appears to be not
```

Huma Haider, M.D.
January 11, 2021

Page 164

```
 1   something that you recorded in your notes?

 2       A.      It is not.  Knowing the name does

 3   not change or influence my diagnosis or

 4   treatment of Ms. Moreaux.

 5       Q.      Okay.  Do you know if -- is the

 6   maintaining of a relationship by the patient a

 7   relevant consideration in your assessment of

 8   the patient at NBII?

 9       A.      Can you be more specific of this

10   question?

11       Q.      Yes.  Like, is it relevant to your

12   overall evaluation of the patient that the

13   patient is in and able to maintain a

14   relationship over time versus not able to do

15   that?

16       A.      Yes, it is relevant.

17       Q.      Okay.  Do you know how long Ashley

18   had been in the relationship with this unnamed

19   boyfriend?

20       A.      So, at that time, I believe it was

21   several months that she has been with him.

22   But yesterday when I spoke with her and I

23   asked her that question, she is not with her

24   boyfriend at this time.  And I did ask her the

25   question, that was this -- why did the
```

Huma Haider, M.D.
January 11, 2021

Page 165

```
 1   relationship fall apart?  Is it related to her

 2   deficits or symptoms that she's explained that

 3   she's having difficulty maintaining

 4   relationships?

 5              And her answer is yes, that is part

 6   of the reason that she's no longer with the

 7   boyfriend.

 8              And the other reason was that her

 9   boyfriend also had a car accident or some kind

10   of an injury where he is also now recovering

11   for that.  So she -- so she hinted that they

12   might -- right now, they are both focusing on

13   getting better and they might get back

14   together later.

15   Q.      Okay.  You said at the outset of

16   that answer that you believe she had been --

17   when you assessed her in April of 2020, she

18   had been in the relationship with this

19   boyfriend for "several months."  Is that just

20   a memory from your own head or is that written

21   down somewhere?

22   A.      No, it is not written down.  I did

23   not write it down.  But the boyfriend had a

24   significant insight of her deficits and her

25   symptoms and what she was experiencing in the
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 166

```
 1   information that he was providing.  So they

 2   both had been together for sometime.

 3       Q.      Okay.  Because he had information

 4   he was providing about how she was doing, you

 5   infer that they had been in a relation for

 6   some period of months; am I right?

 7       A.      Yes.  Some period, maybe.  It was

 8   not just where they were together for a few

 9   days.  It was, I would say, at least minimum a

10   month that they were together.

11       Q.      Okay.  Well, that's different.  You

12   said "several months" earlier.  Which is it?

13       A.      I would say a month; minimum, a

14   month.

15       Q.      So you don't really know is the

16   right answer; right?

17       A.      No.  I don't know that, for how

18   long they were together at that time.

19       Q.      Okay.  Did you directly interview

20   any other family members or friends in your

21   assessment of Ashley, either with -- in the

22   presence of Ashley or outside the presence of

23   Ashley?

24       A.      No, I did not.

25       Q.      Is interview with family members a
```

Huma Haider, M.D.
January 11, 2021

Page 167

```
 1   normal part of your assessment of a neuro
 2   patient at NBII?
 3       A.      If I need to get more additional
 4   information, then I do reach out to the family
 5   members, yes.
 6       Q.      But in this case, you didn't feel
 7   there was any additional information that they
 8   could provide that would be relevant to your
 9   assessment?
10       A.      I got a lot of information from
11   Ashley herself, from the boyfriend, and the
12   medical records, so I did not reach out to her
13   sister or her father or other family members.
14       Q.      And did you deem the information
15   that you got from Ashley to be reliable?
16       A.      Yes.
17       Q.      Okay.  And the same -- the
18   information from the boyfriend, you deemed to
19   be reliable?
20       A.      Yes.
21       Q.      Okay.  In your -- the neuropsych
22   assessments that were done at NBII, are there
23   any controls or questions that are designed to
24   detect malingering on the part of the patient?
25       A.      Yes.  There are validity testing
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 168

```
 1    that is given to the patients.

 2        Q.      Okay.  Do you yourself review

 3    whether the -- well, let me ask you this way:

 4              Did you, with Ashley Moreaux,

 5    review the neuropsych battery for her to

 6    determine whether the results were valid and

 7    reliable?

 8        A.      So her test battery was reviewed by

 9    Dr. Gavron, who is a neuropsychologist, and

10    I -- and then she has reviewed all the raw

11    material testing data, the report, and given

12    her opinion.  So, yes, she did review that.

13              And when I was reviewing the --

14    Ashley's reports, I did see the scores that

15    she had on the validity indicators.

16        Q.      Okay.  So in this -- am I right

17    then, from what you've said that this

18    assessment of this patient, Ashley Moreaux,

19    that it was Dr. Gavron's -- part of

20    Dr. Gavron's job to assess the validity of the

21    battery of neuropsych tests on Ashley?

22        A.      Yes.  Correct.

23        Q.      Okay.  And did you say you

24    independently assessed the validity or did you

25    rely on Dr. Gavron to do that?
```

Huma Haider, M.D.
January 11, 2021

Page 169

```
 1      A.      I relied on her to do that.  I

 2  reviewed the report and I saw that she passed

 3  the validity testing.

 4      Q.      I see.  Okay.  That's clear enough.

 5              We're just about out of time.

 6              Where in the order of events does

 7  the DTI testing by Dr. Filler come in --

 8      A.      So --

 9      Q.      -- for Ashley?

10      A.      For Ashley Moreaux (reviewing), the

11  DTI is advanced brain imaging that is done for

12  the patient as part of the work-up.  So, you

13  know, it depends.  She is coming from out of

14  town, so she got the neuropsychological

15  battery done, she got the DTI done, and then

16  she also got the initial comprehensive

17  evaluation.

18      Q.      Okay.  But the DTI was done on the

19  same trip as the neuropsych testing?

20      A.      Yes.

21      Q.      Okay.  Did you have the results of

22  that when you wrote the Initial Comprehensive

23  Evaluation, Exhibit 4, or the Exhibit 6,

24  Future Medical Report?

25      A.      No.  I did not have that at that
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 170

```
 1    time.

 2         Q.      Okay.

 3                 MR. VERLANDER:

 4                      All right.  It's 2:00 p.m., so

 5                 I guess we've hit our stop point

 6                 for today.  We will adjourn the

 7                 deposition.

 8                      I'm going to work with your

 9                 counsel, Michael, to -- and with

10                 plaintiff's counsel, of course, to

11                 find a date to reschedule to

12                 complete it.  Just be aware that

13                 our trial date is the middle of

14                 April, so we're going to have to

15                 find somewhere to squeeze it is.

16                 And it will be roughly three hours

17                 that we have left, maybe a little

18                 bit more with breaks, but roughly

19                 three hours to complete it.  So

20                 just keep that in mind when we're

21                 trying to find a window here with

22                 Michael.

23                 THE DEPONENT:

24                      Okay.  Thank you very much.

25                 Thank you all.
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 171

```
 1              MR. VERLANDER:

 2                   Thank you for your time and

 3         patience.

 4                   Is there anything else before

 5         we go off the record?

 6         MR. BICE:

 7                   This is Jay Bice.  Thank you,

 8         Dr. Haider.

 9                   Michael, pleasure to meet you.

10    (Whereupon, the deposition was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Huma Haider, M.D.**
**January 11, 2021**

```
 1        W I T N E S S'  C E R T I F I C A T E

 2

 3           I read or have had the foregoing

 4    testimony read to me and hereby certify that

 5    it is a true and correct transcription of my

 6    testimony, with the exception of any attached

 7    corrections or changes.

 8

 9

10

11

12                        _____

13                        HUMA HAIDER, M.D.

14

15

16                        _____

17                        DATE

18

19

20

21        (Check One)

22        (    ) NO CORRECTIONS

23        (    ) CORRECTIONS; ERRATA SHEET(S)

24                   ENCLOSED

25
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 173

```
 1                    REPORTER'S PAGE

 2          I, MICHELLE COSSÉ, Certified Court
    Reporter in and for the State of Louisiana,
 3  the officer, as defined in Rule 28 of the
    Federal Rules of Civil Procedure and/or
 4  Article 1435 (B) of the Louisiana Code of
    Civil Procedure, before whom this sworn
 5  testimony was taken, do hereby state, on the
    record;
 6
            That due to the interaction in the
 7  spontaneous discourse of this proceeding,
    dashes (--) have been used to indicate pauses,
 8  changes in thought and/or talkovers; that same
    is the proper method for a Court Reporter's
 9  transcription of proceeding and that the
    dashes (--) do not indicate that words or
10  phrases have been left out of this transcript;
    that any words and/or names which could not be
11  verified through reference material have been
    denoted with the phrase "spelled
12  phonetically."

13                  _____

14                  MICHELLE COSSÉ, CCR

15

16

17

18

19

20

21

22

23

24

25
```

**Huma Haider, M.D.**
**January 11, 2021**

Page 174

```
 1              REPORTER'S CERTIFICATE
 2          This certification is valid only for a
    transcript accompanied by my original
 3  signature and original required seal on this
    page.
 4
            I, MICHELLE COSSÉ, Certified Court
 5  Reporter, in and for the State of Louisiana,
    as the officer before whom this testimony was
 6  taken, do hereby certify that HUMA HAIDER,
    M.D., after having been duly sworn by me upon
 7  authority of R.S. 37:2554, did testify as
    hereinbefore set forth in the foregoing 173
 8  pages;
 9          That this testimony was reported by me
    in the stenotype reporting method, was
10  prepared and transcribed by me or under my
    personal direction and supervision, and is a
11  true and correct transcript to the best of my
    ability and understanding;
12
            That the transcript has been prepared
13  in compliance with transcript format
    guidelines required by statute or by rules of
14  the Board, and that I am informed about the
    complete arrangement, financial or otherwise,
15  with the person or entity making arrangements
    for deposition services; that I have acted in
16  compliance with the prohibition on contractual
    relationships, as defined by Louisiana Code of
17  Civil Procedure Article 1434 and in rules and
    advisory opinions of the Board; that I have no
18  actual knowledge of any prohibited employment
    or contractual relationship, direct or
19  indirect, between a court reporting firm and
    any party litigant in this matter nor is there
20  any such relationship between myself and a
    party litigant in this matter.  I am not
21  related to counsel or to the parties herein,
    nor am I otherwise interested in the outcome
22  of this matter.
23              _____
                MICHELLE COSSÉ #98013
24              CERTIFIED COURT REPORTER
                STATE OF LOUISIANA
25  _____
```

Huma Haider, M.D.
January 11, 2021

**A**

**a.m** 1:25 65:11 125:3
**aaaahhh,'** 162:8
**ability** 38:17 174:11
**able** 8:8 9:1,5 58:18 100:17,25 107:9 109:6,7,8,9 110:1 110:11 113:9 158:9 164:13,14
**ABLES** 1:9
**abnormalities** 100:20
**absolutely** 11:20 16:11 119:8 120:3 138:14 139:13 152:20
**accept** 38:7
**access** 109:12 116:16,18,24 117:3,4,7,7,11
**accessible** 110:23
**accident** 123:6,6 165:9
**accommodate** 137:8
**accompanied** 99:7 174:2
**accompanying** 99:16
**accomplish** 66:12 120:6
**account** 47:5 103:19
**accountable** 89:16
**accurate** 25:8,23 30:17,18 46:18 129:14
**acknowledge** 18:7
**ACLS** 45:5
**acquired** 107:6
**acted** 174:15
**action** 147:5
**actively** 30:9 48:23
**activities** 20:21
**actual** 102:13 103:7 110:19 111:11 115:7,7 117:11 125:19 128:2 138:22 139:12 147:11 174:18
**acute** 51:2,5 52:12
**add** 69:11 144:10 144:11 145:15
**added** 127:4
**additional** 83:16 167:3,7
**address** 139:2,2

**adjourn** 170:6
**admin** 78:18,19
**administer** 106:18 107:9 108:14 109:15,24 110:1
**administered** 107:24 112:21 139:24
**administering** 4:23 105:16 106:14,21 107:16 108:5 109:23 114:11 140:1
**administers** 5:14
**administration** 108:9 110:18
**admissible** 16:14
**admitted** 51:18,25 52:1 129:8
**advance** 97:11 149:23
**advanced** 45:7 51:17 53:8 58:21 59:11,15,16 60:4 62:12,19 169:11
**advertising** 94:14
**advisory** 174:17
**aesthetic** 56:6,19,20 57:15,19 58:6
**aestheticians** 57:10
**afternoon** 103:9
**age** 139:20
**age-related** 50:21
**agency** 107:23
**ago** 19:21,22 43:7 81:6 134:17 157:16
**agree** 5:3 67:15 91:23 92:23 127:4 145:14 155:9
**agreeable** 148:22
**agreed** 160:1
**agreeing** 161:4
**agreement** 2:5 88:4 90:8
**agrees** 163:5
**ahead** 23:8 69:19 94:16 137:13
**Aiyegbusi** 3:10 5:6 159:9
**allegations** 15:9 16:18
**allow** 5:3 37:20 38:16 69:18
**allowed** 94:15 99:13
**alluded** 142:4
**alluding** 159:17

**alongside** 120:18
**alteration** 132:14
**altered** 132:13
**American** 33:17 34:3,14,16 39:8 80:24 157:20
**amnesia** 123:20 131:9,15,19 132:11
**amount** 154:25
**and/or** 4:15 16:20 117:14 173:3,8,10
**Andrew** 14:8,11,15
**anesthesia** 29:13,14 31:4 38:21 58:15
**anesthesiologist** 48:4,24 58:23 59:1
**anesthesiology** 27:19 28:5,15 29:8,21 30:7 36:4 36:5,15,24 46:15 46:21 48:2,10,14
**aneurysms** 50:19
**Angeles** 13:2
**ankle** 102:18,20 103:1
**answer** 11:8,17 15:13,16,21 23:1 69:20 71:23 107:13 134:9 165:5,16 166:16
**answered** 21:22 22:5,18,23 70:20 74:10
**answering** 72:7
**answers** 4:16 71:14
**anterograde** 123:20
**Antonio** 13:2
**anybody** 161:1
**anymore** 147:17
**anytime** 119:19
**anyway** 8:18 161:18
**apart** 165:1
**apologizes** 69:9
**apparent** 136:15
**appear** 18:2 85:14 133:14
**appearance** 100:14
**Appearances** 2:4 3:1
**appearing** 70:23
**appears** 163:25
**appointment** 95:20 150:13,15,20,23 151:1,3,4,6 157:24

**appointments** 150:22
**appropriate** 62:6
**appropriately** 100:18
**approved** 114:9
**April** 35:24 38:3 95:15 97:12,16,16 97:17,21,22 100:3 103:9 104:11,12 105:3,4,7 106:21 107:11 108:9 112:17 113:17 137:17 141:12,21 142:1 150:8,10,24 151:6 165:17 170:14
**area** 50:3 71:17 80:10 99:17
**areas** 41:1 56:10 58:19 94:22 112:4
**argument** 11:23
**Arizona** 19:12,18 21:18 93:22
**arrange** 149:18
**arranged** 85:2 149:15,16 150:9
**arrangement** 88:19 89:3 174:14
**arrangements** 61:16 90:12 174:15
**arrive** 132:6
**Article** 173:4 174:17
**articles** 44:23
**Ashley** 1:5 2:18 3:2 5:25 72:21 82:5 83:2,23 89:24 95:11,14,18 96:18 97:6 103:5,21 105:2 112:15,17 112:22 113:10,15 115:25 116:13,25 117:13 118:1,15 121:3 122:2 126:21 129:8 130:24 134:6 141:22 142:6 144:2 145:20 146:4,8 147:6,12 147:24 148:7 149:4,15 150:8 160:13 163:17 164:17 166:21,22 166:23 167:11,15 168:4,18,21 169:9

**169:10**
**Ashley's** 82:12,24 114:19 127:9,13 127:14 130:14 138:4 168:14
**asked** 64:2 94:18 100:21 129:2 152:24 153:10 158:6,7 164:23
**asking** 7:10 8:16,19 9:9 21:7,19 25:3 68:9 69:8 72:6 77:24 91:23 92:22 93:5 97:9 99:22 121:5,11,16 129:3 133:24 147:24 158:10 163:12,14
**aspects** 41:1 56:4
**asserted** 16:19
**assess** 128:6 145:25 157:9 168:20
**assessed** 165:17 168:24
**assesses** 43:16
**assessment** 43:15 82:6 83:9,12,14 83:25 84:1 95:18 97:5,24 98:7,10 100:24 101:1,6,9 101:18,19 102:6 102:10 103:8 104:21 106:14,18 108:14 110:20 114:3 115:13 117:14 130:13 139:12,24 142:5 147:11,14 148:5 163:17 164:7 166:21 167:1,9 168:18
**assessments** 97:21 104:10 105:2,7,8 105:15,16,25 107:6 110:12 140:17 167:22
**assignments** 41:3,5 41:6 42:9 43:3,4
**assistant** 46:15,20 48:1,10,14
**assistants** 83:10
**associated** 102:19 102:21 158:19
**association** 80:19 80:20 81:10
**assume** 71:22
**attach** 65:19 84:17 134:21 137:13

Huma Haider, M.D.
January 11, 2021

Page 176

**attached** 65:23 84:23 96:13 134:25 137:20 145:3 148:25 172:6

**attempted** 21:2 22:2

**attend** 11:5 25:25 44:23

**attendance** 11:20

**attending** 49:16,20 51:14

**attention** 43:17

**attorney** 9:23 12:2 77:21 87:8,13,23 89:9,21 90:8,18

**attorney's** 87:10

**attorneys** 77:16,25 81:7 87:5

**attributable** 103:1

**attribute** 102:13,14

**audience** 81:7,11

**audio** 128:22

**August** 46:17 47:1,9 48:4,8 49:1,16,20 54:16 55:24 142:10 143:6,18 144:2,19 145:10 145:20 148:6 149:12 150:6,7,7 150:23 151:3,4 152:2,5 153:3

**authority** 174:7

**autoimmune** 50:21

**available** 32:8 35:13 36:7 77:1 110:23 113:5 115:20

**average** 153:5

**aware** 7:8,22 8:4,11 8:17,18 79:10 80:8 95:3 107:22 170:12

**awareness** 131:10 131:12 132:10,20

---

**B**

**B** 173:4

**baby** 125:10,22

**bachelor** 24:1 25:4 25:9 26:1,3,8,18 26:21,21

**back** 10:6,15 22:9 35:9 44:17 60:22 74:25 78:6,18,19 94:11 97:22 98:8 98:13 118:11 119:12 127:1

136:19 137:4 141:4,5 150:19 152:2,10 156:8 158:8 162:1 165:13

**background** 6:13 75:2 92:7 116:7

**bare** 160:4

**based** 19:12 113:6 113:11,19 130:23 130:24 138:21 153:13,13,16,23 153:25 154:12 155:1,20

**basically** 91:5

**basis** 11:11,16 15:20 16:8 28:6 28:20 29:15,19 37:9,9 45:1 113:4 128:6 134:11

**basketball** 158:1

**batteries** 106:15,19 107:17 109:24 112:22

**battery** 97:3 105:12 110:21 114:4 138:2 139:12 157:12 168:5,8,21 169:15

**Baylor** 30:4,19

**Baylor's** 30:21

**bearing** 38:17

**began** 59:20

**beginning** 57:13

**behalf** 90:18

**believe** 31:25 37:14 40:17 42:6 43:7 44:17 45:11 57:13 58:7 82:7,11,25 104:1 105:5 107:1 118:4 151:1 156:14,20 164:20 165:16

**belong** 79:21

**belonging** 139:15

**best** 74:12 174:11

**better** 86:15,21 165:13

**beyond** 21:19 147:12 148:5

**bias** 11:23

**Bice** 3:3,4 5:10 67:7 67:11 68:2,15,19 69:14 85:5 89:25 134:19 136:24 171:6,7

**bigger** 57:23

**bill** 90:5 153:12 155:13 157:1 158:14 160:13

**billed** 153:15 155:24

**billing** 78:4,6,14 83:5 153:21

**bills** 87:9,14,19,22 88:7,15,16,22 89:4,8,11,13,14 89:15,20,24 90:9 90:20 91:6,9 92:17,24 153:19 154:20 159:25 160:15

**birth** 139:20

**birthday** 122:19,22 122:24,24,25 123:4,10

**bit** 13:18 46:5 113:23 170:18

**blank** 139:16 140:4 140:9

**blow** 133:23

**BLUE** 1:9

**board** 31:11 32:23 32:25 33:3,4,10 33:11,13,15,17,18 34:3,14,16,25 35:1,2,4,14,20 36:4,5 39:1,6,8,24 66:3 80:24 94:10 94:12,14,15,17,18 94:21,22 157:20 174:14,17

**boards** 37:1,5,6,10 47:2,11 94:3

**book** 135:17,19,21 135:22

**booklet** 104:14 114:16,16

**booklets** 104:15

**books** 20:22 122:6 124:15,24

**bookstore** 122:6,15 124:15 132:2

**Botox** 58:4

**bottom** 49:12 96:17 130:19

**bought** 14:17,18 63:4

**Box** 3:5

**boyfriend** 99:2 162:7,10 163:9,10 163:13,16,18,20 163:24 164:19,24 165:7,9,19,23

167:11,18

**brain** 3:18 5:16 28:2,8,12,17,23 29:2,9,18 45:16 45:24 50:16,17,17 50:18,18 51:2,7 51:17 58:16 59:11 59:20 60:5,8,15 60:25 61:2,4,7 62:1,2,4,4,9,11,14 62:18,24 63:20,24 74:23 75:9 80:11 80:18 102:21 132:14 133:7,16 133:22,23 134:2,8 135:22,25 169:11

**brain-related** 50:14 50:15 51:8

**break** 24:17 46:7,11 64:14,25 69:18 100:6 101:4 136:11 137:5

**breakdown** 86:16

**breaking** 13:17

**breaks** 170:18

**brief** 43:6,14 100:18 148:8 158:5

**briefly** 98:16,20

**bring** 98:24 99:4 154:22

**bringing** 125:10

**brought** 125:22

**bulk** 111:18

**bullet** 33:8 45:15 130:20

**business** 57:2,3 77:11 90:1 160:21

---

**C**

**C** 172:1,1

**CAIN** 1:7

**Cal** 80:19

**calendar** 10:8 150:19

**California** 93:21

**call** 2:23 24:16 149:18 150:19 157:17 158:9

**called** 41:24 45:7 91:13 95:13 118:21 131:23 132:19 135:22 149:20 157:23

**calls** 149:19

**camera** 6:10

**capacity** 81:17

167:11,18

**Caption** 2:3

**car** 157:8 165:9

**Cardiac** 45:7

**care** 8:17,23 16:12 28:3,12,14,15,17 29:1,3,16,23 30:9 30:15,22 31:7,11 31:19,21 38:21 40:15 41:1,13,18 41:20 42:1,2,10 42:17 47:7 48:5 48:21 50:22 51:9 51:12,17,20 52:2 52:3,7,9,13,16 53:3,24 54:2,3,12 54:17,19,21 55:1 55:4,11 56:4 58:15 59:4,23 61:23 62:5 73:15 74:1 82:6,12,24 83:2,3,9,11,13,25 117:15 154:9

**case** 9:21 10:19 11:22 16:2 24:20 68:24 69:2 72:21 73:12 74:4 83:23 90:9 91:21 92:1 92:25 103:20 114:19 115:25 118:1 121:11 152:21 167:6

**cases** 29:3,9,17 71:1 71:19

**cause** 4:17

**caused** 58:9 102:23

**CCR** 173:14

**Center** 29:15 46:17 46:20 49:20 50:5 50:9,25 53:12 54:11 59:11,20 60:5,9,15,25 61:2 61:4,7 62:1,9,11 62:14,18,24

**Central** 19:8,9,18 21:17

**CEO** 75:18

**certain** 6:1 134:5 153:15

**certainly** 39:5,11,16

**certificate** 2:9 41:11 42:11,12 174:1

**certification** 4:11 20:7,10 21,2,11 21:20 22:2,13,16 22:20 23:13 33:19 34:2,6 35:19,20 36:10,23,25 37:20

Case 2:18-cv-01255-JDC-KK   Document 144-4   Filed 03/08/21   Page 178 of 192 PageID #: 4631
Huma Haider, M.D.
January 11, 2021

Page 177

37:24,25 38:11,14
39:6,13,19 40:16
40:17 44:25 45:10
46:1 106:13,17
174:2
**certifications** 33:9
34:10 37:18 39:1
42:19 45:15 66:3
**certified** 3:25 4:21
31:11,18,21,22,24
32:4,10 33:3,12
33:13,16 35:2,4,6
35:8,11,14,17
36:2,4,5,7,8 39:22
40:15 41:17 42:2
42:23 43:10,25
45:5 94:22 105:15
173:2 174:4,24
**certify** 39:23 172:4
174:6
**challenges** 112:3
**CHAMBERLAIN**
3:19
**change** 164:3
**changes** 172:7
173:8
**changing** 37:4
**characterization**
46:1 51:4
**characterize** 59:8
59:10 64:4
**characterizing**
54:20
**charge** 154:25
155:11,12 156:1
156:11,18 160:2
**charged** 155:19,20
160:22
**charging** 155:17,23
**Charles** 1:3 3:6
**check** 84:4,9 141:13
172:21
**checklist** 109:16
114:9
**Chicago** 27:10,22
32:19
**Childs** 86:4,5,6
143:25 145:12,17
146:11
**Chiro** 80:19
**chiropractic** 81:10
**chiropractors** 77:6
80:16,20 81:12
**CHRIS** 1:5 3:2
**circulate** 85:5
**cities** 13:9
**city** 12:7

**Civil** 4:6 173:3,4
174:17
**clarify** 22:11 71:25
124:18
**clear** 1:9 15:18
19:25 22:14 23:19
48:7 49:10 70:21
72:8 74:11 127:3
129:3 146:14,22
146:23 157:2
169:4
**clearly** 68:13 132:2
**click** 103:21
**client** 87:11,15,24
88:12
**Clinic** 58:22
**clinical** 13:21
101:20 116:16,17
**clinician** 111:2,8,13
114:7,14 116:23
**clinicians** 105:19
107:4 108:19
109:5,11 110:10
111:19 112:1,20
114:5 117:19
**close** 74:18 101:1
162:22
**closer** 9:14,14
**cloud** 109:11
110:13,15,22
115:9 127:12
138:5
**cloud-based** 119:19
**co-defense** 136:14
**co-owner** 63:3
**co-owners** 14:21
**Code** 4:5 173:4
174:16
**collaborative**
145:16
**collagen** 58:6
**collecting** 92:23
**collection** 91:24
93:1
**college** 24:3,3 25:6
25:7,11,22,23
26:2,9,22 27:1,8
30:4 105:20 108:6
**collision** 121:1
122:9,11 123:13
124:9,17 125:9,12
126:5,6 129:9
131:4 133:1
**Colorado** 93:23
**Coma** 127:20 128:3
**combination** 120:7
153:18 154:13

155:6
**come** 6:25 7:14 13:8
23:18 38:12 52:11
77:20,25 78:1
118:14 119:20
147:5 157:7
158:11,13 169:7
**comes** 90:5,14
126:9 147:4
154:19
**coming** 7:2,18 37:1
46:7 77:15 80:24
87:21 118:7 151:1
169:13
**commencing** 1:24
**commitment** 87:9
87:12,18 88:6
89:2
**common** 145:23
**communicate** 139:1
**communication**
90:17
**company** 1:9,10 3:8
3:13 14:9 17:23
18:17 44:12 45:2
**compare** 160:11
**compared** 154:2
**competency** 109:16
114:8
**compilation** 138:4
**compiled** 116:3
**complaint** 15:9
16:19 94:2,20,25
**complaints** 94:25
95:8
**complete** 31:16 41:3
42:5 43:3,8 44:9
105:23 111:17
137:7,12 162:9
170:12,19 174:14
**completed** 19:7,16
19:19,20,23 21:6
23:10 31:8 32:2
35:12 36:6 38:22
47:15 105:3
114:21
**completes** 43:22
**completing** 31:14
41:4,7,10,14
**completion** 20:7
27:8,20 32:7
41:11 42:11,12,25
144:25
**complex** 29:16
**compliance** 174:13
174:16
**comprehensive** 2:17

95:14 96:3,17
98:17 101:13
109:13 116:9
118:12 119:3
141:6,24 144:5
162:3 169:16,22
**computer** 6:10
115:2,4
**computerized** 43:15
**concern** 58:13
**concerns** 98:12
**concluded** 171:10
**conclusion** 92:1,24
**concrete** 158:2
**concussion** 158:1
**condition** 52:23
53:4 102:5 128:3
133:2
**conditions** 28:9,22
50:14,15,21,21
51:7,9,18 151:13
**conduct** 162:17,25
**conference** 109:3
149:14
**conferencing**
103:23
**conferral** 26:25
**confidentiality**
160:6,10,24
**conflicts** 58:17
**confused** 132:9
143:9
**confusion** 72:1
131:7,12 132:15
133:11
**conjunction** 62:19
**consciousness**
130:21 131:8,12
131:16,20,24
132:5,10,16,19
133:10
**consent** 90:14 91:14
**consideration** 164:7
**consult** 10:22 61:1
61:10,17,18
**Consultant** 42:20
42:24 43:11,13
44:1,3,16
**consultation** 158:4
158:5
**contact** 9:25 10:12
76:16 101:1
**contacted** 9:22
**contacting** 10:16
**content** 121:23,24
**continue** 44:24
52:24 111:22

132:24 136:16
**continued** 48:12
63:13
**continues** 52:23
**continuing** 36:17,19
37:8 80:10 97:21
**continuous** 52:22
**continuously** 93:13
111:21
**contractor** 82:14,15
82:19,20 86:8
112:7 113:3,4
126:16
**contractors** 81:18
81:23 82:22 83:21
105:9
**contractual** 174:16
174:18
**controls** 167:23
**conversation**
119:10 148:16
161:8,14
**convert** 115:5
**converted** 114:24
**Cook** 29:14
**cooperation** 141:3
**copy** 45:16 66:16
67:14 85:10
134:18 135:4
136:4
**corporation** 13:16
13:23
**correct** 6:15 13:11
16:21 17:7,11,12
17:13,14,16,17
22:4 26:23,24
27:11,12,14,16,23
27:24 29:4,5,10
30:12 35:1 36:13
39:20 45:4 46:3
49:25 50:10 51:1
51:3 52:5 54:5,10
54:14 59:5,6,24
59:25 60:7,12,13
63:5,17,21 75:18
75:19 76:1 82:12
82:13 87:18 93:8
93:16 95:25 97:8
101:15 106:22
108:4,20,21 111:3
111:4 122:3,7,12
122:14 123:7
126:13 127:18,21
127:22 128:13
129:9 130:17,21
130:22 131:5
136:2 137:24,25

Case 2:18-cv-01255-JDC-KK   Document 144-4   Filed 03/08/21   Page 179 of 192 PageID #:
4632
Huma Haider, M.D.
January 11, 2021

Page 178

138:7 142:2,12
144:15 147:25
148:2,3 151:6,7
152:3 168:22
172:5 174:11
**corrections** 172:7
172:22,23
**correctly** 32:2 60:2
88:2 91:3 130:3
134:23 142:7
**corroborating**
129:13
**corroboration**
128:10
**cosmetic** 57:25
**Cossé** 3:24 4:21
173:2,14 174:4,23
**cost** 157:11,14
**Council** 2:14 31:12
33:1,14,19 34:14
**counsel** 2:5 4:4 5:3
6:18,18,19,20
11:5,11,19 33:7
64:19 66:11 68:23
69:2 72:13 136:14
138:9 139:7
142:16 144:21
148:21,21 170:9
170:10 174:21
**County** 29:14
**course** 8:23 24:1
26:17 29:7 32:17
41:2,4,11,19 42:3
42:4,7,12,25 43:2
43:5,9 44:7 92:13
160:21 170:10
**courses** 40:24 42:5
**court** 1:1 3:25 4:21
5:2,14 22:8 65:21
70:3,9,13,13,17
71:4 73:13 74:5,6
74:22 75:15
144:22 148:22
156:24 173:2,8
174:4,19,24
**courtroom** 70:23
**coverage** 55:4,7
**covered** 68:11
147:7
**COVID** 35:16,25
98:12
**created** 135:15,16
**creating** 76:20
114:2 154:17
**credential** 44:21
**Credentialed** 42:20
44:3

**credentials** 47:18
48:18 49:5
**critical** 28:14,15,17
29:1,3,16 50:14
50:15,22 51:9,12
51:17,20 52:2,9
53:23 54:2,3,12
54:17,20 55:1,4
55:11 58:15 59:4
59:23
**CST** 1:25
**current** 66:17
**Curriculum** 2:14,15
**CV** 24:9,19 25:4
30:14 31:23 32:25
33:5,10 34:24
40:14 45:6,16
49:11 65:18 66:1
66:5,17,23 67:14
84:16 85:13 94:8
94:9 142:23

─────────
**D**
─────────

**D-O-X-Y-M-E**
118:23
**daily** 28:5 29:15,19
**Dallas** 13:2
**Daniel** 82:2 106:5
106:10,11
**dashes** 173:7,9
**data** 114:22,23
115:3,5,8,11,18
116:2,5,6 117:11
138:3,4,14,15,19
138:22,22,24
139:4,11 141:1
168:11
**date** 24:13 97:15
121:9 139:20,22
141:8,12,15,17,18
141:20 161:15
170:11,13 172:17
**dated** 95:15 137:17
141:8
**dates** 26:23 30:16
60:2 141:13
152:19
**day** 36:11 104:7
155:10 156:22,23
**day-to-day** 55:19
**days** 37:10 52:20
97:17 98:8 110:5
114:20 124:2,21
157:16 166:9
**dealing** 51:2
**December** 26:6,20
35:22 46:17 47:17

48:13 49:21
**decided** 15:7 53:18
58:19
**decision** 53:5 58:11
**decrease** 144:10
**dedicated** 51:15
**deem** 167:14
**deemed** 167:18
**defense** 2:14 24:19
68:23 138:9
**defer** 66:11 90:8
91:24 92:23 93:1
**deficits** 162:24
165:2,24
**defined** 173:3
174:16
**definitely** 113:6
**degree** 21:11,17,20
23:10,11 26:18
27:1 105:20 108:6
**delayed** 35:16
**Denia** 3:10 68:8
159:11
**denia@deutschke...**
3:12
**denoted** 173:11
**departure** 15:5
**depending** 20:18
83:21 154:7
**depends** 37:16 44:5
53:9 151:12
152:11 169:13
**deponent** 5:4,15
23:3 40:4 60:16
60:21 64:15 65:6
65:25 67:21 75:1
75:7 85:23 92:5
92:10 128:16
135:2 136:22
145:5 170:23
**deposed** 7:4
**deposition** 1:23 4:4
5:1 7:4,25 8:13
11:6 65:20 69:8
69:10 73:13 82:9
109:3 140:23
142:25 143:17
145:1 149:9 150:2
155:23 156:2,9
170:7 171:10
174:15
**depositions** 6:15
9:17 69:23 155:17
156:19
**derangements**
133:21
**described** 41:20

44:2 116:3 121:20
**designation** 40:20
44:16 45:5,18,20
75:13 106:22
**designed** 167:23
**details** 13:25 94:18
123:12 124:7
**detect** 6:9 167:24
**determine** 157:3
168:6
**determined** 107:18
**DEUTSCH** 3:9
**developed** 44:12
144:6
**diagnose** 50:13
**diagnosing** 28:6,22
**diagnosis** 55:19
133:8 164:3
**Diagnostic** 59:12
**Diagnostics** 58:22
59:15,17 60:5
62:12,19
**diagram** 2:19
134:16 135:4,13
135:20,22 137:15
**dialed** 149:24
**dictating** 120:5
**difference** 21:10
49:22 74:20
**different** 7:3,15
10:24 21:13 36:22
36:24 37:1,2,5,9
37:10,15 40:25
42:6 43:1,20,23
49:15,23 52:24
53:10,11,22 56:4
61:25 77:10 78:12
78:13 79:20,21
80:17 104:22,22
124:2,2 130:10
134:12,13 152:8
153:19,21 155:16
156:11 166:11
**differently** 155:20
155:24 156:18
**difficulty** 165:3
**digest** 68:9
**digitally** 127:17
**Dillard** 18:11,12,13
18:14 75:25
**direct** 83:11,13 87:5
174:18
**directed** 158:8
**direction** 59:14
174:10
**directly** 33:6 83:8
87:22 117:13

121:3 166:19
**director** 56:1 59:21
60:11 75:21
**disagree** 11:15
**disciplines** 111:15
**discourse** 173:7
**discovery** 4:13
**discretion** 111:12
**discuss** 112:2,3
**discussion** 128:23
137:7 147:6
**dismissed** 94:20
**disorders** 50:20
**disorientation**
131:7,13 132:16
133:11
**disoriented** 132:9
**disposition** 53:17
**distinction** 73:7,10
**District** 1:1,2 12:12
**divided** 59:7 114:19
**DIVISION** 1:3
**dizziness** 102:17,20
102:24 103:4
133:11
**dizzy** 102:17
**doc** 118:19 128:12
**doctor** 15:2 16:4
38:5,18 83:3
93:11 106:6
111:20 138:18
157:17
**doctors** 28:21 58:1
61:1,11,14,19
82:21
**document** 75:14
95:13 96:6 101:14
135:13 137:23
141:7 158:17
**documentation**
138:12
**documents** 69:7
85:4 110:17
**doing** 20:20 41:12
44:6 48:20 49:1,1
51:13 53:13 56:14
57:15 58:2 59:11
80:25 88:18 98:3
99:12 101:17
110:6 120:4,15
136:0 147:8,22
149:13,21 151:11
155:16 166:4
**dollars** 154:25
**double** 84:4
**downgraded** 52:14
52:20,24

Case 2:18-cv-01255-JDC-KK   Document 144-4   Filed 03/08/21   Page 180 of 192 PageID #: 4633
Huma Haider, M.D.
January 11, 2021

Page 179

**Doxy.me** 103:17
104:5 118:21,22
146:20
**dozen** 92:21
**Dr** 2:23 4:4 5:22
6:19 12:18 15:2,5
16:20 17:2,10
23:1 63:4,9 65:13
66:13 67:13 68:22
72:12 77:24 82:2
82:5,10,18,23
83:1,1 84:16 85:3
100:9 106:4,5,8,9
108:16 111:6,6,9
112:2,6,23,25
113:11,18,25
115:15 116:1,1,4
116:12,16 118:2
120:13 121:4
129:1 137:4 159:1
159:19 162:2
168:9,19,20,25
169:7 171:8
**drawn** 126:11
**drew** 127:24
**drive** 98:8,13,24
129:6
**driven** 99:20
**driving** 20:24 47:3
121:25 123:3
125:4 128:9 129:5
**dropped** 135:18
**drove** 97:22
**DTI** 169:7,11,15,18
**due** 173:6
**DUHE** 3:14
**duly** 5:19 174:6
**duty** 43:25

**E**
**E** 3:10 172:1,1,1
**ear** 57:18,25
**earlier** 7:13,19
38:25 56:11 64:2
74:10 76:7 85:7
91:11,23 93:6
127:13 138:1
142:3 146:16
153:11 166:12
**earliest** 39:4
**earn** 40:19
**echo** 92:6
**Edition** 135:24
136:1
**education** 24:19
26:7 36:17,19
37:8 80:10 139:21

**educational** 20:20
21:10
**effect** 36:11 38:5
**eight** 48:22 114:18
136:20 152:5,13
152:16
**either** 33:6 73:13
114:24 117:23
119:15 120:10
123:24 163:14
166:21
**electives** 28:5,10,11
28:13,16 29:1
**electronic** 135:4
**electronically**
135:12
**eligibility** 94:10,14
**eligible** 32:24,25
33:4,10 34:25
35:1 94:12,23
**email** 66:14 67:22
67:23 69:19,20
117:6 139:1,2
157:18
**emailed** 69:13
**employed** 18:16
**employee** 61:3 70:4
70:5,7 81:25
82:19 86:8,9,10
86:12 111:1 112:8
112:9 126:17
**employees** 10:4
61:7,13 76:2
78:20 81:15,21
82:22 83:7,18
105:9,13,15
106:20 108:9,13
**employment** 174:18
**ENCLOSED**
172:24
**encompasses** 29:3
50:22
**encounter** 29:9
**ends** 146:10
**engaged** 16:5
**enroll** 40:22 42:13
42:14
**enrolled** 12:11
**enrolling** 42:4
**ENT** 57:14,17,20
**enter** 115:3
**entered** 114:22
**entire** 156:22
**entirely** 20:4,5
**entirety** 127:9
146:25
**entitled** 160:19

**entity** 13:20,22
174:15
**ER** 127:25 128:4,7
128:12 129:7
**ERRATA** 172:23
**error** 25:14 115:1
**errors** 66:4
**Esq** 3:4,4,10,10,15
3:20
**establish** 130:11
**estimate** 9:13 69:22
86:20
**ethics** 95:8
**ethnicity** 139:20
**eval** 99:5,7
**evals** 99:13
**evaluate** 145:25
**evaluation** 2:18
63:23 95:14 96:3
96:17 97:4,18
98:11,17,20 99:1
101:4,13 103:13
116:10 118:12
119:4 120:1 141:6
141:24 144:6
145:13 162:4
164:12 169:17,23
**evening** 103:11
**events** 2:19 124:3
169:6
**every-patient** 133:4
**everyday** 28:19
**evident** 137:6,11
**exact** 9:8 108:11
122:13
**exactly** 34:22 40:1
66:7
**exam** 31:17,17,25
32:1,8,9 34:11,18
34:18,19,21 35:13
35:14,15,23,25
36:8 38:2,12
41:15,16 43:9,10
47:22 100:5 107:7
**examination** 2:6
5:21 102:1 139:22
**examiner** 101:25
139:22,23
**example** 73:8
120:23 133:17
157:15
**exams** 32:14 34:13
34:15 36:2,20
**exception** 172:6
**exclusively** 63:19
63:22
**Excuse** 40:5

**exhibit** 2:12,14,15
2:16,17,19,20,21
2:23 65:19,22
84:17,20 96:11,12
101:12 118:11
134:22,24 137:13
137:14,16,19
141:7,16,23,24
144:19 145:2
148:20,24 161:7
161:21 162:2
169:23,23
**Exhibits** 84:21
**existence** 87:21
**existing** 39:13 111:8
**expect** 99:14,25
**experience** 38:23
45:22 46:2,5,14
49:13 55:22
142:25 155:5
**experienced** 134:7
**experiencing**
165:25
**expert** 71:11 72:5
72:20,25 73:4,11
73:20 74:4,22
75:9 140:11,25
**expertise** 74:7
154:14
**expiration** 39:12,19
**explain** 43:12 87:6
88:4 113:22
116:18 128:17
**explained** 94:19
125:15 155:15
165:2
**explanation** 51:23
141:3
**eye** 129:23
**eyes** 100:16

**F**
**F** 172:1
**facility** 53:8,9,20,20
56:3,10 57:23
**fact** 6:7 30:19
111:24
**fair** 55:2 153:8
161:10,17
**fairly** 151:20
**fall** 36:1 165:1
**family** 123:13,24
125:18,21 162:21
163:2 166:20,25
167:4,13
**far** 73:20 97:11
**father** 167:13

**February** 19:20,24
40:18 70:14
**federal** 74:5 173:3
**fee** 156:4,6,9 157:4
158:12 159:16
**feel** 117:21 167:6
**feels** 102:16
**fees** 91:24,25 92:23
93:2 158:19
**Feibus** 3:20 5:8
11:7,12,18 12:4,8
12:13 15:12,22
16:6,22 17:5
22:25 66:25 67:2
67:19 71:24 85:9
85:19 159:20
160:14 161:3,11
**Feinberg** 32:18
**fell** 158:2
**fellowship** 29:25
30:4,9,15,22 31:7
31:9,14,16 32:2,7
46:23 47:7,16
**felt** 58:18,20
**female** 79:4
**field** 21:3,12,12,21
22:3,17 23:14
74:7
**fifth** 45:15
**FIG** 41:24
**figure** 65:3 155:13
**file** 16:10 75:15
91:16 127:13
138:5 140:10
**filed** 15:10
**files** 90:23 116:17
**filing** 4:11
**fill** 49:5
**filled** 76:15,23
**Filler** 82:18,23 83:1
169:7
**fillers** 58:6
**filming** 19:2
**financial** 174:14
**find** 16:1 97:13
132:8 135:21
170:11,15,21
**findings** 95:17
101:8 102:15
**fine** 5:13 22:21
135:12
**fingertips** 84:6
**finish** 35:9
**finishing** 47:6
**firm** 89:25 174:19
**first** 5:19 6:12,14
9:22 31:22,23

32:11,14,24 35:8
35:19 41:2 46:14
46:18,22 48:22
54:3 96:20 106:6
106:9 107:19
120:24 121:17,18
125:8,9,12,16
152:9 163:10
**five** 78:11,13,16
83:4 100:12 101:3
**five-minute** 64:13
101:17,25 102:5
132:7,7 136:11
**flat** 154:11
**floor** 52:21,25
53:15,17
**floors** 54:7
**Florida** 93:24 113:7
113:7,12
**focusing** 165:12
**folder** 90:25 91:19
116:25 117:8,9
127:15,16,17
140:11,14
**folders** 116:22
**follow** 53:16 54:8
54:12 122:8 144:4
149:11,12
**follow-up** 84:2
85:24 86:1 142:4
142:8,9,14,19
143:4 144:3
145:21 147:19
150:12,25 152:1,7
153:6
**followed** 119:24
**following** 27:19
31:10
**follows** 5:20
**foregoing** 172:3
174:7
**forensic** 81:24
**forgot** 93:7 112:6
**form** 4:15 76:19,20
76:23,25 77:2,4,8
77:9 90:14,15
91:4,7,14 129:4
139:14,16 140:6,8
140:9,13
**formal** 41:15 119:3
**formalities** 4:8,10
**format** 174:13
**formed** 14:3,4,24
**forms** 10:15,21,23
11:3 76:15 77:10
83:6 104:14
**forth** 53:9 174:7

**forward** 68:4
135:11
**founded** 14:8
**founder** 13:10
**four** 29:24 34:22
37:13,22 53:1
71:10 74:16 76:6
108:12 151:5,10
151:20,24
**four-hour-long**
42:15
**four-month** 30:10
**fourth** 33:8
**fracture** 102:19,20
103:1
**frequently** 151:14
151:15
**Fridays** 112:10
**friend** 162:23
**friends** 163:2
166:20
**front** 15:18 96:6
97:11 140:16,20
143:12
**fulfilled** 31:5
**full** 63:3
**full-time** 61:14
63:24 76:2 81:15
81:16 83:18,19
86:7 105:13,14
108:13 112:7
**Fully** 1:22
**function** 132:14
**functioning** 100:16
**functions** 101:2
**further** 52:20 53:17
62:5 118:5 121:14
121:15 147:20
160:5
**Fusion** 148:9
**future** 2:20 113:8
137:16 141:6,16
141:17,25 169:24

___

**G**

**G** 109:11 115:9
**G-O-M-E-S** 14:13
**game** 85:7
**gap** 29:23 47:2,6,13
132:7 152:6
**Gavron** 82:11 83:1
106:4,7,7 108:16
111:6 112:23,25
113:11,18,25
115:15 116:1,1,4
116:12,16 118:2
168:9,25

**Gavron's** 168:19,20
**GCS** 127:20 129:6
129:22,25 130:14
131:9 132:12
**general** 21:5 50:22
51:9,12,19 52:21
52:25 53:15,16
54:17 100:13
**generally** 30:23
**generate** 119:5
**generated** 43:23
138:21 141:10,17
141:25 154:20
159:3
**generating** 120:12
**gentleman** 62:22
**getting** 10:13 21:10
30:3 47:18,18
53:2 107:5 123:9
125:3 133:25
152:16 165:13
**give** 8:8 9:1,6,8,11
11:6 46:10 58:14
58:18 86:21
110:12 133:17
138:20 139:1
157:15 158:9
**given** 6:14 9:18
24:20 69:23 71:3
80:9 115:15 117:6
123:13 138:22
161:14 168:1,11
**gives** 39:24
**giving** 42:3 43:19
133:15
**Glasgow** 127:20
128:3
**gleaned** 119:1
**go** 16:10 18:1 23:8
27:6 29:20 42:7
42:24 50:3 52:2
52:18,25 53:6,7
69:19 74:13,25
102:8 105:20
106:24 109:8,15
114:7 118:19
119:7,12 127:1
130:4 136:21
137:12 146:7
150:18 156:22
162:1 171:5
**goes** 96:18 117:8
140:12 147:8
154:22 155:8
**going** 8:2 11:8
15:13,15 36:16
53:18 64:12 66:8

66:21 67:13,23
76:17 84:19 85:17
87:19 88:7,17
89:5 90:19 91:6
109:9,20 112:1,2
112:3 118:11
119:10,20 133:16
134:1 136:13,15
137:7,9,11 141:4
143:16 155:11,12
157:11,14 158:15
159:22 160:4,5
161:23 170:8,14
**gold** 41:15
**Gomes** 14:8,12 15:2
17:2 63:4,9
**Gomes's** 15:5
**good** 5:22 130:1
136:25
**gotten** 85:15
**governing** 107:23
**grace** 39:25 40:2
**graded** 41:13
**great** 67:18 68:7
**guarantee** 161:13
**guarantees** 87:4
**guess** 7:9 23:18 30:6
38:8 65:13 71:14
74:13 90:16 92:2
123:14 136:18,19
138:3 147:15
148:19 157:3
161:20 170:5
**guidance** 56:8
**guidelines** 174:13
**guy** 75:24
**guys** 72:2

___

**H**

**Haider** 1:23 2:23
3:18 4:4 5:1,16,22
12:18 16:20 17:10
23:1 65:13 66:13
67:13 68:22 72:12
77:24 84:16 85:3
100:9 120:13
121:4 129:1 137:4
159:1,19 162:2
171:8 172:13
174:6
**Haider's** 6:19
**half** 8:10 9:3 33:23
39:22 64:12 92:21
112:18
**Hallmark** 3:8
142:20
**hand** 61:23

**hand-filling** 140:2
**hand-typing** 120:9
**handedness** 139:21
**handle** 10:4 78:14
78:17
**handles** 76:10 78:4
**handwritten** 119:4
119:18
**happen** 87:11 92:25
123:19 133:22
**happened** 97:19
121:10 123:17
131:3
**happening** 56:18
**happens** 138:19
**happy** 139:3
**harassing** 15:23
**hard** 59:9 64:20
**head** 17:21 93:25
133:23 157:9
158:2 163:15
165:20
**headache** 32:16,25
33:11,14,16,17,20
34:2,3,4,10,16
80:24 94:12
157:20
**headaches** 133:4
**headings** 132:25
**hear** 72:12 75:5
**heard** 146:22
**hearing** 100:17
**held** 128:23 134:16
135:14
**help** 20:15 36:21
72:8 73:6
**helpful** 136:5
**hemorrhages** 50:17
**hereinbefore** 174:7
**hereto** 65:24 84:23
96:14 135:1
137:21 145:4
149:1
**Hermann** 46:16,19
47:8,15 48:9
49:14,19,23,25
50:1 51:1,8 52:1
53:21 54:1 59:18
63:16 64:5
**Hermanns** 55:24
**Hernandez** 78:25
79:1
**Hey** 150:18
**Hi** 100:8
**high** 46:10
**Hillcroft** 5:17
**hinted** 165:11

**history** 116:8,9
118:13,25 120:24
126:10 130:12
**hit** 158:2 170:5
**hitting** 103:4
**hold** 15:15 89:16
93:17 159:21
**home** 53:6,18 97:22
98:13 103:12
**hormonal** 56:6
**hormone** 56:9
**hospital** 47:19
49:14,24 52:2
53:10 62:13 124:2
125:10,23 126:1,2
126:11,15 129:8
**Hospital-Texas**
46:16,20 49:19
**hospitalization** 51:6
126:7
**hospitals** 53:10
58:22 62:20
**hour** 46:7 64:12
124:17 153:6,7
155:12,23 156:1
**hour-long** 119:9
**hourly** 154:24
155:17
**hours** 34:22,23
98:18,19 107:1,6
114:18,18,18
156:21,25 157:1
170:16,19
**Houston** 3:21 5:18
12:9,20 13:2 50:2
50:8 51:25 63:10
76:9 78:4,9 79:9
79:12 80:2,22
81:3 96:21 97:7
97:20 98:3,5,23
104:11 108:10,23
111:10 113:17
143:19
**HRDLICKA** 3:19
**Huma** 1:23 3:18 4:4
5:1,16 172:13
174:6
**human** 115:1

**I**

**ICU** 51:18 52:11,17
53:16
**idea** 9:15 100:13
153:2
**identification** 65:23
84:22 96:13
134:25 137:20

145:3 148:25
**identify** 68:24
**III** 3:4
**Illinois** 30:2
**Illness** 118:13,25
120:24 126:11
**imaging** 169:11
**immediately** 27:19
31:10 124:20
131:17
**ImPACT** 42:20,24
43:11,13,14 44:1
44:3,15 45:3
**implication** 130:8
**important** 119:11
133:8
**improve** 52:23
**improvement**
111:23 144:8
**improving** 53:4
**in-person** 20:3
40:24 98:4 101:18
103:5
**in-service** 111:25
**inaudible** 13:15
**include** 29:2 50:17
56:17 70:24
**included** 54:18
**including** 17:1 56:5
56:5,6,7
**increase** 144:10
**independent** 81:17
81:22 82:14,15,19
82:20,22 83:21
86:8 99:8 105:9
111:14 112:7
113:2,4 126:16
128:6,10 130:13
**independently**
110:1,11 129:13
168:24
**INDEX** 2:1,12
**India** 23:19
**indicate** 18:25
124:13,25 125:5
131:11 173:7,9
**indicated** 7:20 29:2
54:17 64:19 69:22
85:15 86:18 89:7
129:7 139:10
**indicates** 30:22
**indicating** 133:18
135:18 139:16
140:9,17
**indication** 8:1 131:6
**indicative** 131:9
**indicator** 131:25

**indicators** 168:15
**indirect** 174:19
**individual** 76:10
106:17
**individuals** 78:12
78:13
**infarctions** 50:20
**infer** 166:5
**influence** 164:3
**information** 66:19
86:16,22 99:19
115:14,20 116:2,7
117:3,22,25 118:6
119:1,11,15,16
120:18,19 126:4
133:15 134:1
138:11 139:11
140:1,2,5,25
157:22 158:10
163:1,8 166:1,3
167:4,7,10,14,18
**informed** 174:14
**initial** 2:17 52:3
84:1 95:14,17
96:2,17 101:5,9
101:12 103:7
105:12 111:18
116:9 118:12
119:3 141:5,24
144:5 147:4 162:3
162:17 169:16,22
**initially** 151:9
**injuries** 62:2,4
**injury** 3:18 5:17
28:2,8,12,17,23
29:3,9,18 45:17
45:24 51:3 58:16
62:4 63:20,24
74:23 79:9,12
80:2,3,7,11,22
81:4 92:3 102:14
102:21 121:7,13
123:25 133:7,20
133:20 134:4,8
135:23,25 157:9
165:10
**inside** 133:16,22
134:1
**insight** 165:24
**instance** 51:23
103:4 160:3
**instances** 89:19
90:15
**Institute** 3:18 5:17
63:20
**institution** 26:23
59:1 105:17

107:20 108:2
**institution's** 105:18
**institutions** 24:2
25:6,25 26:10
107:21
**instruct** 11:17
**instruction** 11:24
16:7 17:8
**INSURANCE** 1:9
3:8,13
**insurers** 5:24
**intake** 76:11 77:2,3
83:6
**intakes** 78:17
**intellectual** 154:15
155:5
**intending** 20:15
**intense** 40:23
**intentional** 38:18
**intentionally** 38:10
38:15
**interaction** 173:6
**interested** 160:11
174:21
**internal** 27:13,20
28:4,14,20 29:8
29:12 31:3 34:25
35:2,4,7,17,20
36:1,22 37:11,20
38:11,14,20 39:6
39:8,20
**internship** 27:7,11
**interpretation**
43:24
**interventional**
32:16
**interview** 103:22
117:13 118:14
121:21 122:2
147:23 148:5
159:2,3 162:11,18
162:25 163:6
166:19,25
**interviewed** 97:23
141:21
**interviewing** 119:25
147:12 163:4,16
**introduced** 100:11
100:11
**invitation** 157:19
**invitations** 80:17
**involve** 28:16 115:1
**involved** 6:23 7:1,5
9:19 28:21 52:16
52:17 54:21 55:18
55:19 82:5,11,23
83:1,3,5,8,11,13

83:25 84:3,10
86:1 91:21 92:3
114:4 120:11,16
143:21 155:3
156:23
**involving** 29:17
**issue** 102:24
**issues** 39:5 161:18
**items** 132:24

**J**

**J** 3:4,15
**J-I-N-N-A-H** 25:6
**Jacqueline** 86:4,6
143:25 144:1
145:12,17 146:11
147:3,10 153:4
**James** 3:13 5:23
**January** 1:24 26:6
26:20 40:18 47:15
47:24,24 48:8
59:19,21 60:2
70:14 80:25
**Jay** 3:4 65:14 66:15
67:6 68:1,18
84:19 85:4,17
92:9 139:8 171:7
**jay@veronbice.c...**
3:7 68:3
**Jere** 3:4
**Jinnah** 24:3 25:6,11
25:22 26:2,9
**job** 46:23 55:21
168:20
**jobs** 57:20
**joins** 146:1
**Jr** 3:10
**Juan** 78:25 79:1
**JUDGE** 1:7,10
**judgment** 92:2
**July** 27:16,22
**jump** 100:20
**June** 27:16,22

**K**

**KAY** 1:10
**keep** 36:16,16,18
37:4 44:24 60:17
89:23 90:22 91:15
111:21 133:19
170:20
**keeping** 120:21
**Ken** 18:12
**kept** 138:4
**Kerrigan** 3:9,10
**KEVIN** 1:11
**Khyber** 23:21 24:2

25:7,23 26:22
27:1
**kind** 76:23 88:3
90:17 165:9
**Kirby** 3:5
**knew** 61:16 94:13
100:24
**know** 6:25 7:5,16
8:5,19 9:12 10:3
10:20,21,25 11:2
13:24,25 14:2
15:6 17:25 20:20
20:21 21:7 24:24
38:2 41:25 46:6
49:1 53:3,7 59:10
61:8,10,12,15
62:13,16 63:10,11
63:12 69:7 71:8
73:20 74:21 77:14
77:20,20,24 78:2
79:11,12,14 80:4
80:5 81:9 86:19
88:20,24 89:3,4
92:12 94:13 95:22
95:23 96:24 97:14
99:4,18 105:1
108:11 110:5
111:14 115:5
117:2 118:2,9
119:9,22 121:10
121:14 122:10
123:18,19,22
124:4 125:17,19
129:23 131:25
132:1 133:19
136:9 142:18
143:2 145:25
146:3 147:10
150:18 151:19
152:13,21,23
155:1,15,19
156:21 157:11
161:1 163:14,21
163:23 164:5,17
166:15,17 169:13
**Knowing** 164:2
**knowledge** 74:8
88:6 89:6 153:1
174:18
**knows** 87:1

**L**

**L** 4:1
**L-I-E-N** 91:12
**label** 144:18 148:19
**labeled** 141:7
**Lake** 1:3 3:6

**laminated** 135:6
**language** 140:8
**lapse** 35:21 36:23
37:21,23 38:11,13
38:16
**lapses** 123:8,16
124:5,11
**lapsing** 36:12
**lasted** 34:21 153:4,9
**lasts** 43:20 44:4
**late** 98:14
**Lauren** 82:10 106:7
**law** 4:7
**lawyer** 88:12,19
**lawyers** 24:20 81:12
91:21
**learn** 8:21,22,23
**learning** 19:14 20:4
**leave** 58:9 86:13
98:8 136:20
**led** 15:5
**left** 17:2 99:4
102:18 170:17
173:10
**leg** 102:14
**legal** 13:22 73:18
80:10
**legs** 136:12
**let's** 6:12 46:4 53:1
64:24 65:4 93:4
95:11 129:1 136:9
136:10,19 139:17
151:10 155:25
159:21 162:1
**letter** 90:18,24 91:2
91:12,16
**letters** 90:23
**Level** 29:14
**license** 30:3 41:17
42:16 113:7
**licensed** 93:7,10,14
93:21,22,22,23,23
94:4 95:2,9
105:22 106:1,3
138:23
**licenses** 93:17 95:5
111:22
**licensure** 20:6,11
21:3,12,21 22:3
22:16,20 23:13
106:13
**lien** 90:15 91:2,11
91:16
**life** 30:6 40:15 41:1
41:12,18,20 42:1
42:2,10,17 44:21
45:7

**light** 70:19 162:23
**lights** 40:5 60:17
88:23
**liked** 58:20
**limit** 88:10
**limitations** 102:5
**limited** 74:6 100:7
**limiting** 70:22
**limp** 102:12,19,23
**limping** 102:7,25
**line** 120:24
**link** 103:20,22
**liposuction** 56:18
**list** 2:16 45:14
46:14 68:25 69:3
69:10 70:1 74:13
84:18 85:14
132:23 142:24
158:19,23 161:19
161:21
**listed** 13:6 49:10
55:21 79:14 94:10
130:18 149:17
154:24 155:21
156:4,16 159:8
**listing** 79:8
**lists** 25:5 34:24
46:14
**litigant** 174:19,20
**litigation** 6:23 7:2,6
8:3,12 9:19 11:6
15:17 16:4 17:4
80:4 86:17 87:2
90:21 92:3 152:19
**litigation-related**
7:12,23 8:7,21,25
**little** 7:9 13:18 46:5
104:25 113:23
133:18 134:16
143:8 147:15
151:5 170:17
**live** 152:24
**LLC** 1:10 3:3 13:16
13:23
**LLP** 3:9
**LOC** 130:20
**located** 12:18 19:11
**location** 49:15 50:4
50:6
**locations** 13:6 49:23
50:2 51:1
**log** 109:6
**long** 20:1 32:19
34:23 36:16,18
44:4 81:6 149:4
153:3 154:12
164:17 166:18

**long-term** 43:16
**longer** 112:25
114:25 165:6
**longer-term** 52:7
**look** 70:1 74:24,25
104:19,24 134:5
141:1 150:18
160:15 161:4
**looked** 30:21
**looking** 24:6 60:1
**looks** 27:21 29:21
29:24
**Los** 13:2
**loss** 56:5 130:20
131:8,10,11,12,20
131:24 132:4,9,10
132:16,19,19
133:10
**lost** 128:22 131:15
126:19 154:22
167:10
**Louisiana** 3:11
**Louisiana** 1:2 3:6
3:16 4:5,22 12:12
173:2,4 174:5,16
174:24
**loved** 163:1
**low** 131:9 132:12
**lunch** 102:8

**M**

**M-O-D-S-C-U-L-...**
55:25
**M.D** 1:23 3:18 5:1
5:16 57:12 172:13
174:6
**ma'am** 8:15 22:10
22:24 23:10 66:7
96:20 129:19
130:7
**Magazine** 3:11
**MAGISTRATE**
1:10
**mailing** 139:2
**main** 56:8,10
**maintain** 37:18
44:20,22,25
164:13
**maintaining** 164:6
165:3
**majority** 114:1
150:21
**making** 89:17
174:15
**male** 79:4,5
**malformations**

50:19
**malingering** 167:24
**man's** 14:10
**management** 32:17
32:25 33:11,14,17
33:21 34:3,10
55:20 63:23 81:11
157:18
**manager** 78:22,23
83:6
**managing** 28:6
**mandatory** 28:13
29:1 38:13 39:2
**manner** 109:5
**manually** 114:25
**manuals** 109:18
110:10,20
**March** 35:23 55:24
58:24 59:22 60:3
63:1 64:1 70:8
71:7 73:2 122:20
151:2 152:1
**mark** 96:10 161:6
**marked** 65:22 84:22
96:12 134:24
137:19 145:2
148:24
**master's** 19:2,17
20:8 21:5 23:11
**material** 4:13 41:2
41:4 42:25 109:21
110:9 168:11
173:11
**materials** 42:8
109:9,10,12 110:8
110:22
**maternity** 86:13
**math** 152:4
**matter** 16:12,13
69:13 159:23
174:19,20,22
**MDs** 60:14,24 61:6
81:14,16
**mean** 20:14 33:2
37:21 57:20,21
58:3 70:5 87:6,12
103:14 108:2
127:16 128:18
130:3 147:13
159:24
**means** 20:16,17
43:25 89:15,19
141:16
**meant** 13:22 76:24
125:14
**medical** 2:20 7:25
8:2 24:3 25:7,23

Huma Haider, M.D.
January 11, 2021

26:7,15,22 27:1
37:8 38:5,18
46:16,20,23 47:11
49:19 50:5,9,25
52:21,25 53:12,15
53:17 54:11 56:1
56:1 57:4 59:21
60:11 75:20 77:15
77:21 78:1 81:8
83:10 92:17 93:11
94:2,15,17,18
95:8 111:20 116:5
116:8,11,13 117:1
117:12 126:6,11
126:15,19,22,24
127:6,9,11 130:16
130:18,24 131:10
137:17 138:18
141:6,16,17,25
145:23 146:1
150:3,5 167:12
169:24
**medically** 102:3
**medication** 144:10
144:11
**medications** 144:9
**medicine** 26:21 27:2
27:13,20 28:4,14
28:20 29:8,12
30:5 31:4 32:18
33:16 34:4,17,25
35:3,5,7,18,20
36:1,22 37:11,20
38:1,4,6,11,14,20
39:6,9,20 80:25
94:12 135:23,25
157:20
**meet** 98:9 145:12
171:9
**meeting** 99:9 109:4
**member** 162:22
**members** 163:2
166:20,25 167:5
167:13
**Memorial** 46:16,19
47:8,14 48:9
49:13,19,23,25
50:1 51:1,7 52:1
53:21 54:1 55:23
59:18 63:16 64:5
**memories** 123:23
**memory** 43:17,17
118:8 121:17,19
122:5,7,9,12,14
122:19,25 123:4,9
123:10,16 124:5
124:11,14 125:9

125:12,16,19
132:1 139:18
140:6 165:20
**mentation** 132:13
**mention** 28:25 83:4
162:6
**mentioned** 18:10
32:16 34:2 38:25
75:17,23 76:6
108:16,18 110:9
127:12 138:1
146:15 151:25
155:2 157:4
158:12
**met** 39:17 98:15,16
98:19 99:9 100:3
100:10
**metabolic** 133:21
**method** 173:8 174:9
**Michael** 3:20 66:15
72:10 84:25 139:8
170:9,22 171:9
**Michael.Feibus@...**
3:22
**Michelle** 3:24 4:21
56:24 84:15
158:23 159:8
173:2,14 174:4,23
**middle** 146:2
170:13
**migrated** 67:5
**mind** 73:7 170:20
**minimum** 160:4
166:9,13
**minor** 58:7
**minute** 73:24
134:17
**minutes** 43:21,21
100:13 101:3
124:16 136:20,21
149:6 153:7,8
**missed** 41:22 56:12
**missing** 66:3 132:3
**misunderstand**
91:12
**mixed** 54:23
**mixture** 105:10
**MODSculpt** 55:25
57:4 58:10
**module** 139:18
140:6
**modules** 43:1
**moment** 20:12,14
20:16 21:25 22:12
22:20 40:11 67:20
85:1 161:5
**Monday** 1:24

112:10
**money** 90:4
**month** 150:14
151:17 166:10,13
166:14
**months** 29:24 31:10
33:24 37:23 38:13
39:23,25 41:8
44:7,8,9 47:17
48:23 63:14
123:17,18 150:14
150:14 151:5,11
151:20,22,24,24
152:5,10,10,14,17
164:21 165:19
166:6,12
**months'** 151:18,19
**Moreaux** 1:5,5 2:18
2:24 3:2,2 5:25
9:22,23,24 10:20
11:1 72:21 73:25
83:24 95:12,15,18
96:18,21 97:6
101:6 102:1
103:21 113:11
115:25 116:14
117:14 118:2
139:12 140:10,14
140:18 141:19,22
142:6 160:13
163:17 164:4
168:4,18 169:10
**Moreaux's** 82:6
83:2 89:24 102:4
116:25 126:21
139:7 140:5
**morning** 5:22
**motion** 16:10 40:7
**motor** 129:24
**move** 22:21 40:8
**moved** 93:12
**movement** 100:16
**moving** 30:2
**multidisciplinary**
55:15
**multiple** 50:2 56:4
61:25 76:11,13
77:9 78:5,9 142:5
**musculoskeletal**
50:20
**mute** 92:9
**muted** 75:6

_____
**N**
_____

**N** 4:1 172:1
**nail** 17:20 21:24
23:9

**name** 5:22 14:10
17:21 56:17 63:7
75:24 78:25 82:2
82:10 104:19
106:6,9 135:21
139:3,19 163:13
163:23 164:2
**named** 5:24 17:25
**names** 173:10
**narrative** 118:13
146:22
**National** 3:18 5:16
63:20
**nature** 13:19 46:2
74:1
**nausea** 133:11
**NBII** 6:1 10:22 11:1
11:5 12:24 13:10
13:19 14:6,24
16:20 33:7 62:23
63:3,15,24 64:6
70:4,6,8 71:2
72:24 73:2 74:15
75:18 76:3 80:6
81:15,25 83:7
87:21 96:22 97:6
105:8,21 106:2
108:3,4 110:13
112:12,14,16
113:1,11,17
115:23 116:13
117:2 119:18
138:5,11 142:6
153:12 164:8
167:2,22
**NBII's** 6:18,20 11:5
86:15 91:25 92:24
97:1 104:11
117:14
**nearly** 19:22
**need** 16:9 27:6 46:6
52:7 53:6,7 107:7
113:8 117:21,25
143:12,13 144:9
150:18 160:23
167:3
**needed** 61:17 118:6
**needs** 79:23 112:4
117:10 151:14
152:11 154:9
**network** 79:9,13,15
79:17,20,23,25
80:2,22 81:4
**networks** 80:7
**neuro** 53:15 54:4,21
133:2 167:1
**neuro-ICU** 48:17

51:15 52:11 53:13
**neurocognitive**
43:14
**neurocritical** 28:3
28:12 29:23 30:8
30:15,21 31:7,11
31:18,21 38:21
47:7 48:5,21
54:19
**neurointensivist**
48:6 49:3,8,16,20
50:11,12 51:14
**Neurologic** 31:12
33:15,20
**neurological** 28:8
28:22 33:1 102:15
**neurologically**
100:15
**neurologist** 17:11
**neurologists** 55:8
55:10 61:20
**Neuromembrane**
2:19
**neuropsych** 97:5,11
97:20 98:3 99:5,7
99:12,19 100:4
101:4,24 104:10
105:2,7 113:16
138:2 167:21
168:5,21 169:19
**neuropsychological**
97:2 98:10 105:16
106:14,18 108:8
108:14,19 110:20
112:21 114:3
115:13,22 147:18
147:20,21 154:11
157:12 169:14
**neuropsychologist**
82:10 115:17
138:17 168:9
**neuropsychologists**
81:20,21
**neuroradiological**
55:17
**neuroradiologist**
17:15 55:16
**neuroradiologists**
55:13 61:20,21
**neurosurgeon**
17:13
**never** 20:14 69:1
**new** 3:11,16 76:11
76:15 78:17 93:22
144:7
**newborn** 125:22
**noise** 75:3

Huma Haider, M.D.
January 11, 2021

nonlitigation 86:17
    87:2
normal 151:8
    160:21 162:16,19
    163:3 167:1
normally 37:19
    41:8 85:16
North 19:8,9,17
    21:17
Northwestern
    32:18
nose 57:18,20,25
note 2:23 84:11
    101:11,11 120:19
    120:20 121:15
    122:1 144:3
    148:16 159:3
noted 79:8
notes 84:9 101:18
    101:22 103:25
    104:4 119:5,18
    120:22 143:9
    164:1
November 30:15
    32:3 47:16
number 9:2,6,8
    74:19 98:7 107:2
    107:6 149:17,20
    149:24
numbered 132:23
numbers 8:9
nurse 53:2 57:9
    83:12,17,19,24
    84:3,10 85:25
    120:14,16,17
    130:4 143:23,24
    145:24 146:3,6,12
nursing 53:1,8,20
nutrition 56:8

**O**

O 4:1
oath 4:23 5:15,19
object 85:8
objected 129:4
Objection 128:15
objections 4:14
obligations 137:9
observations 102:4
observe 103:3
obtain 22:2 40:16
    44:15 45:9 106:13
    106:17 117:24
    118:5 159:18
obtained 20:6 21:17
    126:6
obtaining 21:11

obviously 143:11
occasion 73:24
occasions 71:12
    73:24
occurred 89:10
    96:21 97:6 118:3
    122:20 124:3
occurs 76:16
October 30:16 31:9
    32:3,17 46:25
    47:7,16 49:17
    54:16 58:23 63:18
    64:1
offer 32:1
offered 71:11
office 10:6,15 12:22
    40:5 76:10 78:4,6
    78:18,19,21 94:8
    94:13 95:22 96:22
    97:2 99:4,5,10,21
    104:11 108:10
    111:10 119:20
    135:10 143:1
    156:9 157:23
    158:8,9
office-based 58:1,7
officer 173:3 174:5
offices 12:25 13:1,9
    76:6
officiated 4:23
oh 47:14 49:15 93:4
    120:10 149:16,22
okay 6:11,21 7:7,19
    8:5 9:13,17,21
    10:1,19,24 12:2
    12:11,16,24 13:3
    14:2,5 15:8,17
    18:9,25 19:25
    20:24 21:9,16
    23:2,4,9,21 24:16
    24:24 25:3,13,15
    25:20 26:11,16
    27:10 28:10,25
    29:20 30:6,13
    31:8,20 32:15
    33:5 34:5,24 36:3
    37:19 38:7 40:3
    40:10 43:12 45:9
    45:25 46:9,10,12
    46:22 47:20,23
    48:12,22 49:9
    50:7 51:21 52:6
    53:25 54:24 55:8
    55:12 56:16 57:6
    57:12 58:9,21
    59:19 60:20 61:3
    62:1 64:9,14,24

68:7,16 69:11
    70:3,16,19 71:14
    72:10,19,23 73:6
    73:23 75:8,17
    76:25 78:3,8,21
    79:6,16 80:1
    81:19 83:4,17,23
    85:22 86:7 87:20
    88:8 89:1,7,18
    90:7,22 91:10,15
    91:20 93:3 94:1,6
    94:24 95:11,20
    96:8,16,24 97:5
    97:19 98:15,22
    99:3 100:2,7,16
    100:17 101:3,16
    102:12,23 103:3,7
    103:14 104:16,24
    105:14 106:2,12
    107:10,15 108:1
    108:16 110:8,25
    112:20 113:10
    115:22 116:11,21
    118:1,7,11,18,24
    119:24 120:23
    121:9,16,22
    122:18 123:2,12
    124:13,25 125:24
    126:20 127:11
    131:22 132:21
    134:15 136:3,6,8
    136:23 138:1,8
    139:5 140:7,15,21
    141:4,23 142:3,13
    142:16,18 143:18
    143:21 144:13
    145:6,18 146:14
    146:21 147:3,10
    147:22 148:4,15
    149:22 150:1
    151:4,25 152:9,18
    152:21 153:2,10
    153:22 154:4,10
    154:21 155:8,25
    156:11,17 157:2
    158:16,21 159:6
    159:13 162:1,13
    163:19,21,25
    164:5,17 165:15
    166:3,11,19
    167:17,21 168:2
    168:16,23 169:4
    169:18,21 170:2
    170:24
old 66:5 120:25
on-site 40:24 98:11
    108:23 111:9

once 32:1 42:11,13
    44:20 53:22
    105:23 115:11
one-on-one 52:13
    52:13 53:3
ones 81:22 93:24
    163:2
ongoing 102:17
    111:15,22 112:5
online 19:13,18
    20:4,5 21:18
    40:25 42:14
    147:23
opened 25:2
opening 129:24
operating 48:17,20
    49:6 62:8,11,12
    62:15 162:16
operations 78:23
    83:7
opines 6:9
opinion 65:16
    115:19 168:12
opinions 113:20
    174:17
option 37:12,13
    39:11,16
options 37:5
oral 34:18
order 42:23 55:16
    106:23 127:5
    160:6 169:6
ordinarily 88:8
ordinary 29:7
organization 39:7
    39:17 41:16,24,25
    45:18,19,21 86:15
    86:21,24,25
organizations 80:13
original 4:13 37:23
    39:19 174:2,3
originally 2:14
Orleans 3:11,16
orthopedic 61:22
    61:24 102:13
Osborn 82:2,3,5
    106:5,8,10,11
    111:6,9 112:2,6
Osborn's 106:9
outcome 90:20
    174:21
outset 8:22 64:19
    165:15
outside 166:22
overall 164:12
overhead 154:18
    155:6

overlapped 64:3
overlaps 55:23
    59:22
owner 13:13 14:6,7
    57:3,5 60:8 62:14
    62:23 63:4

**P**

P 4:1
p.m 137:1,2 170:4
P.O 3:5
pace 44:5
page 2:2,13 24:18
    31:22 32:24 33:9
    49:12,18 132:22
    132:24 173:1
    174:3
pages 96:6 126:24
    127:5 137:18
    174:8
paid 87:10,14,19,22
    87:25 88:7,15,17
    89:5,8,11,20,24
pain 81:11 157:17
Pakistan 23:19,20
    23:25 25:12 26:17
    27:3,5
Palermo 3:3,4
    128:14,21
paper 75:14 77:8
    119:21 143:12
paper/pencil 114:13
paperwork 47:19
    68:23
paramedics 131:22
    132:6
parents 125:4
part 6:22 15:7
    29:11,18 34:7,17
    34:18,19 54:2
    55:13 57:5,16
    61:2 65:3 80:25
    91:14 112:14
    114:14 117:14,17
    132:25 140:22,23
    143:16,16 146:13
    147:1,2 149:8,10
    162:10 163:17
    165:5 167:1,24
    168:19 169:12
part-time 81:25
    82:18 86:9,10,12
    105:9 112:9
participate 147:5
particular 130:8
parties 174:21
partly 153:4

**partners** 62:23
**party** 4:12 174:19
  174:20
**pass** 23:21 38:12
  41:16 42:16 43:10
  95:23
**passed** 32:11,13
  169:2
**passing** 31:17
**pathologies** 50:16
**patience** 171:3
**patient** 8:2 11:22
  16:12 43:19,22
  52:11,18 53:14,16
  53:23 54:4,6,8,13
  76:11,16,16 78:17
  79:23 83:6,8,9,11
  83:13 87:10,15,23
  88:13,21 89:8,9
  89:12,14,20 90:13
  90:14,16,19,19
  91:2,6 92:2,4,15
  99:14 101:5,21
  103:20,23 104:3
  104:14 114:15
  115:21 116:5,7,10
  116:22 118:5
  119:2,25 120:25
  121:6,8 123:21
  127:19 131:19
  133:25 134:12
  139:16,19,24
  140:3 145:13
  146:1 150:13
  151:9 152:8
  153:20 154:2,3,7
  155:14,19 157:7
  162:18,20 163:4,5
  164:6,8,12,13
  167:2,24 168:18
  169:12
**patient's** 8:12 43:16
  90:9,25 91:18
  92:11,20,25 117:8
  117:12 119:23
  151:12 152:11
  154:8 162:24
**patients** 6:22,25 7:2
  7:5,12,13,16,17
  7:17,23 8:6,7,20
  8:24,25 9:4,18
  10:8,16,17,18
  13:8 28:7,16
  45:24 50:13 51:3
  51:6,16,20 53:2
  55:17,20 56:15
  62:3,5 73:14,22

75:11 77:5,12
  86:18 87:1,5
  89:16 91:8 104:23
  105:8 114:2
  116:17 117:19,23
  119:17 133:7
  134:4,7,11,14
  149:18,19 150:12
  150:17 151:16,17
  151:18,19 154:23
  158:14 168:1
**Paul** 3:15 5:23
  15:15 67:8 68:4
  71:25 159:10,21
**pause** 40:10 60:20
**pauses** 173:7
**pausing** 84:15
**pay** 90:5,19
**paying** 88:21 89:13
  89:14,15 91:5,9
  158:15
**payment** 91:4 92:13
  92:16 156:3,6
  157:3 158:12
  159:16
**payments** 87:5
  89:17
**pen-typing** 119:16
**people** 10:10 76:12
  76:13 78:5,8,10
  83:5 95:22 105:6
  108:17 142:6
**percent** 9:10,10,14
  9:15 59:13,16,16
  59:17,17
**percentage** 8:6,20
  8:24 9:12
**perfectly** 127:2
**perform** 105:24
  106:25 107:3
  108:22
**performed** 116:10
  146:20
**period** 30:10 39:25
  40:2 100:18
  131:23 132:3
  152:15 166:6,7
**permitted** 4:6
**person** 98:10,15,17
  104:20 105:1,3
  107:16 108:5,22
  110:7 111:10
  117:16 120:11
  139:25 153:20
  154:3 162:20
  163:6 174:15
**personal** 6:17 80:3

92:3 174:10
**personally** 90:11
  96:2 126:14 127:8
  142:1 145:19
**Peshawar** 25:12
**phone** 10:14 76:22
  118:5 149:17,19
  149:23 153:19
  158:5
**phonetically** 173:12
**phrase** 173:11
**phrases** 173:10
**physical** 12:25 13:1
  13:9 100:14,20
  120:11 127:17
**physically** 70:22
**physician** 14:15
  37:16 40:15 50:12
  57:8 72:4,15,17
  72:25 73:5,9,16
  73:20 145:12
**physicians** 57:7
  61:23 77:6 81:12
**picked** 149:23
**pictures** 124:1
  125:17,21
**place** 103:25 111:7
  143:19,20 148:6
**places** 60:4
**plaintiff** 72:21
**plaintiff's** 88:12,19
  170:10
**Plaintiffs** 1:6
**plan** 20:20 85:7
  133:9 146:7,9
  147:4
**planner** 40:15
  41:18 42:2,2
**planning** 41:1,20
**plans** 41:13 42:10
  42:17
**platform** 43:15,16
  44:13 45:3 103:18
  118:20 146:15
**playing** 158:1
**please** 68:8 69:14
  71:20 92:9
**pleasure** 171:9
**PM** 64:22,24
**point** 7:20 20:25
  22:1,15 23:12,13
  27:25 33:9 36:14
  45:15 69:17
  131:16 136:16
  170:5
**points** 130:20
  132:13

**policies** 53:10,11
**policy** 11:4 105:18
  105:18
**POLITZ** 3:14
**polytrauma** 29:17
  29:18
**poorly** 71:21
**portion** 7:11 139:23
**POSEY** 1:11
**position** 16:16
**positive** 18:4 132:17
**possibility** 131:18
**possible** 131:14
  134:18
**post** 20:7
**post-residency**
  46:23
**post-traumatic**
  131:8,15,19
  132:11 133:3
**posted** 94:8,9
**postponed** 35:24
**Poydras** 3:15
**practical** 34:19
**practice** 6:22 7:11
  13:21 15:6 16:3
  27:2 29:25 38:1
  38:17,20,20,21
  45:22 53:11 54:25
  57:16 58:16 63:22
  86:14,17 95:9
  111:3 119:19
  148:9
**practices** 145:24
**practicing** 30:10
  38:4,5 48:23
  58:25 63:9
**practitioner** 83:20
  83:24 84:3,10
  85:25 120:15,16
  120:17 143:23,24
  146:3,7,12
**practitioners** 44:9
  57:9 83:12,17
  145:24
**prefer** 162:21
**preparation** 149:8
  149:10 156:9
  157:5
**prepared** 137:23
  174:10,12
**preparing** 8:13
  155:22 156:2,12
**prescription** 77:7
**presence** 166:22,22
**present** 23:12 36:11
  63:19 70:8 86:11

93:15 101:25
  118:13,25 120:24
  126:10 140:5
  146:24 163:6
**presentation** 157:19
**presenting** 157:21
**president** 17:23
  18:10 75:25
**press** 46:8 64:25
**previous** 88:2
**previously** 62:23
**primarily** 80:3
**primary** 12:21
  61:23 133:20
  134:3
**printed** 135:6
  158:16
**prior** 39:12,18 69:2
  69:4,10 71:6,23
  122:9,11 123:17
  124:5,7,11 138:9
  144:24
**privilege** 11:16
**probably** 18:20,23
  59:13 64:7 69:25
  71:10 75:10 76:4
  92:20 121:16
  153:11
**problem** 6:11
  102:17
**procedure** 4:6
  55:17 113:15
  162:17 163:3
  173:3,4 174:17
**procedures** 56:7,12
  56:15,19,20 57:15
  57:19,24,24 58:1
  58:6,8
**proceed** 20:18,19
  20:23
**proceeding** 173:7,9
**process** 7:6,21 8:3
  76:11 90:21
  105:21 107:5
  109:14,16 110:4
  111:5,6 113:22,24
  114:8 117:18
  120:12 148:5
  153:11
**processing** 43:18
**produce** 159:22
  160:5,7 161:5
**produced** 161:24
**professional** 46:13
  49:13 55:22 91:24
  91:25
**professor** 46:15,21

Huma Haider, M.D.
January 11, 2021

48:2,10,14
**program** 19:19 20:1
21:18 27:7 30:22
30:24 31:7 32:19
32:20 40:22,23
115:3,4 154:17
**programs** 54:8
**progress** 147:25
**progressed** 54:7
**prohibited** 174:18
**prohibition** 174:16
**promise** 87:13
**promptly** 32:6
**proper** 173:8
**property** 154:15
155:5
**proportion** 54:20
64:4 87:1
**proposing** 157:13
**proprietary** 159:24
**provide** 7:21 55:6
65:20 66:22 84:19
88:13 140:24
143:7 144:21
148:20 155:3
167:8
**provided** 6:1 24:13
33:6 44:11 65:18
69:1,6,7 85:16
113:18 114:1
115:21 116:1,4,12
117:7 140:11
142:13,18 143:1,3
160:3,16
**provider** 62:7
138:16,19,19,23
138:25 146:1
**providers** 10:9 55:3
55:6 77:5,16,21
78:1 79:20,21
81:8,13
**provides** 117:18
153:12
**providing** 67:24
87:8 114:10
153:14 155:18
159:19 166:1,4
**psychologist** 81:24
105:22 106:1,3
115:15,17 117:18
138:17
**psychology** 19:3,17
20:7 21:3,6,19,21
22:3,17 23:11,14
**psychomotrician**
106:16,24 107:17
107:25

**psychomotricians**
107:12
**pulled** 129:7
**pulling** 24:23
**purchased** 14:9
**purchasing** 122:6
124:15,23
**purpose** 143:7
157:10
**purposes** 4:6
**pursue** 58:12,19
**pursued** 20:10
23:25
**pursuing** 19:6,8
**pushback** 161:22
**put** 10:1,7 55:2
110:10 115:14
161:19 163:13
**putting** 10:17
**pverlander@twp...**
3:17

---

**Q**

**qualifications** 93:6
**qualified** 38:19
105:24
**qualify** 27:2
**quarter** 111:25
**question** 10:24,25
11:9 15:14 16:17
21:22 22:5,18,23
38:8,9 39:15 47:4
64:2 67:12 71:15
71:20 77:19 87:17
88:2,10 97:10
107:10,11 128:18
129:2,11 130:3,9
133:5 134:10
146:4,9 158:7
164:10,23,25
**questions** 4:15
15:16 68:10 69:20
86:22 93:5 101:21
121:24 133:1,10
133:13,14,25
134:10,13 147:24
162:5 167:23
**qui** 15:9,17 17:3
**quick** 46:11 100:24
**quite** 29:22 43:7
66:5 81:1
**quotation** 122:13
**quotes** 122:7

---

**R**

**R** 172:1
**R.S** 174:7

**radiologist** 15:4
**raising** 85:2 143:11
**rate** 153:16,24
154:12,25 156:12
156:24 159:22
**rates** 157:4
**raw** 114:22,23
115:3,5,8,11,18
116:2,5,6 117:11
138:3,14,15,18,21
138:22,24 139:4
139:10 141:1
168:10
**reach** 117:22 167:4
167:12
**reached** 103:11
**reaction** 43:18
**read** 22:8 42:8 99:6
121:15,23 126:21
127:8 172:3,4
**reading** 4:8 24:15
24:18 33:4 109:20
**ready** 24:25 109:25
111:13 150:2
**really** 49:10 66:14
125:25 130:8
166:15
**reason** 47:12 95:5
138:23 149:7
165:6,8
**reasons** 98:6
**recall** 73:1 74:3
86:16,19 88:18
89:18 99:8,9,11
99:23 113:15
138:10
**receipt** 67:16 68:5
**receive** 10:7 77:10
138:24
**received** 90:24
**recertification**
36:20 37:3 40:2
**recertified** 35:15,17
36:15 39:3,21
**recertify** 37:13
39:12,18
**recertifying** 37:12
**recess** 40:12 56:25
65:10 137:1
**recollection** 74:12
**recommendations**
145:15,15
**record** 8:2 10:11
56:24 89:23,25
103:24 104:2,14
114:16 119:23
126:12 127:25

128:24 129:7,16
130:16,18,25
140:6,16 163:8
171:5 173:5
**recordation** 130:15
**recorded** 118:24
130:12,15 164:1
**records** 8:1 82:8
90:1 116:5,12,13
117:1,12 118:8
126:7,15,19,22,24
127:6,9,11 128:8
131:10 138:10,13
140:19 142:14,19
143:1 150:3,5
163:15 167:12
**recounts** 123:14
**recovering** 165:10
**recovery** 52:7
**reference** 45:17
127:1 173:11
**referenced** 85:4
134:16
**referral** 10:12,15
76:19,21,21,22
77:7,8,9,12 79:22
**referrals** 10:7,8,14
77:25
**referred** 7:14 79:24
157:10
**referring** 24:11
**reflected** 144:13
**reflective** 95:16
**refusal** 15:21
**regarding** 2:23
146:9
**regardless** 107:8
**rehab** 52:7 53:7,19
**rejected** 74:6
**rek@deutschkerr...**
3:12
**related** 51:6 80:3
94:7 165:1 174:21
**relates** 16:3
**relating** 5:25 16:18
41:3
**relation** 166:5
**relationship** 163:9
164:6,14,18 165:1
165:18 174:18,20
**relationships** 164:4
174:16
**release** 138:15,18
**relevance** 11:13,21
15:23 16:1,11
**relevant** 164:7,11
164:16 167:8

**reliable** 167:15,19
168:7
**relied** 169:1
**rely** 129:15 168:25
**relying** 128:12
**remained** 36:11
**remaining** 40:25
162:2
**remember** 32:1
34:22 40:1 69:24
70:10,15 71:4,13
71:16,17 73:3
75:24 81:5 93:24
98:23 104:9,17
118:10 119:6,8,12
120:25 121:7,8,12
122:21 123:23
124:7,20 126:1,25
131:2,5 132:1,4
138:6 156:4,15
163:18
**remembered**
124:22
**remembering**
125:20 134:22
**remembers** 124:23
**remind** 64:18
**remote** 1:22 70:25
**remotely** 5:5 108:24
108:25 110:4,6
**render** 115:19
**rendered** 113:19
**renew** 45:11
**renewed** 45:13
**repeats** 162:8
**rephrase** 38:9
**replacement** 56:9
**replacements** 56:6
**report** 2:20,22
95:16 115:8,18
116:6 117:11
119:3,5 120:12
128:5 134:6
137:17 138:21
141:7,10,16,18,25
143:5 144:14,20
145:14 146:2
148:8 168:11
169:2,24
**reported** 3:23 128:7
144:5 174:9
**reporter** 3:25 4:22
5:2,14 22:8 65:21
144:23 148:22
173:2 174:5,24
**Reporter's** 2:9
173:1,8 174:1

**reporting** 174:9,19
**reports** 117:2,9,20
  143:10 150:4
  162:7 168:14
**represent** 5:23
**represented** 90:16
**REPRESENTING**
  3:2,8,13,18
**represents** 89:9
**require** 52:13
**required** 38:22 51:6
  51:16 62:5 174:3
  174:13
**requirement** 31:14
  31:15 107:8,16,18
  107:20,21,22,24
  108:2,4
**requirements** 31:6
  34:9 37:10 39:18
  49:6 83:22 152:12
**requiring** 52:22
**reschedule** 170:11
**research** 155:6
**reservation** 161:23
**reserved** 4:16
**residency** 27:7,11
  27:19,20 29:21
  30:8 31:4,5 35:9
  35:12 36:6
**residents** 28:20
**resolve** 140:22
  143:15
**resolved** 90:10
**response** 18:4 67:3
  104:14,15 114:16
  129:24,24 132:17
  142:19 143:2
**responses** 114:15
**responsibility** 92:12
**responsible** 4:12
  17:23 88:21 89:13
  90:13 91:5,8
  92:16,20
**responsiveness** 4:16
**rest** 129:16
**restate** 23:7
**result** 130:13 134:3
**results** 113:16,19
  116:3,6 168:6
  169:21
**résumé** 23:25 24:5
  24:8 30:14 85:11
  138:13
**retain** 4:13 138:13
**retained** 72:5,20,25
  73:11
**retrograde** 123:20
**review** 41:2 44:23

118:8 126:14
144:24 145:14
168:2,5,12
**reviewed** 150:3,4,4
168:8,10 169:2
**reviewing** 7:25 25:1
84:8,12 117:20
141:14 168:13
169:10
**reviews** 115:17,18
**revoked** 95:5
**right** 7:10 8:18 11:4
12:19 14:25 16:16
16:25 17:4,18
18:3 19:3,5 21:4
21:14 23:22,24
24:4 26:25 27:5
27:25 29:6 30:11
30:24 37:2 46:25
52:4,9 54:15 60:1
60:6 63:1,6,18
65:4,9 66:21
68:18 69:15,24
70:8 71:19 74:12
76:9,14 82:17
86:13 93:4 95:24
96:1 97:10 99:24
101:24 102:25
104:5,16 110:14
113:1,14,24
119:25 122:4
123:2 125:8,15
127:17,23 128:2,5
129:9,11 131:4,6
132:22 135:5
138:6,15 139:18
140:9,15,20
144:16 148:19
151:13 152:4,9
161:20,21 165:12
166:6,16,16
168:16 170:4
**rigorous** 110:3
114:8
**River** 3:13 5:23
**Robert** 3:10
**Rock** 3:4 66:15
129:4
**rock@veronbice....**
3:6
**role** 48:13,15
108:22 145:9,11
**room** 48:17,20 49:6
99:14,17,25 100:1
100:5
**roughly** 170:16,18
**round** 136:18

---
**S**
---
**S** 3:10 4:1,1 172:1
**S'** 172:1
**sample** 41:12 42:10
139:14
**San** 13:2
**saw** 14:23 23:24
58:14 96:20 102:8
114:19 133:9
149:11 150:8
169:2
**saying** 25:24 29:7
56:21 73:8 74:2
126:20 129:17,20
161:6
**says** 25:4,15 27:16
30:13 31:21 33:8
33:10 36:3 40:14
42:19 45:16 49:12
56:16 63:7 96:16
122:5 125:2,11,25
141:8,9
**Scale** 127:20 128:3
**scan** 135:11
**scanned** 110:21
**schedule** 9:24 10:2
10:11,18 20:18
37:2 150:15
151:10,23 152:16
153:21 156:4,7
157:4 158:12
159:16
**scheduled** 35:23
37:22 38:3,13
39:23 95:21 150:8
150:10 152:1
**schedules** 37:15
**scheduling** 10:17
152:18
**school** 26:7,15
32:18
**science** 24:1 25:4,9
26:1,4,8,18
**score** 128:11 129:14
129:18 130:12,14
**scores** 43:23,24
114:15,24 115:6,7
168:14
**screen** 24:7,21

**script** 110:18
**Sculpt** 56:16
**seal** 174:3
**sealing** 4:10
**search** 84:7
**second** 31:5 71:15
77:19 122:4
135:23,25 152:6
**secondary** 133:20
134:4
**section** 43:5
**sections** 42:7
**see** 7:16 11:1,3
24:10,14,16 25:20
62:3,17 66:8
75:13,14 87:15
88:13 98:4 99:7
99:15,24 100:1,15
100:15 109:1,7
111:10 118:19
119:21 120:10,14
129:23 133:2,6
135:3 136:17
139:19 141:11
146:18 149:21
150:12 151:9,11
151:21 152:9
160:19 168:14
169:4
**seeing** 7:15 45:24
75:11 99:11
125:20 138:10
151:15 153:20
154:3 162:20
**seeking** 22:12
**seen** 10:9,23 17:24
18:7 73:25 76:17
82:8 112:16,17
113:11 151:14,15
151:16,17,18,20
158:6
**sees** 125:17
**selected** 113:25
**self-paced** 44:7
**seminar** 80:21
**seminars** 80:9,17
81:2
**send** 62:6 85:3,17
91:16,20 134:18
136:3 139:1,4
**sending** 117:5
**senior** 17:22 18:9
**sense** 39:10 51:5
**sensors** 40:7
**sent** 2:14 76:19,23
103:20
**sentence** 122:5

125:11
**separate** 34:15
102:24 120:22
**separately** 117:5
**sepsis** 50:19
**September** 25:4,5
25:10,10,15,16,17
25:17,18,19
**service** 54:1 97:15
104:6 141:8,15
**services** 4:12 6:1
7:21 153:12 155:3
155:18 158:15,19
160:2,16 174:15
**serving** 13:4
**session** 36:1
**set** 95:21 150:19,23
151:2 152:22
157:23 174:7
**setbacks** 147:25
**setting** 52:17
150:22
**settings** 28:18
**settled** 90:9
**settlement** 92:1
**sex** 139:20
**shadow** 109:22
111:1
**shadowing** 109:23
**SHANNON** 1:10
**share** 24:5,6
**shared** 116:18,23
**shed** 162:23
**sheet** 159:23 160:12
**SHEET(S)** 172:23
**short** 46:7 64:25
69:18 137:5
**short-term** 43:17
**shortly** 124:16
**show** 109:9 139:13
160:25
**showed** 124:1 136:4
**sic** 33:17
**side** 58:16
**sign** 46:10 90:14,15
91:2
**signature** 84:11
174:3
**significant** 6:22
7:11 74:20 102:4
162:22 165:24
**signing** 4:9 91:7
**similar** 27:5 80:7
109:5
**simply** 161:12
**simultaneously**
163:3

Case 2:18-cv-01255-JDC-KK   Document 144-4   Filed 03/08/21   Page 189 of 192 PageID #: 4642
Huma Haider, M.D.
January 11, 2021

Page 188

**sir** 12:5 16:2,7 67:10
**sister** 125:9,22 167:13
**sit** 21:1 22:1,15 104:16 112:1 140:15
**sitting** 162:15
**six** 33:24 39:23,25 41:8 44:9 63:14 78:11,13,16 83:5 114:18 150:14 151:19 152:10
**six-month** 152:15
**skilled** 53:8
**Smith** 3:20
**so-and-so** 121:10
**SoCal** 80:18
**software** 44:12 45:3 103:17 115:2,4
**sole** 14:6,7
**Solutions** 79:9,13 80:2
**somebody** 89:4 94:16
**son** 157:25 158:6
**sorry** 6:7 14:10,17 18:6 19:9,22 25:24 32:3 34:1 35:10 41:19 51:11 56:11 60:17 72:16 74:9 79:1,3,6 93:5 97:9 106:8 117:19 118:18 135:17 137:14 150:6
**sort** 10:5 15:2 45:23 61:19 101:5 147:23 148:4
**sought** 21:1,20 22:16,19 23:13
**Sounds** 136:25
**source** 7:17 77:12
**sources** 7:3,15
**Southwest** 49:14 50:6,7,8,25 51:8 51:11 53:21 54:1 54:9,15,22 55:1 55:14 59:5,12,18 59:23 60:4 63:14 63:16
**spa** 56:1,2,18 57:4,7
**span** 43:17 151:8
**spatial** 140:12
**speak** 100:18 145:19,25 157:24
**specialist** 45:17 57:14 75:10 79:24

157:18
**specialities** 61:25
**specialized** 45:23
**specialties** 79:21
**SPECIALTY** 3:8
**specific** 13:25 21:8 22:18 28:2,11 61:15 164:9
**spectrum** 132:18
**speculating** 9:16
**Speech** 162:7
**speeds** 43:18
**spelled** 173:11
**spending** 154:1,6
**spent** 64:5 153:17 154:17 156:22,23
**spine** 61:24
**split** 97:16
**spoke** 118:4 141:18 145:22 148:7 149:6 164:22
**spoken** 63:12
**spontaneous** 173:7
**spread** 76:6
**squeeze** 170:15
**staff** 53:1 54:25 94:8
**staffing** 154:18
**standard** 26:17 41:15 69:6 91:7 115:6 132:25 152:6
**standards** 114:10
**start** 48:1 109:22 112:11 133:21 134:4 136:19 155:25
**started** 6:9 29:25 47:14,23 48:3 49:1 50:5 63:2,15 72:24 73:1 105:2 112:13,18 121:11 121:15
**starting** 30:4 47:8
**starts** 146:12 147:4
**state** 4:22 14:2 74:5 93:8,11,14 173:2 173:5 174:5,24
**statement** 88:14 126:10
**states** 1:1 13:4,8 93:18,20 94:3 95:2,9
**status** 8:12 61:12
**statute** 174:13
**stay** 98:19 124:2 126:1,2

**staying** 52:19
**stays** 91:18
**stenotype** 174:9
**step-by-step** 110:16 110:17,19
**stepping** 100:8
**steps** 54:13
**stipulated** 4:3
**stop** 54:3 64:20 65:1 111:16 136:10,16 137:10 170:5
**stops** 125:1,6
**stored** 110:13 127:12
**straight** 29:22
**Street** 3:5,11,15,20 5:17
**stretch** 136:12
**stroke** 51:24
**strokes** 50:18
**study** 26:17
**studying** 19:1 47:1 47:11,21
**subject** 81:4 94:2 95:1,7
**submitted** 10:15
**submitting** 41:5
**subpoena** 8:14,24 142:20 143:2
**subpoenas** 7:24
**subsequent** 150:9
**subset** 54:18
**subspecialist** 79:24
**subspecialties** 31:13 33:2,15,20 79:22
**subsumed** 71:22
**suffered** 102:22 134:8 157:25
**suggests** 100:2
**suit** 5:25
**Suite** 3:16,21 5:17 109:11 115:10
**summation** 138:3
**Sunday** 148:10
**superior** 110:6
**supervise** 108:17
**supervised** 108:7
**supervising** 57:8 145:11
**supervision** 105:22 105:25 109:25 174:10
**supplemental** 147:11,13
**support** 45:8 52:12 52:14

**sure** 20:13 21:25 33:7 64:16 68:11 68:12 70:20 74:10 85:20 87:9,14 88:7,15 89:5 125:11 141:15 143:14
**surgeon** 61:24
**surgeons** 61:22
**surgery** 26:22
**surgical** 57:22,24 116:8
**surprised** 142:22
**suspended** 95:5
**sustained** 124:1
**swear** 5:4 68:25 138:8
**swellings** 50:18
**sworn** 5:19 173:4 174:6
**symptoms** 134:5,6 144:4,7,8,8 147:25 151:13 154:8 158:3 162:24 165:2,25
**system** 110:15,22 115:9 116:15 149:17,20 153:24

**T**
**T** 4:1,1 172:1,1,1
**table** 119:21 133:19 154:23
**take** 28:11 31:17 32:12 34:11 35:23 36:20 37:6,7,17 38:3 40:21 41:15 42:14 43:6,6,9 44:6,8,8 46:6,11 53:22 64:25 69:18 98:18 103:25 107:3,7 109:19 111:7 119:4,17 136:11 139:6 161:18
**taken** 1:23 4:5 40:12 56:25 65:10 125:18,21 137:1 173:5 174:6
**takes** 41:8 114:25 153:23 154:12
**talk** 6:2,12 46:4 80:17 93:4 95:11 109:7 136:14 149:4 157:25 160:9
**talked** 63:2 100:4

100:12
**talking** 13:5 65:14 65:17 68:22 78:9 88:3 96:25 104:3 119:1,17 122:21
**talkovers** 173:8
**talks** 13:4
**tam** 15:9,17 17:3
**TAYLOR** 3:14
**TBI** 2:19
**teaches** 42:1
**teaching** 111:16
**team** 53:13,22 54:12,25 55:3,5,9 55:13,15
**teamwork** 145:16
**technician** 104:20
**technicians** 105:11 105:19
**technology** 70:25
**tele-unit** 52:15
**telefloor** 52:18 53:14
**telemedicine** 2:21 13:5,7 52:15 96:23 97:4,23,25 98:21 100:25 101:10 102:11 103:12,16,18 117:15,24 118:16 143:20,22 144:20 145:21 146:19,25 153:3,14,19,22 154:1,6 162:11,18 162:21
**telemonitoring** 52:22
**telephone** 2:23 103:16 117:24 148:13,14 149:14 159:2
**tell** 9:9 64:11 84:14 94:6 121:6 136:8 144:18 157:13,14
**telling** 121:3 161:12
**tells** 89:4 120:2
**template** 114:3 115:12,14
**ten** 37:3,6,12 114:18
**tendered** 71:17,18 74:4,7,22
**tenure** 71:2 74:15
**terminology** 73:18
**test** 37:22 42:13,14 42:15 43:6 107:1 107:3,7,17 108:8

Huma Haider, M.D.
January 11, 2021

109:24 114:4,17
116:3 168:8
**tested** 21:2
**testified** 5:19 70:3,9
70:10,17 71:9
73:4,13,21 74:15
**testify** 152:24 174:7
**testifying** 72:3,15
72:16 73:9,11,17
156:13
**testimony** 2:16
68:24 69:4,10
70:14 71:1,3,9,19
72:23 74:13 84:18
85:13 113:15
142:4,24 156:18
157:5,6 172:4,6
173:5 174:5,9
**testing** 105:12
107:2,9,24 108:5
108:15,19 112:22
113:16,23 114:8
114:13,21 115:23
138:2 147:18,20
147:21 153:14
154:11 155:4
157:12 167:25
168:11 169:3,7,19
**tests** 37:7 41:6
43:19,20,22 47:12
98:3 106:21
113:25 114:11,12
114:13 144:11
168:21
**Texas** 3:21 5:18
12:3,20 14:4 30:3
30:3,8 50:2,4,9,24
51:25 53:12 54:11
59:11,20 60:5,8
60:15,25 61:2,4,7
62:1,9,11,14,18
62:24 93:8,11,14
94:5,15,17,18,25
**Thank** 6:4 23:16
65:7 68:18,20
69:16 72:10 141:2
145:8,18 149:3
159:14 170:24,25
171:2,7
**Thanksgiving**
122:19,22 123:1,5
123:11
**thing** 10:5 124:22
130:1 159:17
**things** 21:13 29:4
62:2 68:10 110:7
117:5 131:21

143:13 154:23
**think** 13:17 14:23
19:3 22:24 23:21
33:22 34:21 35:10
35:12,23,25 39:24
42:14 45:12 51:22
56:7,8 57:14 66:2
70:1,11,12 71:5
73:19 74:9,16,18
80:21 81:6 83:2
84:2 85:1 88:22
89:1,2 92:6 94:7
94:11 96:11
112:13,18 116:20
121:6 129:3
155:15 156:3,8,21
156:24,25 157:16
157:21
**thinks** 111:13
125:16
**thought** 26:12 79:6
91:11 142:3 173:8
**thoughts** 162:9
**thousands** 126:24
**three** 27:21 34:22
37:22 41:8 44:7,8
60:4 71:10 74:16
87:21 94:11 98:19
108:12 109:21
150:14 151:18,22
151:23 152:10
157:16 170:16,19
**three-** 42:15
**throat** 57:18,25
**Tim** 1:9 18:11,13,14
75:25
**time** 4:17 7:4 8:4
19:1 20:17,19,22
22:21 23:5,12
35:8 47:2,6,13
51:16 54:21 55:23
58:13,15,17,18
59:3,7,10 61:9
64:5,20 69:21
81:6 94:5 99:15
100:6,18,21
101:16,21 108:11
108:12 111:20
112:15 113:5,10
113:12 114:17,25
120:21 121:10
128:3 129:14,23
130:14 131:23
132:3 134:2 143:3
149:11,13 150:9
150:15 151:9,16
151:17,18,19

152:6,15 153:9,13
153:16,23,25
154:2,7,14,14,15
162:2,14 163:7,11
163:20 164:14,20
164:24 166:18
169:5 170:1 171:2
**time-related** 58:12
**times** 8:16 43:18
49:7 71:8,10 73:1
73:3 74:16 77:4
86:19 92:21
110:24 150:21
**timing** 7:8
**today** 6:3,18 21:1
22:1,15 64:20
72:15,16 137:8,10
137:12 150:2
157:8 162:2 170:6
**told** 121:12,18
122:2 123:15,25
130:24
**top** 49:18 93:25
**total** 114:17 115:7
**town** 169:14
**track** 77:11,18,22
77:23 87:3 90:4,6
143:15
**tracking** 90:2
**trained** 50:13 108:7
108:13 111:1
112:23 130:5
**trainee** 111:7
**training** 19:6 23:25
27:8 28:1,1 29:8
29:12,19 31:4,5,6
31:16 32:15,17
38:23 40:23 44:2
44:6,11 45:22
55:11 105:21,24
106:25,25 108:18
109:8,10,12,14,17
109:17 110:4,8,9
110:17 111:5,11
111:11,16,17,19
111:23,25 112:4,5
113:24 114:5
117:17 154:16
155:4
**trainings** 38:23
**trains** 41:25
**transcribed** 174:10
**transcript** 173:10
174:2,11,12,13
**transcription** 172:5
173:9
**transfer** 53:14

transferred 53:19
53:23 119:2
**transitioning** 30:7
49:2
**trauma** 29:15
131:16
**traumatic** 28:2,8,12
28:17,23 29:17
45:16,24 58:16
63:23 74:23 75:9
80:11 102:21
133:7,22 134:8
**travel** 13:8 156:23
**treat** 50:13
**treated** 62:2 73:14
**treating** 28:7 72:4
72:15,17,24 73:4
73:9,16,20 75:12
**treatment** 7:1 11:21
28:23 52:3 54:13
55:20 62:5 83:14
133:9 146:7,9
164:4
**trial** 4:17 70:25
71:9,19 72:23
74:15 142:24
152:22,25 156:17
156:18 170:13
**trials** 71:3
**trip** 169:19
**TRUCKING** 1:10
**true** 6:23 7:23 38:7
154:5 172:5
174:11
**try** 23:1 32:11,14
119:11,12 128:20
129:1
**trying** 21:23 22:10
23:9 47:5 67:19
69:19 71:4 72:7
85:6 88:10 98:1
129:5 130:11
170:21
**tumors** 50:18
**turn** 40:6,8 136:18
**turned** 40:6
**turning** 60:17
**two** 19:22 20:2
21:13 24:2 25:5
26:4,5,18 34:13
34:15 37:14,22
40:23 45:12 47:17
50:25 55:23 72:2
74:19 81:1 94:11
97:17 98:6,7
109:21 114:20,23
124:6 151:16

157:16
**two-hour-long**
119:10
**two-year** 30:23 37:9
**type** 119:6
**typed** 119:2
**typing** 120:1,5
**typo** 25:14,16 66:4

---
                U
**U** 4:1
**U.S** 27:6
**UCNS** 34:20
**Uh-huh** 18:4 132:17
**ultimately** 88:21
89:12 90:13 92:15
92:20
**unable** 9:11
**unclear** 125:13
**Undergraduate**
24:18
**understand** 9:7
20:15 21:9,13,15
21:16 36:21 51:21
51:22 67:12 72:19
73:6,23 74:2
77:18,23 87:17
88:1 91:2,10 98:2
99:22 116:20,21
121:22 130:2
142:7 147:7
**understandable**
127:2
**understanding** 6:5
72:14,22 79:17,19
80:1 81:9 92:14
113:20 174:11
**Understood** 139:5
**unintentional** 38:19
**unit** 52:3,9,15 53:24
54:2 55:1 59:4,23
**United** 1:1 31:12
33:1,14,19 34:14
**units** 52:24 55:5
**University** 19:8,10
19:18 21:18 25:12
**unnamed** 164:18
**up-to-date** 66:18
**updated** 2:15 44:24
66:23 67:14 68:13
84:16 85:11
142:23
**uploaded** 110:21
115:8,12
**use** 77:3 81:22
103:18,19 104:6
110:16 115:2

Huma Haider, M.D.
January 11, 2021

**uses** 79:24

**V**

**V** 1:7
**vague** 147:16
**valid** 168:6 174:2
**validity** 167:25
168:15,20,24
169:3
**value** 154:22
**various** 28:21
**vascular** 50:19
**verbal** 129:24
**verification** 128:11
**verified** 173:11
**verify** 130:1
**verifying** 129:13,25
130:4
**Verlander** 2:8 3:15
5:12,23 11:10,14
12:1,6,10,15,17
15:19,25 16:15,24
17:9 23:6 40:9,13
56:23 57:1 60:19
60:23 64:10,17,23
65:8,12 66:6,10
66:24 67:4,9,17
67:25 68:6,17,21
72:9,11 75:4,16
84:13,24 85:12,21
86:2 92:8,18 96:9
96:15 128:19,25
134:20 135:8
136:7 137:3,22
144:17 145:7
148:18 149:2
158:22,25 159:7
159:12 160:8,18
161:9,16,25 170:3
171:1
**Veron** 3:3 89:25
**version** 68:14 135:7
**versus** 53:20 64:5
72:4,6 86:17 87:2
164:14
**vice** 17:22 18:9
75:24
**video** 6:8 17:18,19
17:24 18:2,7,19
18:25 19:2 23:17
70:25 103:22
147:23 148:12
**Videoconference**
1:22
**videos** 14:23 43:2
109:17 110:19
**videotaped** 115:23

**virtue** 45:21
**vis-à-vis** 16:3
**visible** 6:8
**visit** 2:22 95:17
100:4 103:5
125:22 142:4,9,14
142:19 143:5,19
143:22 144:14,20
144:20 145:10
146:10,12,13,19
146:25 147:19
150:7,8,16,23
152:5 153:3
**visits** 153:5,6,15
**Vitae** 2:14,15
**voice-typing** 119:15
120:8
**voluntarily** 37:25
39:1 161:24
**vomiting** 133:12

**W**

**W** 172:1
**waiting** 99:17,17
**waived** 4:9,11
**walk** 100:21
**want** 16:9 21:25
22:14 23:7 24:10
24:14 37:17,17
46:8 48:7 66:12
66:16 68:12 74:10
88:13 98:18 127:3
135:20 136:17
137:12 151:21
157:9,11 160:25
161:1 163:1
**wanted** 48:19 66:8
100:13,14,15
149:12,21 157:24
158:6
**wanting** 58:14
**wants** 136:17
**wards** 54:7
**warning** 149:23
**wasn't** 23:19 39:13
88:8,9 130:7,8
141:15 146:23
**watch** 43:2
**watched** 17:18
23:17
**watching** 111:6,8
**WATSON** 1:10
**way** 49:11 50:1
52:10 54:19 55:2
64:3 70:19 97:19
116:15 120:10
124:14,18 125:5

129:12,25 144:23
150:11 168:3
**ways** 15:7 114:23
**we'll** 7:7 22:21
40:10 60:20 64:25
65:2 67:14 69:17
69:18 73:23 74:13
84:16 96:10
104:24 134:21
139:6,8
**we're** 6:2 15:18
46:7 68:22 84:14
96:11 99:12 137:4
137:6,9,11 147:8
153:13 155:11,12
159:22 160:4
169:5 170:14,20
**we've** 63:2 64:11
65:13,17,18 68:11
113:23 137:8
159:16 170:5
**webinars** 44:24
81:1
**website** 13:3 14:24
17:19,24 18:1,1
77:2,4 79:15 94:9
94:10,14
**Wednesdays** 112:10
**week** 157:21
**weekend** 32:20,21
**weeks** 109:21
124:21
**weeks'** 151:16
**weigh** 65:15
**weight** 56:5
**wellness** 56:3,5,14
**WELLONS** 3:14
**went** 27:10,18
29:22 63:24 70:12
70:13 88:23 94:16
113:21
**Western** 1:2 12:12
**WILSON** 3:3
**window** 170:21
**witness** 4:24 11:25
15:24 64:21 66:20
**Women** 24:3 25:7
25:11,22 26:2,9
**word** 56:13
**worded** 71:21
**words** 32:5 122:14
123:22 173:9,10
**work** 41:19 42:3
43:9 46:4 47:8
48:19,21 50:3,24
54:15 59:22 62:18
78:19 109:1 113:5

113:8,9 117:10
125:2,2,3 139:8
160:24 170:8
**work-up** 169:12
**worked** 46:19 61:11
114:2
**working** 48:4,9,16
49:7 50:4,5 57:7
57:11 58:23 59:4
59:20 60:3,14,24
61:17 63:15,20
81:17 111:2
112:11,13 113:1
115:16 120:20
**works** 50:1 52:10
116:15 150:11
**worry** 88:16
**worsening** 144:7
**wouldn't** 37:19
**wreck** 157:8
**write** 41:12 42:10
42:17 66:21 101:8
119:13 135:20
165:23
**writing** 88:9 104:4
114:14 119:14
120:17,19 121:2
**written** 34:17,21
76:15 77:7 88:3
88:14 90:17,18
99:20 104:13
117:2 119:22
122:1 128:4
129:15 139:23
148:16 159:3
165:20,22
**wrong** 74:17 146:17
**wrote** 94:16 128:12
169:22

**X**

**X** 153:14 154:25
157:14

**Y**

**Y** 153:14
**y'all** 14:20 66:16
138:12 139:8
**yeah** 31:25 36:18
41:23 47:5 48:25
52:10 59:9 67:18
71:21 74:18 75:5
83:14,15 87:8
88:11 92:19
105:11 118:23
120:14 121:22
127:4 143:11

147:15 150:5
160:19
**year** 9:18 18:20
19:21 24:2 31:2,6
32:1 34:8 39:25
45:12,13 69:24
70:10 71:5 112:14
112:19 122:20,23
123:11 124:6
142:10
**yearly** 37:8 44:25
**years** 19:22 20:2
26:4,5,18 27:21
37:4,6,12,16,14
44:18 45:12 87:21
94:11 120:25
124:6 154:16
**yesterday** 148:7
149:5 159:4
164:22
**yield** 154:24 155:11
**York** 93:23

**Z**

**Z-scores** 115:6
**zero** 11:13,20
**Zoom** 16:9 70:12,24
71:6 103:15 109:3
111:7 118:14

**0**

**09** 35:11

**1**

**1** 2:3,14 9:9,14
29:15 33:9 49:12
65:19,22 96:18
122:20 140:22
143:16
**1/10/21** 2:23 158:24
**1:06** 136:9
**1:07** 137:1
**1:18** 137:2
**10,000** 155:11
**10:00** 1:25
**10th** 148:10
**11** 1:24 137:18
**11:25** 65:5,10
**11:30** 65:5
**11:32** 65:11
**12** 42:6 127:20
129:6
**1200** 3:20
**13** 143:18 144:2,19
145:10,20 148:6
150:7 153:3
**134** 2:19

**137** 2:20
**13th** 142:10 143:6
**14** 76:4,5
**1400** 3:21
**1434** 174:17
**1435** 173:4
**145** 2:22
**148** 2:24
**15** 9:20 42:6 69:23
  69:25 70:2 76:4
  153:7
**1515** 3:15
**16** 44:18 59:19,21
  60:2 76:4,5
**173** 174:7
**174** 2:9
**19** 96:6,18,19,19
**19-page** 101:13
**1900** 3:16
**1998** 25:5,18
**1999** 25:5,10

**2**

**2** 2:15 49:18 65:3
  84:17,21 132:22
  140:23 143:17
**2:00** 64:22,24
  136:10 137:10
  170:4
**2:18-CV-1255** 1:5
**20** 9:20 69:25 70:2
**20,000** 127:5
**2000** 25:10,17,19
  26:6,13,14,20
**2004** 26:6,21
**2005** 27:16
**2008** 27:16,22 35:11
  35:12
**2009** 35:13
**2011** 27:22 30:16
  35:10 36:6 93:12
  93:14
**2012** 30:16 31:9
  32:3 36:8,9 46:25
  47:7,16
**2013** 32:4 46:17
  47:1,9,24 48:8,9
  48:23 49:17,21
  54:16 55:24
**2015** 46:18 48:13
  49:21 55:25 58:24
**2017** 32:17 44:17
  122:21 123:6
**2018** 14:24 49:17
  54:16 58:24 59:22
  60:3 63:2,19 64:1
  64:2 70:8 73:2

122:20,24 123:1,5
123:11 124:4,10
124:11,12
**2019** 14:9,18 18:23
  19:20 35:22 39:22
  40:18 63:4
**202** 5:18
**2020** 18:22,22,23
  19:24,24 33:22,23
  35:15,18 70:11
  95:15 104:12
  105:7 106:21
  107:11 108:10
  137:18 142:1,11
  143:6,18 144:2,19
  145:10,20 148:6
  150:7,7 152:2,5
  153:3 165:17
**2021** 1:24 152:1
**21** 150:6
**2125** 3:5
**24/7** 55:4,6
**25** 70:2
**28** 173:3
**29** 120:25

**3**

**3** 2:4,16 24:18 84:20
  84:21 125:3
  132:24
**3/2018** 121:1
**30** 43:21 59:17
**300** 107:1 155:12
**35** 149:6
**37:2554** 174:7
**3rd** 97:16,21 104:11
  105:3 113:17
**3rd/4th** 100:3

**4**

**4** 2:5,17 96:11,12
  97:12,22 101:12
  118:11 137:17
  141:23 151:6
  162:3 169:23
**40** 59:17
**45** 43:21 136:21
  153:7
**4th** 95:15 97:16,17
  103:9 104:12
  105:4 113:18
  141:12,21 142:1

**5**

**5** 2:8,19 134:22,24
  137:13,14
**50** 13:4 59:16

**50/50** 64:8

**6**

**6** 2:20 137:16,19
  141:7,16,25
  169:23
**60** 59:16
**60/40** 59:13
**6065** 5:17
**65** 2:14

**7**

**7** 2:21 144:19 145:2
  162:6
**70/30** 59:13
**70112** 3:16
**70130** 3:11
**70602-2125** 3:6
**721** 3:5
**755** 3:11
**77002-4310** 3:21
**77081** 5:18

**8**

**8** 2:23 148:20,24
  159:10,13
**8/13/20** 2:21
**84** 2:15,16

**9**

**9** 159:15
**90** 9:15
**96** 2:18
**97** 26:5,12,14
**98** 25:16 26:12
**98013** 174:23
**99** 9:10 25:16,17
  26:5,12,14